IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

IMPLICIT, LLC,

*Appellant*

v.

SONOS, INC.,

*Appellee*

KATHERINE K. VIDAL, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,

*Intervenor*

**Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, IPR2018-00766 and IPR2018-00767**

## CORRECTED OPENING BRIEF OF IMPLICIT, LLC

Jason L. Romrell
Timothy P. McAnulty
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

J. Derek McCorquindale
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1875 Explorer Street,
Suite 800
Reston, VA 20190-6023
(571) 203-2700

*Counsel for Implicit, LLC*

Exemplary Claim 1 of Implicit's U.S. Patent No. 7,391,791 (Appx158-174):

A method for synchronizing a rendering of a content provided by a source at one or more devices which are nodes of a network, the content having a rendering time, the method comprising:

designating one of the one or more devices a master device, the master device having a master device time and a master rendering time;

designating remaining devices among one of the one or more devices as at least one slave device, the at least one slave device having a slave device time and a slave rendering time;

receiving the content for rendering by the master and at least one slave device;

sending from the master device to the at least one slave device an indication of when the master device renders content corresponding to the master rendering time;

determining a master device time domain, a slave device time domain, and a source time domain;

determining whether a time domain differential exists between the master rendering time, the slave rendering time; and

adjusting, based on the received indication, the rendering of the content at the at least one slave device within the slave device time domain and in proportion to the time domain differential when present to account for variation between when the master device and the at least one slave device to render content that should be rendered at the same time.

Appx172[8:25-53].

i

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

**Case Numbers:** <u>2020-1173, -1174</u>

**Short Case Caption:** <u>Implicit, LLC v. Sonos, Inc.</u>

**Filing Party/Entity:** <u>Implicit, LLC</u>

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: <u>June 13, 2024</u>    Signature: <u>/s/ J. Derek McCorquindale</u>

Name: <u>J. Derek McCorquindale</u>

ii

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Implicit, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this **court** for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐　　None/Not Applicable　　　　☐　　Additional pages attached

| William Ellsworth Davis, III | Davis Firm, P.C. | |
| Christian J. Hurt | Davis Firm, P.C. | |
| Kirk Voss | Davis Firm, P.C. | |
| Ben Singer | Singer Cashman LLP | |
| James Hopenfeld | Singer Cashman LLP | |
| Evan Budaj | Singer Cashman LLP | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒　Yes (file separate notice; see below)　　☐ No　　☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒　　None/Not Applicable　　　　☐　　Additional pages attached

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................................xi

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES.........................................................................2

INTRODUCTION ...............................................................................................3

STATEMENT OF THE CASE.............................................................................5

    A.   The Invention of the Implicit Patents.........................................................5

        1.   The Implicit Patents and the Problem of Synchronization ..................5

        2.   Implicit's Development of the Patented Inventions............................8

    B.   The IPR Proceedings ................................................................................12

    C.   Federal Circuit Appeal and Supreme Court Proceedings Based on *Arthrex* ......................................................................................................14

    D.   Correction of Inventorship and Denial of Director Review.......................16

    E.   Remand Based on Issued Correction Certificates.....................................18

    F.   Remand Proceedings and the Board's Final Written Decisions on Remand....................................................................................................19

SUMMARY OF THE ARGUMENT ....................................................................20

ARGUMENT ......................................................................................................21

I.   Legal Standards ...............................................................................................21

II.   Section 256 Makes Implicit's Corrections to Inventorship Retroactive...........23

    A.   The Text and Framework of § 256 Underscore Its Retroactive Effect......23

    B.   Precedent Confirms that Inventorship Corrections Under § 256 Have Retroactive Effect in General ..........................................................25

III.   Judicial Estoppel Does Not Apply ..................................................................27

A. Implicit Did Not Advance "Clearly Inconsistent" Positions .......................27

B. Implicit Did Not "Succeed in Persuading" the Board to Accept Its First Position.......................31

C. Implicit Would Gain No "Unfair Advantage" If Judicial Estoppel Were Not Applied .......................34

IV. Neither Forfeiture nor Waiver Apply Here.......................37

A. Forfeiture .......................38

B. Waiver .......................41

V. Equitable Doctrines Such as Judicial Estoppel, Waiver, and Forfeiture Should Not Nullify Application of a Savings Provision Enshrined in Statute.......................45

CONCLUSION .......................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerolineas Argentinas v. United States*,
  77 F.3d 1564 (Fed. Cir. 1996) ...................................................................43

*Airbus DS Commc'ns, Inc. v. microDATA GIS, Inc.*,
  No. 15-1037, D.I. 28 (Fed. Cir. Mar. 18, 2015) (nonprecedential) ....................41

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
  941 F.3d 1320 (Fed. Cir. 2019) .........................................................xi, 14

*Associated Elec. Coop., Inc. v. United States*,
  226 F.3d 1322 (Fed. Cir. 2000) .................................................................22

*Bridgestone/Firestone Rsch. v. Auto. Club de L'Ouest de la France*,
  245 F.3d 1359 (Fed. Cir. 2001) .................................................................22

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998) .................................................................31

*Cleveland v. Pol'y Mgmt. Sys. Corp.*,
  526 U.S. 795 (1999).........................................................................31, 33

*Crandon v. United States*,
  494 U.S. 152 (1990).........................................................................23, 24

*Egenera, Inc. v. Cisco Sys., Inc.*,
  972 F.3d 1367 (Fed. Cir. 2020) .......................................................*passim*

*Eli Lilly & Co. v. Aradigm Corp.*,
  376 F.3d 1352 (Fed. Cir. 2004) .................................................................31

*Emerson Elec. Co. v. SIPCO, LLC*,
  IPR2016-00984, Paper 52 (PTAB Jan. 24, 2020), *aff'd*, No. 2018-
  1364, D.I. 78 (Fed. Cir. Jan. 21, 2021).................................................24, 25

*Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*,
  919 F.3d 1347 (Fed. Cir. 2019) .................................................................22

*Ericsson Inc. v. Intell. Ventures I LLC*,
901 F.3d 1374 (Fed. Cir. 2018) ....................................................................22

*Google LLC v. IPA Techs Inc.*,
34 F.4th 1081 (Fed. Cir. 2022) ....................................................................25

*In re Google Tech. Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) ................................................................38, 42

*Haskell v. Colebourne*,
671 F.2d 1362 (CCPA 1982) ........................................................................26

*Henderson v. Carbondale Coal & Coke Co.*,
140 U.S. 25 (1891) ........................................................................................39

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge, Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................................22

*LendingTree, LLC v. Zillow, Inc.*,
656 F. App'x 991 (Fed. Cir. 2016) ...............................................................40

*Miller v. French*,
530 U.S. 327 (2000)......................................................................................45

*New Hampshire v. Maine*,
532 U.S. 742 (2001)................................................................................*passim*

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................................................................42

*Patterson v. Hauck*,
341 F.2d 131 (CCPA 1965) ..........................................................................25

*Perry v. Blum*,
629 F.3d 1 (1st Cir. 2010).............................................................................34

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ......................................................................38

*Riverwood Int'l Corp. v. R.A. Jones & Co.*,
324 F.3d 1346 (Fed. Cir. 2003) ....................................................................25

*Roche Palo Alto LLC v. Ranbaxy Lab'ys Ltd.*,
  551 F. Supp. 2d 349 (D.N.J. 2008)..................................24, 25, 46

*S.W. Software, Inc. v. Harlequin Inc.*,
  226 F.3d 1280 (Fed. Cir. 2000) ................................................24

*SAS v. Iancu*,
  138 S.Ct. 1348 (2018) ..............................................................36

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
  580 U.S. 328 (2017)..................................................................45

*Skinner v. Brown*,
  27 F.3d 1571 (Fed. Cir.1994) ...................................................43

*Stark v. Advanced Magnetics, Inc.*,
  119 F.3d 1551 (Fed. Cir. 1997) .....................................17, 39, 47

*Stark v. Advanced Magnetics, Inc.*,
  29 F.3d 1570 (Fed. Cir. 1994) .......................................37, 39, 46

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021)................................................................xi, 15

*United Steelworkers of Am. v. Ret. Income Plan for Hourly-Rated
  Emps. of ASARCO, Inc.*,
  512 F.3d 555 (9th Cir. 2008) ....................................................33

*Vikase Corp. v. Am. Nat'l Can Co.*,
  261 F.3d 1316 (Fed. Cir. 2001) ................................................25

**Constitutional Provisions**

Appointments Clause, U.S. Const. art. II, § 2, cl. 2...............................15

**Statutes**

5 U.S.C. § 706...........................................................................38

18 U.S.C. § 3626(e)(2)................................................................45

28 U.S.C. § 1295(a)(4)..................................................................2

35 U.S.C. § 102 .................................................................*passim*

35 U.S.C. § 102(a) ......................................................................23, 25

35 U.S.C. § 102(e) ............................................................................ 25

35 U.S.C. § 102(f) ......................................................................23, 25

35 U.S.C. § 103 ........................................................................*passim*

35 U.S.C. § 116(c) ............................................................................44

35 U.S.C. § 141(c) ..............................................................................2

35 U.S.C. § 254 ................................................................................24

35 U.S.C. § 255 ................................................................................24

35 U.S.C. § 256 ........................................................................*passim*

35 U.S.C. § 328(a) ..............................................................................2

Administrative Procedure Act..................................................35, 38

## Regulations

37 C.F.R. § 1.41 ..............................................................................44

37 C.F.R. § 1.48 ..............................................................................44

37 C.F.R. § 1.324 ................................................................16, 17, 39

## Rules

Fed. Cir. R. 27(f)................................................................................2

Fed. Cir. R. 31(c) ..............................................................................2

## Other Authorities

MPEP § 2132.01(I) (9th ed. Rev. 07.2022, Feb. 2023)........................25

S. Rep. No. 82-1979 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394 ......46

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5(a), counsel is aware of no other case pending in this or any other court, tribunal, or agency that will directly affect or be directly affected by this Court's decision in the appeal, with the exception of *Implicit, LLC v. Sonos, Inc.*, Case No. 1:17-cv-00259 (D. Del.), and *Implicit, LLC v. D&M Holdings U.S. Inc. et al.*, Case No. 1:17-cv-00258 (D. Del.), which are currently stayed or administratively closed.

Previously, Implicit filed an Opening Brief in these consolidated cases on May 6, 2020, arguing for the application of *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019) (panel decision), and *Arthrex, Inc. v. Smith & Nephew, Inc.*, 953 F.3d 760 (Fed. Cir. 2020) (denial of petition for rehearing en banc). D.I. 23, 1-2, 16-21. On December 23, 2020, this Court granted Implicit's motion to vacate and remand for proceedings consistent with the decisions in *Arthrex*. D.I. 61. The U.S. Patent and Trademark Office ("PTO") intervened and filed a petition for a writ of certiorari to the Supreme Court. *Hirshfeld v. Implicit, LLC, et al.*, Nos. 20-1631, -1654 (S. Ct. May 21, 2021). On October 18, 2021, the Supreme Court granted the certiorari petition, vacated, and remanded for further consideration in light of *United States v. Arthrex, Inc.*, 594 U.S. ___ (2021).

**JURISDICTIONAL STATEMENT**

Appellant Implicit, LLC ("Implicit"), appeals the "Final Written Decision[s] on Remand," entered September 19, 2023, Appx1-26; Appx78-103, and the two underlying Final Written Decisions in IPR2018-00766 and IPR2018-00767, *see, e.g.*, Appx27-77; Appx104-157.[1] The Patent Trial and Appeal Board ("Board")— relying in each instituted ground on U.S. Patent No. 7,269,338 to Janevski (hereinafter "*Janevski*")—held that claims 1-3, 6-9, 12, 16, 19, and 23-25 of Implicit's U.S. Patent No. 7,391,791 ("the '791 patent") are unpatentable as anticipated by *Janevski*; that claims 1-3, 6-9, and 12 would have been obvious in view of *Janevski* alone; and that claims 1-3, 6-9, and 12 would have been obvious over the combination of *Janevski* and another reference. Appx28-29; Appx76. The Board also held that claims 1-3, 8, 11, and 17 of Implicit's U.S. Patent No. 8,942,252 ("the '252 patent") would have been obvious over the combination of *Janevski* and other references. Appx106; Appx156-157. Implicit timely appealed these decisions. Appx1083-1088; Appx4766-4771.

---

[1] The Federal Circuit appeal (No. 2020-1173) of the Board proceedings in IPR2018-00766 for U.S. Patent No. 7,391,791 was consolidated with the appeal (No. 2020-1174) of proceedings in IPR2018-00767 for U.S. Patent No. 8,942,252. *See Implicit, LLC v. Sonos, Inc.*, Nos. 2020-1173, -1174, D.I. 2 (Fed. Cir. Dec. 2, 2019).

Implicit later moved pursuant to Fed. Cir. R. 27(f) and 31(c) "for an order terminating the consolidated appeals" because "[t]he Director is currently reviewing Implicit's petitions under 35 U.S.C. § 256 to correct the inventorship of U.S. Patent No. 7,391,791 . . . and U.S. Patent No. 8,942,252"—the patents-at-issue in this appeal. *See* D.I. 78, 1. Once the certificates issued to formally correct inventorship, the Court "remanded for the sole purpose of having the Board issue an order addressing what, if any, impact the certificates of correction would have on the final written decisions in these cases." D.I. 85, 2. The Court added that "[a]ny appeals from the [Board]'s decision on this issue will be consolidated with these appeals." *Id*. The Board issued "Final Written Decision[s] on Remand," Appx1-26; Appx78-103, and Implicit timely filed a Second Amended Notice of Appeal on October 10, 2023, *see* D.I.s 90-93; Appx1279-1284; Appx4963-4968.

This Court has jurisdiction over Implicit's appeals under 35 U.S.C. § 141(c), and 28 U.S.C. § 1295(a)(4).

## STATEMENT OF THE ISSUES

Whether the Board erred by relying on the nonstatutory doctrines of judicial estoppel, waiver, and forfeiture to defeat the retroactive application of 35 U.S.C. § 256 for corrections of inventorship.

# INTRODUCTION

This appeal involves two patents: the '791 patent and the '252 patent (collectively, the "Implicit Patents"). Appx158-174; Appx175-192. Appellee Sonos, Inc. ("Sonos") petitioned for *inter partes* review ("IPR") of the Implicit Patents, alleging unpatentability under 35 U.S.C. §§ 102/103. Sonos relied in each instituted unpatentability ground on would-be prior art reference *Janevski*.

Implicit attempted to antedate *Janevski* by detailing the activities of the two inventors on the face of the Implicit Patents—Mr. Balassanian and Mr. Bradley—including how they worked with the company's Engineering Master, Mr. Carpenter, to implement the inventions of the claims. *See infra* Sections A-B. Implicit asserted that the claimed subject matter was fully conceived and reduced to practice by December 9, 2001, at the latest—two days prior to *Janevski*'s filing date—with the work of Mr. Carpenter inuring to the benefit of the named inventors. *See id.*

But after analysis of the evidence before it, the Board found, *inter alia*, that "the source code was authored by non-inventor Mr. Carpenter, rather than the two named inventors." Appx46-47; Appx156. As such, the Board found that the source code creation did not inure to Mr. Balassanian and Mr. Bradley, and held that *Janevski* constituted prior art by six days for all conclusions of unpatentability.

*See infra* Section B. Implicit subsequently petitioned the Director under § 256 for a correction of inventorship adding Mr. Carpenter. *See infra* Section D.

In August 2022, while this appeal was pending, Implicit informed the Court that the Director had just granted its two petitions to correct the inventorship of the patents-on-appeal. *See* D.I. 84. In light of the corrected inventive entity, this Court granted Implicit's motion to remand to "address[] what, if any, impact the certificates of correction would have on the final written decisions in these cases." D.I. 85, 2 (Order on Motion).

The Board, however, did not complete its assignment. Rather than considering "in the first instance" the merits of its prior unpatentability determinations in view of the certificates of correction, the "Final Written Decision[s] on Remand" simply relied on judicial estoppel and waiver to sidestep the issue. *See* Appx11-25; Appx88-102. The Board's use of nonstatutory doctrines to nullify Implicit's clear legal rights under § 256 is fundamentally inconsistent with the retroactive applicability of inventorship corrections. *See* Appx7-10 ("In view of the language of the statute, . . . a certificate of correction of inventorship should apply retroactively in general."); Appx84-87. Thus, despite properly holding that § 256 applies retroactively, i.e., as though in corrected form from the date of patent issuance, the Board improperly refused to assess whether *Janevski* still constituted prior art in light of the corrected inventive entity. *See infra* Sections F, III-V.

The Board's Final Decisions on Remand themselves identify issues needing to be addressed if the corrected inventive entity were considered on the merits. Appx25 (e.g., "whether the source code practices the claimed invention" and "resolving a claim construction dispute between the parties"); Appx102. But this Court already remanded these cases back to the Board to address "what, if any, impact the certificates of correction would have on the final written decisions in these cases." D.I. 85, 2. The Board had every opportunity to hear from both Sonos and Implicit on these issues on remand. Yet even after confirming that Implicit's corrected inventorship applied retroactively, the Board avoided addressing the impact of the certificates of correction on patentability with an erroneous application of these equitable doctrines. This was an abuse of discretion. *See infra* Sections III-V.

The Final Written Decision(s) and Final Written Decision(s) on Remand should be vacated and the cases remanded with specific instructions to perform the patentability analysis previously ordered. D.I. 85, 2.

## STATEMENT OF THE CASE

### A. The Invention of the Implicit Patents

#### 1. The Implicit Patents and the Problem of Synchronization

The '791 patent and the '252 patent are both entitled "Method and System for Synchronization of Content Rendering." Appx158; Appx175. The '252 patent is a

continuation of the '791 patent. Appx175-176. Both Implicit Patents claim priority to U.S. Provisional Application No. 60/341,574 filed on December 17, 2001, Appx158; Appx176, but as explained below, the inventions of the challenged claims were conceived of and reduced to practice by December 9, 2001, at the latest, *see infra* Section A.2.

The Implicit Patents generally relate to techniques for rendering content across multiple devices at the same time. Appx158[Abstract]; Appx169[1:19-52]; Appx175[Abstract]; Appx187[1:23-56]. They allow, for example, simultaneous playback of audio and/or video on multiple devices. *See, e.g.*, Appx169[2:13-61]; Appx187[2:17-65]. Because the patented technology allows a single content stream to be rendered with tight synchronization at multiple networked devices, the wireless, multiroom audio space has adopted the technology to great commercial success.

The problem of synchronizing the rendering of content is an old one. Multimedia presentations, for example, confronted the problems of synchronizing video, audio, and text. Appx169[1:36-52]; Appx187[1:40-56]. If the content is rendered on only one device, it is possible to synchronize the content. The problem becomes more complicated, however, when attempting to render the content on multiple devices at the same time. This is because each rendering device has its own system clock, which means that each rendering device typically operates in its

own "time domain[]." Appx169[1:36-52]; Appx187[1:40-56]. And the clocks on each of the devices typically operate on slightly different frequencies, such that the "time domains" of each rendering device can, over time, drift out of alignment. The content becomes out of sync as a result. If the difference is large enough, a viewer can perceive that the rendering of the content is not aligned (e.g., hearing a noticeable echo for audio playback in wireless speakers). Appx169[1:36-52]; Appx187[1:40-56].

The Implicit Patents solve this problem by exchanging information or "message[s]" between various devices to determine how much out of sync the devices are and then adjust the playback accordingly. Appx169[2:13-61]; Appx187[2:17-65]. These messages include "device time[s]" and "rendering time[s]." The device time reflects the time on a device's system clock; the rendering time reflects a reference to the position in the content stream. Appx169[2:13-61]; Appx187[2:17-65]. Using these values, devices in the network can adjust their rendering of content to match a device designated as the "master rendering device." Appx169[2:28-61]; Appx187[2:32-65].

Claim 1 of the '791 patent is an example method claim from the Implicit Patents:

> A method for synchronizing a rendering of a content provided by a source at one or more devices which are nodes of a network, the content having a rendering time, the method comprising:

designating one of the one or more devices a master device, the master device having a master device time and a master rendering time;

designating remaining devices among one of the one or more devices as at least one slave device, the at least one slave device having a slave device time and a slave rendering time;

receiving the content for rendering by the master and at least one slave device;

sending from the master device to the at least one slave device an indication of when the master device renders content corresponding to the master rendering time;

determining a master device time domain, a slave device time domain, and a source time domain;

determining whether a time domain differential exists between the master rendering time, the slave rendering time; and

adjusting, based on the received indication, the rendering of the content at the at least one slave device within the slave device time domain and in proportion to the time domain differential when present to account for variation between when the master device and the at least one slave device to render content that should be rendered at the same time.

Appx172[8:25-53].

## 2.     Implicit's Development of the Patented Inventions

Implicit developed the patented technology before it filed the December 17, 2001, provisional patent application leading to the Implicit Patents. *See generally* Appx2564-2593[¶¶1-80]; Appx483-501; Appx6630-6659[¶¶1-80]; Appx4173-4190. A central issue in the IPR proceedings was Implicit's ability to swear behind the sole base reference that Sonos relied upon—the *Janevski* patent, Appx1789-

1808; Appx5336-5355, which has a priority date of December 11, 2001. *See also* Appx335; Appx4031-4033. That date is six days *before* Implicit filed the provisional patent application but *after* Implicit developed the patented technology. *See generally* Appx2564-2593[¶¶1-80]; Appx483-501; Appx6630-6659[¶¶1-80]; Appx4173-4190.

Implicit is the successor entity to a company known as BeComm. Appx2564[¶¶2-5]. The lead inventor of the Implicit Patents, Edward Balassanian, founded BeComm in 1996 to build a new type of operating system that would allow any application or device to interact with any other application or device. Appx2566[¶¶9-11]. BeComm built that operating system starting in the late 1990s, which it released under the name "Strings." Appx2567-2569[¶¶12-18]. BeComm grew to over 30 employees and had relationships with companies like Intel to use Strings. Appx2570-2572[¶¶21-25]; *see also* Appx2591-2592[¶¶76-78] (discussing project proposals for Comcast, Philips, and Advanced Micro Devices).

BeComm initially ran into difficulty. As detailed above, each device can have different clocks and delays in transmitting, receiving, processing, and rendering content. Appx2573-2574[¶28]. BeComm and Intel recognized these issues in the late 2000 and early 2001 time period. In connection with a multimedia project (codenamed "Juno"), BeComm and Intel (codenamed "Jupiter") recognized in December 2000 "that true synchronization is an unsolved computer science

problem." Appx2573-2574[¶¶27-29] (quoting Appx2681); *see also* Appx2745-2746 ("In all cases, the Adapter synchronization in these cases will be difficult at best."). The Intel portion of the Juno project went on hold in February 2001. Appx2574[¶30]; Appx2768.

Mr. Balassanian and his coinventors—BeComm Development Manager Scott Bradley and BeComm Engineering Master Guy Carpenter[2]—then solved the synchronization problems. Appx2575[¶¶32-33]; *see also* Appx2591[¶75]; Appx46-47; Appx123-125; Appx156. They conceived of the inventions and successfully reduced them to practice by December 9, 2001, at the latest. Appx2575-2591[¶¶31-75]. The solution involved adjusting clock and playback timing differences between devices, as reflected in the Implicit Patents.

Strings implemented the invention using a series of new software modules (known as "beads"). Three beads formed the bedrock of the solution: "timesync,"

---

[2] As explained below, Implicit's original analysis was that the inventors listed on the face of the patents—Mr. Balassanian and Mr. Bradley—could antedate *Janevski* because the contributions of Mr. Carpenter inured to their benefit. Appx2575[¶¶32-33]; Appx1974[59:5-18]; Appx40-42; Appx112-116. In light of the Board's extensive and intervening factfindings regarding the inventive activities of—and communications between—Mr. Carpenter, Mr. Balassanian, and Mr. Bradley around the time of the inventions, Implicit reassessed the legal question of inventorship and petitioned under § 256 to add Mr. Carpenter as an inventor to the Implicit Patents. Appx174; Appx192;Appx1108-1109; Appx4791-4792; D.I. 78 Exs. E-F; *see also* Appx46-47; Appx123-125; Appx156; *see infra* Section D.

"clocksync," and "audiosync." *See, e.g.*, Appx2576-2585[¶¶34-61]; Appx3378-3395[¶¶17-61]. The provisional patent application to which the Implicit Patents claim priority identifies and describes how each of these beads operates, among other beads that BeComm developed. Appx5356-5359; Appx2920-2922; Appx6974-6976; *see also* Appx3402-3432; Appx3433-3447(mapping BeComm source code—including timesync, clocksync, and audiosync beads—to challenged claims of the Implicit Patents); Appx75-76 (dismissing Sonos's motion to exclude claim charts as moot); Appx156-157.

By October 4, 2001, BeComm was considering filing a provisional patent application on the working system. Appx617("Guy Carpenter came up with a scheme to synchronize media across networked machines. . . . We are thinking of writing up a provisional patent application on our system . . . ."); *see also* Appx607-627; Appx2864-2873; Appx4290-4310; Appx6918-6927; Appx713-718 (denying motion to supplement). BeComm completed a draft of the provisional patent application by December 9, 2001, which is *before* the December 11, 2001, effective date of *Janevski*. Appx2920-2922; Appx2932; Appx3313; Appx3360; Appx6974-6976; Appx6977; Appx7367; Appx7414. The December 9, 2001, document entitled "synchronization.doc" serves as the disclosure for the provisional application. Appx2920-2922; Appx46; Appx123-124.

In the metadata for this document, the author is listed as "guyc," identifying Guy Carpenter, who wrote the source code. *See* Appx3360; Appx46; Appx123-124; Appx156. This identification is confirmed in a December 15, 2001, email written by Mr. Bradley, who stated that this document was written by Mr. Carpenter. Appx2923; Appx46; Appx123-124. In that email, Mr. Bradley indicated that the document was "sufficient for the patent provisional as is." Appx2923; Appx46; Appx123-124. There is nothing else in the record indicating that anyone was involved in development of the source code besides Mr. Carpenter. Appx47; Appx125. After an internal review of the provisional application, Appx2923, BeComm filed the draft provisional with the PTO without any substantive changes on December 17, 2001. *Compare* Appx5356-5359, *with* Appx2920-2922.

### B. The IPR Proceedings

Sonos filed petitions for IPR of the Implicit Patents in March 2018. Appx301; Appx380; Appx4001; Appx4077. Sonos based both petitions on *Janevski*, which has a priority date of December 11, 2001. Appx1789-1808; Appx335; Appx4031-4033. That date is *after* BeComm completed the draft provisional application. *See supra* Section A.2.

The Board instituted proceedings on both petitions in September 2018 to review the following claims: 1-3, 6-9, 12, 16, 19, and 23-25 of the '791 patent and

claims 1-3, 8, 11, and 17 of the '252 patent. Appx28; Appx105; Appx108-109. The primary prior art reference underlying each and every ground of unpatentability for these claims was *Janevski*; Implicit asserted, however, that the claimed subject matter was conceived and reduced to practice two days prior to *Janevski*'s filing date. *See* Appx483-501; Appx4173-4190; Appx2564-2593[¶¶1-80]; Appx40-42; Appx112-116. Implicit argued that the then-named inventors, Messrs. Balassanian and Bradley, could antedate *Janevski* because the contributions of Mr. Carpenter inured to their benefit. Appx40-42; Appx112-116.

The Board issued its original Final Written Decisions in both cases in September 2019. Appx27-77; Appx104-157. The Board found unpatentable all of the instituted claims. Appx76; Appx156-157. Although Implicit submitted many internal BeComm documents—some 75 exhibits, including the draft provisional application, the source code repository, and expert testimony—the Board concluded that Implicit's evidence did not adequately corroborate Mr. Balassanian's testimony that he and Mr. Bradley conceived of the inventions of the Implicit Patents. Appx47; Appx125. In particular, the Board affirmatively found the BeComm document entitled "synchronization.doc," Appx2920-2922,

> was filed on December 17, 2001, as the provisional application to which the '252 Patent claims priority and which Patent Owner contends was drafted at least as early as December 9, 2001. *The evidence shows, however, that the December 9 version of this document, which appears to be the version that was the basis for*

> *the provisional application, was authored by non-inventor*
> *Mr. Carpenter.*

Appx123-124 (emphasis added) (citing Appx2923 ("After talking with Guy and rereading the /docs/synchronization.doc document he wrote, I think it is sufficient for the patent provisional as is."); Appx3315 (listing "guyc" as last saving the document)). According to the Board, there was no evidence "that anyone else was involved in development of the source code besides Mr. Carpenter." *See* Appx46-47; Appx123-125; Appx156; Appx3312-3315; Appx2923.

At bottom, the Board conclusively determined that the source code that led to both Implicit Patents was authored by non-named inventor Mr. Carpenter, rather than the two named inventors. Appx156; *see also* Appx123-124; Appx46. And after determining that it was prior art, the Board relied on *Janevski* for each of its unpatentability conclusions. Appx48; Appx74; Appx156; Appx126.

### C. Federal Circuit Appeal and Supreme Court Proceedings Based on *Arthrex*

About forty days after the Board's original Final Written Decisions, this Court issued the *Arthrex* panel decision on October 31, 2019. *See Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). That decision concluded that the Board as it existed at the time—including when it issued the Final Written Decisions here—was unconstitutional. *See id.* at 1325. This Court concluded that "the appropriate course of action is for this case to be remanded to a new panel of

14

APJs to which [the patentee] is entitled." *Id*. Given the *Arthrex*-panel decision just issued, Implicit timely filed its notices of appeal in early November 2019, raising the Appointments Clause violation in these cases also. Appx1083-1088; Appx4766-4771. On May 6, 2020, Implicit filed an opening brief arguing that this Court's decision in *Arthrex* "requires vacating the Board's Final Written Decisions in these cases" because these "Board panels, as constituted prior to October 31, 2019, violated the Appointments Clause, Article II, Section 2, Clause 2 of the U.S. Constitution." D.I. 23, 1-2, 15-17.

This Court vacated the Board's decisions and remanded under *Arthrex*, alongside dozens of other matters that properly raised an Appointments Clause challenge. *See* D.I. 61. While the remanded cases were stayed before the PTO, the government petitioned for a writ of certiorari and this case became the lead for a group of trailing matters at the Supreme Court, all arguing for the application of *Arthrex*. *See Hirshfeld v. Implicit, LLC, et al.*, No. 20-1631 (S. Ct. May 21, 2021). The Supreme Court, on June 21, 2021, decided the Appointments Clause issue in *Arthrex* and prescribed Director Review of final written decisions as the remedy. *United States v. Arthrex, Inc.*, 594 U.S. 1, 14-15, 25-26 (2021) (citation omitted). Implicit's case remained pending at the Supreme Court for several months, however, until a separate order issued in the fall of 2021. *See Hirshfeld v. Implicit,*

*LLC*, No. 20-1631 (S. Ct. Oct. 18, 2021) (petition granted, judgment vacated, and case remanded).

On November 30, 2021, this Court subsequently remanded both IPR proceedings to the jurisdiction of the Director for review in light of the Supreme Court's decision in *Arthrex*. *See* D.I. 70, 2. This would be the first opportunity for Implicit to have the ongoing IPRs reviewed by a constitutionally appointed officer, as it had requested.

### D.      Correction of Inventorship and Denial of Director Review

With these IPR proceedings back before the Acting Director, Implicit exercised on December 17, 2021, its rights under § 256 by filing a "Petition for Correction of Inventorship Under 37 CFR § 1.324" for both the '791 and '252 patents. *See generally* D.I. 78 Exs. E-F. Commensurate with the earlier findings of the Board, *see supra* Section B, the petitions specified that the "addition of Guy A. Carpenter as an inventor is requested. Through error, Guy A. Carpenter was not named as an inventor . . . ." D.I. 78 Ex. E at 1, Ex. F at 1. As required by 37 C.F.R. § 1.324(b), the petitions were accompanied by all fees and sworn statements agreeing to the change in inventorship, including the necessary signatures of Guy Carpenter, Edward Balassanian, and Scott Bradley, as well as the assignee, Implicit. *See generally* D.I. 78 Exs. E-F.

In its requests for Director Review—the first occasion to review the IPR proceedings—Implicit informed the Director of the correction petitions pending before the same office and specifically asked that "the Director hold this rehearing request until the correction of the [Implicit Patents are] finalized, and then remand proceedings to the Board for further consideration of patentability." Appx1109; Appx4792. Implicit noted that "Section 256, on its face, does not limit the time during which inventorship can be corrected." Appx1120 n.4 (quoting *Stark v. Advanced Magnetics*, *Inc.*, 119 F.3d 1551, 1554 (Fed. Cir. 1997) ("diligence is not a requirement to correct inventorship under section 256")); Appx4803 n.5. Implicit also explained that "corrections of named inventors under § 256 have been deemed by the Federal Circuit, district courts, and this agency to apply retroactively."Appx1109; Appx4792.

Those requests for review before the Acting Director were denied without opinion on February 7, 2022. However, the newly appointed Director eventually granted Implicit's twin petitions for inventorship correction under 37 C.F.R. § 1.324, adding Mr. Carpenter as a coinventor to the face of the Implicit Patents. Appx174 (Certificate of Correction for the '791 patent (Aug. 30, 2022)); Appx192 (Certificate of Correction for the '252 patent (Aug. 9, 2022)).

### E. Remand Based on Issued Correction Certificates

With the *Arthrex* process complete but resulting in a denial of Director Review, this Court struck the parties' prior briefing and invited Implicit to file a substitute opening brief on the merits in these consolidated cases. *See* D.I. 72, 2. Before the due date of its substitute opening brief and given the retroactive impact of the pending certificates of correction, Implicit filed a motion to remand back to the Board or, in the alternative, stay the proceedings. D.I. 78, 19-20 (June 9, 2022) ("Implicit has sought corrections of inventorship and a remand is warranted to await the Director's issuance and to allow the Board to consider the effect of these new facts on its prior unpatentability determinations."). As it had done previously for the Director, Implicit described in detail the case law and legislative history supporting a retroactive application of inventorship corrections under § 256. *See id.*, 11-15. While Sonos argued that the doctrine of waiver should prevent Implicit from receiving its requested relief, D.I. 79, 14-21, this Court stayed the proceedings. D.I. 81.

On August 29, 2022, with the inventorship correction finally formalized by the Director, Implicit renewed its motion before this Court seeking a remand to the Board. D.I. 84; *see also* D.I. 78; D.I. 80. Sonos still opposed, arguing as it had before that there was no general retroactivity to § 256 and that Implicit had waived the argument that Mr. Carpenter was an inventor. *See* D.I. 82, 2-4; D.I. 79, 14-21.

18

But with the certificates of correction now formally issued, the Court granted

Implicit's motion for remand:

> Allowing the PTAB to consider the impact of these intervening circumstances on the decisions on appeal in the first instance may conserve party and judicial resources.
>
> Accordingly,
>
> IT IS ORDERED THAT:
>
> (1) These appeals are remanded for the sole purpose of having the PTAB issue an order addressing what, if any, impact the certificates of correction would have on the final written decisions in these cases. . . .

D.I. 85, 2 (Nov. 9, 2022).

## F.    Remand Proceedings and the Board's Final Written Decisions on Remand

After the Board determined the scope and schedule, Implicit submitted

additional briefing to the Board. Appx1210-1227; Appx1257-1266; Appx4894-

4911; Appx4941-4950. Implicit pointed out that § 256 has general retroactive

effect, as shown by the plain language, the legislative history, and case law

dispositions. Appx1217-1223; Appx4901-4907. Further, Implicit explained that

*Egenera* recognized that the inventorship analysis can be informed by a tribunal's

view of the evidence, as here, such that subsequent inventorship corrections may

be sought at any time, including during appeal, as here. *Egenera, Inc. v. Cisco Sys.,

Inc.*, 972 F.3d 1367, 1376 (Fed. Cir. 2020). Sonos also filed a brief on remand

seeking to limit the retroactivity of § 256 inventorship corrections and claiming that doctrines such as judicial estoppel and waiver precluded Implicit's ability to add Mr. Carpenter as an inventor. Appx1240-1250; Appx4924-4934.

The Board held on September 19, 2023, that "even in light of the general retroactive effect of 35 U.S.C. § 256, judicial estoppel and waiver apply under the specific circumstances of these cases." Appx2; Appx79. While the Board correctly determined that Implicit's inventorship correction should benefit from retroactive application under the statute, Appx7-10; Appx84-87, the Board nevertheless determined that nonstatutory doctrines prevented retroactive application of § 256 under these circumstances, Appx11-25; Appx88-102. Implicit timely appealed these remand decisions. Appx1279-1284; Appx4963-4968.

## SUMMARY OF THE ARGUMENT

In view of the Board's evidentiary analysis regarding development of the inventions, Implicit sought an inventorship correction to the '791 and '252 patents, petitioning the PTO after the Final Written Decisions but before the Director Review of these IPRs. Implicit had a right to do so based on the plain language of § 256—a statute that is retroactive in its application to prevent invalidation under §§ 102/103. *See infra* Section II.

But on remand, the Board failed to give the Implicit Patents the benefit of § 256, holding that the nonstatutory doctrines of judicial estoppel and

20

waiver/forfeiture precluded application of § 256's broad "savings provision" intended by Congress. *See Egenera*, 972 F.3d at 1377. This abused discretion. The elements required for the application of judicial estoppel were not satisfied in this case and the Board erred in its analysis of all three required factors. *See infra* Section III. And "waiver"—a term improperly used throughout the Board's opinion—does not apply in these circumstances where Implicit never intentionally relinquished its right to correct inventorship and its timing before the Director Review would not effect a forfeiture. *See infra* Section IV. Seeking certificates of correction under § 256 can be informed by the factfinding of tribunals due to the complexity of the inventorship analysis, as the case law demonstrates. *See infra* Section IV (citing *Egenera*, 972 F.3d at 1377-79).

Moreover, by virtue of their retrograde focus, these particular equitable doctrines inherently conflict with Implicit's right to seek correction of inventorship without regard to timing or intent. *See infra* Section V. The Board erred by using the nonstatutory doctrines of judicial estoppel, waiver, and forfeiture to sidestep the retroactive effect of § 256. *See infra* Section V.

## ARGUMENT

### I. Legal Standards

"The legal effect of representations to the PTO and statutory interpretation of the Patent Act . . . are issues of Federal Circuit law." *Egenera*, 972 F.3d at 1378

(citing *Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*, 919 F.3d 1347, 1352 (Fed. Cir. 2019)). This Court reviews equitable defenses and decisions related to compliance with the Board's procedures for an abuse of discretion. *Bridgestone/Firestone Rsch., Inc. v. Auto. Club de L'Ouest de la France*, 245 F.3d 1359, 1361 (Fed. Cir. 2001); *Intelligent Bio-Sys., Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016); *see also New Hampshire v. Maine*, 532 U.S. 742, 750 (2001); *Egenera*, 972 F.3d at 1378.

"An abuse of discretion is found if the decision: (1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Ericsson Inc. v. Intell. Ventures I LLC*, 901 F.3d 1374, 1379 (Fed. Cir. 2018) (citation omitted). This Court has also found an abuse of discretion where the Board's action reflects "an unreasonable exercise of judgment in weighing relevant factors." *Bridgestone/Firestone*, 245 F.3d at 1361.

In interpreting the meaning of statutes, this Court "begin[s], of course, with the language of the statutes at issue. However, to fully understand the meaning of the statute, [this Court] look[s] 'not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.'" *Associated Elec.*

22

*Coop., Inc. v. United States*, 226 F.3d 1322, 1326 (Fed. Cir. 2000) (citation omitted) (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)).

## II. Section 256 Makes Implicit's Corrections to Inventorship Retroactive

Sonos asserted before the Board that "a certificate of correction for inventorship cannot be used [retroactively] to cure a finding of invalidity under 35 U.S.C. §§ 102(a), (b), and (e), or 103(a)." *See* Appx7-8; Appx85-86. The Board rejected this argument and correctly determined as a matter of law that § 256 applies retroactively—not only to misjoinder of inventors under § 102(f), but for all invalidity purposes under §§ 102/103. *See* Appx7-10; Appx84-87. Nevertheless, the Board erroneously refused to actually apply this retroactivity to the benefit of Implicit due to judicial estoppel and waiver/forfeiture doctrines. Appx11-24; Appx88-101. This was error and an abuse of discretion.

### A. The Text and Framework of § 256 Underscore Its Retroactive Effect

As a matter of plain language, nothing in § 256 restricts retroactive application:

> Whenever . . . through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

> The error of omitting inventors or naming persons who are not inventors *shall not invalidate the patent* in which such error occurred *if it can be corrected* as provided in this section.

23

35 U.S.C. § 256 (emphases added). Related correction provisions in the Patent Act, such as §§ 254 and 255, demonstrate that § 256 has a distinct retroactive application given the "design of the statute as a whole." *Crandon*, 494 U.S. at 158. Other correction sections contain an explicit limitation to "causes *thereafter arising*," 35 U.S.C. § 254 (emphasis added), but such prospective language is absent from inventorship corrections of § 256; the language Congress drafted for *inventorship* correction intentionally does not restrict retroactive application:

> The very notion that Congress carved out a separate section for correction of inventorship indicates its intention to treat it in a different way than the much larger subset of corrections that Section 254 encompasses. Thus, here the canon of statutory interpretation known as *generalia specialibus non derogant* (general provisions do not qualify specific ones) is applicable. . . . *[A] Certificate of Correction issued for correction of inventorship has retroactive effect*.

*Roche Palo Alto LLC v. Ranbaxy Lab'ys Ltd.*, 551 F. Supp. 2d 349, 357-59 (D.N.J. 2008) (emphasis added); *see S.W. Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1294-96 (Fed. Cir. 2000) (rejecting the retroactive application under § 254 because it "contains language concerning 'causes thereafter arising'"); *Emerson Elec. Co. v. SIPCO, LLC*, IPR2016-00984, Paper 52 at 17-21 (PTAB Jan. 24, 2020) ("[Section] 256 provides for retroactive effect of a certificate correcting named inventorship. . . . This is in contrast with § 255, which does not include any similar provision."), *aff'd*, No. 2018-1364, D.I. 78 (Fed. Cir. Jan. 21, 2021).

### B. Precedent Confirms that Inventorship Corrections Under § 256 Have Retroactive Effect in General

The plain language of § 256 is notably agnostic as to any specific subsection. Numerous tribunals have thus agreed that corrections of inventorship under § 256 are to be given "retroactive" effect—i.e., as though in corrected form from the date of patent issuance—and this applies "in general" against invalidation efforts under 35 U.S.C. § 102(a), (b), (e), or § 103(a), and not just for misjoinder under § 102(f). *See* Appx9-10; Appx86-87; *Google LLC v. IPA Techs Inc.*, 34 F.4th 1081, 1088 (Fed. Cir. 2022) (addressing pre-America Invents Act ("AIA") § 102(a) prior art); *Egenera*, 972 F.3d at 1378-79; *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1355-56 (Fed. Cir. 2003) (addressing pre-AIA § 102(e) prior art); *Vikase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328-29 (Fed. Cir. 2001) (addressing pre-AIA § 102(e) prior art); *Roche*, 551 F. Supp. 2d at 357-59; *SIPCO*, IPR2016-00984, Paper 52 at 10-21.[3] Further, provisions such as § 256 "should be given a liberal construction in favor of applicants, permitting them to make such changes as more thorough consideration of facts may show to be necessary in order to comply accurately with the law in naming inventors." *See Patterson v. Hauck*, 341 F.2d 131, 138 (CCPA 1965).

---

[3] *See also* MPEP § 2132.01(I) (9th ed. Rev. 07.2022, Feb. 2023) (advising that a pre-AIA § 102(a) rejection can be overcome "by adding the coauthors as joint inventors to the application").

In this case, because the corrected inventorship on the Implicit Patents has retroactive effect against Sonos's §§ 102/103 challenges, adding Mr. Carpenter as a coinventor necessarily alters the Board's original merits analysis. Indeed, Mr. Carpenter was both an inventor and the author of the "synchronization.doc," which establishes conception and reduction to practice of the claimed inventions by December 9, 2001, at the latest—two days before *Janevski*'s effective date. *See* Appx2591[¶75]; Appx2920-2922; Appx2923; Appx3313; Appx3360; Appx123-125; Appx6657[¶75]; Appx6974-6976; Appx6977; Appx7367; Appx7414; *see also supra* Section A; *Haskell v. Colebourne*, 671 F.2d 1362, 1366-67 (CCPA 1982) ("Further, there appears to be no reason why evidence of conception naming only one of the true inventive entity cannot inure to the benefit of and serve as evidence of conception by the complete inventive entity, whether initially thought to be joint inventors or only considered to be such later, upon a change of inventorship during prosecution.").

This Court ordered the Board, given these "intervening circumstances" of inventorship correction to "address[] what, if any, impact the certificates of correction would have on the final written decisions in these cases." D.I. 85, 2. The Board on remand recognized § 256's broad retroactivity, including for purposes of antedating prior art and avoiding unpatentability under § 103. *See* Appx7-10; Appx84-87. Despite this understanding, the Board restricted application of § 256 in

26

this case by using equitable doctrines such as judicial estoppel, waiver, and forfeiture. *See* Appx11-25; Appx88-102. But when properly viewed through the retroactive lens of § 256, none of these equitable doctrines are applicable here.

## III. Judicial Estoppel Does Not Apply

"Judicial estoppel is an equitable doctrine that prevents a litigant from taking a litigation position inconsistent with one successfully asserted in an earlier court proceeding." *Egenera*, 972 F.3d at 1378. In determining whether the doctrine applies, courts typically examine three factors: "(1) whether a party's earlier and later positions are 'clearly inconsistent'—that is, 'mutually exclusive'; (2) whether the party 'succeeded in persuading a court to accept' the earlier position; and (3) whether the party would 'derive an unfair advantage or impose an unfair detriment' on the other side if not estopped." *Id.* (quoting *New Hampshire*, 532 U.S. at 750-51). These three factors are not "inflexible prerequisites or an exhaustive formula," and other "considerations may inform the doctrine's application." *Id.* at 751.

Because the Board legally erred here as to each *New Hampshire* factor, it necessarily abused its discretion by applying judicial estoppel.

### A. Implicit Did Not Advance "Clearly Inconsistent" Positions

According to the Board, Implicit took a "clearly inconsistent" position when "at trial, [it] asserted a certain inventorship, and . . . then sought a different

inventorship." Appx16; Appx93. In *Egenera*, however, this Court expressly rejected the proposition that even *multiple* corrections under § 256 are per se "mutually exclusive." 972 F.3d at 1378-79 (citation omitted). Egenera had previously removed an inventor from its patent and asserted its new inventorship during an IPR proceeding. *Id.* at 1377-78. Yet after a district court decided predicate claim construction questions, "it was entirely consistent for Egenera to request an accompanying formal correction of inventorship" adding back the previously removed inventor. *Id.* at 1379. In other words, there was nothing "mutually exclusive" about Egenera seeking to add back a previously removed inventor before the district court. *Id.* This Court rejected the idea—from a § 256 perspective—that Egenera's situation presented a necessarily inconsistent position for judicial estoppel purposes. *Id.* Similarly, Implicit's inventorship correction here "was entirely consistent," *id.*, actually acceding to the Board's findings regarding Mr. Carpenter's involvement with the Implicit Patents. Appx15 (recognizing that Implicit's documentary evidence "could also be consistent with [its] current position that Mr. Carpenter was an inventor all along"); Appx92; *see also* Appx47; Appx123-124; Appx156.

The Board asserts that it did not actually decide inventorship, but merely the sufficiency of evidence corroborating inurement arguments. Appx13-14 (stating that its decisions did not specifically address "the correct inventorship of the

28

patents"); Appx90-91. But the Board's acknowledgement only underscores that Implicit's positions here are not "mutually exclusive," *Egenera*, 972 F.3d at 1378-79 (citation omitted), but rather adjacent. *See* Appx15; Appx92. On its way to deciding that the work of Mr. Carpenter could not be shown to inure to the named inventors, the Board made clear factual determinations regarding the source-code authorship leading directly to the provisional applications. *See, e.g.*, Appx123-124 ("The evidence shows, however, that the December 9 version of this document, which appears to be the version that was the basis for the provisional application, was authored by non-inventor Mr. Carpenter."); Appx156 ("[T]he source code files themselves indicate the source code was authored by non-inventor Mr. Carpenter, rather than the two named inventors."); Appx47 ("There are no arguments or evidence presented . . . that anyone else was involved in development of the source code besides Mr. Carpenter.").

Implicit was entitled to take such findings from the adjacent inurement analysis, reconsider its ultimate inventorship, obtain the necessary affidavits, correct under § 256, and assert the corrected inventive entity commensurate with the findings of the Board. In *Egenera*, for example, it was the court's consideration of *claim construction* that prompted a *second* correction. *See* 972 F.3d at 1379. Even as "[i]nventorship . . . can depend on claim construction," so too can inventorship depend on a tribunal's view of relevant inurement evidence before it.

*See* Appx14 (alteration in original) (quoting *Egenera*, 972 F.3d at 1376-79); Appx91. Indeed, "inventorship is a legal conclusion premised on underlying factual findings." *Egenera*, 972 F.3d at 1376. And it is entirely expected that this context-dependent legal conclusion might change based on intervening factfindings from the Board regarding the inventive activities of—and communications between—Mr. Carpenter, Mr. Balassanian, and Mr. Bradley around the time of the invention. *Id.* at 1379 ("[A]t least due to the intervening claim construction, it was not 'mutually exclusive,' as judicial estoppel requires, to again request formal correction of inventorship.").

Moreover, the Supreme Court has recognized that judicial estoppel may be unwarranted "when a party's prior position was based on . . . mistake." *New Hampshire*, 532 U.S. at 753 (citation omitted). Here, Implicit's original analysis of inventorship was consistent with a plain-language reading of claims and the inventors listed on the face of the presumptively correct patents. Implicit, however, lacked the benefit of the Board's later inurement insights in the Final Written Decisions, including the intervening findings that while Mr. Carpenter was the sole author of the source code that was the basis for Implicit's provision application, his work did not inure to the benefit of Mr. Balassanian and Mr. Bradley. Appx46-48; Appx118-125.

Even if Implicit's original position on inventorship was mistaken in retrospect, its prior assessment on a difficult issue should not result in case-ending, patent-invalidating judicial estoppel here. Inventorship is sometimes "complicated, as with complex projects involving many contributors at various times." *Egenera*, 972 F.3d at 1376; *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("The line between actual contributions to conception and the remaining, more prosaic contributions to the inventive process that do not render the contributor a co-inventor is sometimes a difficult one to draw."); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1352-53 (Fed. Cir. 1998) (recognizing "[t]he difficulty of determining legal inventorship"). Being wrong about complicated legal determinations that require application of found facts is not the same as changing *purely factual* positions where judicial estoppel is at its highest ebb. *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 802 (1999) (expressing doubt about use of judicial estoppel when the alleged contradictory positions are not binary factual assertions, such as "'The light was red/green,' or 'I can/cannot raise my arm above my head,'" but complex legal analyses requiring application of found facts).

### B. Implicit Did Not "Succeed in Persuading" the Board to Accept Its First Position

The judicial estoppel doctrine is inappropriate unless the earlier position is accepted by the agency. Here, the Board found that Implicit had argued that

31

Messrs. Balassanian and Bradley were inventors, and that this proposition was accepted by the tribunal in rendering its decision. Appx12-13; Appx17-18; Appx89-90; Appx94-95. But this is an artificially narrow characterization of Implicit's real position—it argued instead that named parties Mr. Balassanian and Mr. Bradley were inventors *of claims that could antedate Janevski* because the work of an employee, Mr. Carpenter, *inured to their benefit*. Appx40-42; Appx112-116. The Board's decision on this second factor takes only a subpart of Implicit's actual argument, viewed in isolation at a particular snapshot in time— i.e., "*during trial* we accepted Patent Owner's representations as to the inventorship of the subject matter of the patents"—as though this satisfies the "succeed in persuading" factor. Appx17-18 (citation omitted, emphasis added); Appx17 ("we *started* with the testimonial evidence on inventorship presented by Patent Owner at trial") (emphasis added). Appx94-95. That is not where the analysis ended-up by the conclusion of the Board's trial, however: in no way did Implicit "succeed in persuading" the Board to adopt its position at issue in the proceedings below, i.e., that the previously named inventive entity was correct and *could antedate* Janevski *by virtue of inurement*. Instead, the Board held just the opposite—that the work of Mr. Carpenter *did not inure to their benefit*. Appx43-48; Appx118-126. There is simply no "risk of inconsistent court determinations" here, the main rationale for applying the nonstatutory doctrine of judicial estoppel.

*New Hampshire*, 532 U.S. at 750-51 (citation omitted). That is especially true given that this Court expressly instructed the Board on remand to "address[] what, if any, impact the certificates of correction would have on the final written decisions in these cases." D.I. 85, 2. Such findings would supersede any alleged inconsistency.

Moreover, even if the Board "accepted" Implicit's "representations on inventorship"—a legal conclusion—as the initial premise in considering inurement, that does not mean that it actually "accepted" them as persuasive for purposes of judicial estoppel. Appx17-18; Appx94-95; *see also Cleveland*, 526 U.S. at 802; *Egenera*, 972 F.3d at 1379-80 (finding that Egenera had not succeeded in persuading the PTO to accept its first position and discounting Cisco's administrative judicial estoppel precedents because they involved "'inconsistent statements about an *objective fact* . . .' rather than 'context-related legal conclusions'" (citation omitted)). In fact, the Board repeatedly stated that it "did not make a determination on inventorship." Appx16; Appx93; *see also* Appx13; Appx15-16; Appx17-18 n.9; Appx90; Appx92-93; Appx94-95 n.9. This underscores the inapplicability of judicial estoppel here. *See United Steelworkers of Am. v. Ret. Income Plan for Hourly-Rated Emps. of ASARCO, Inc.*, 512 F.3d 555, 563-64 (9th Cir. 2008) (finding that failure to demonstrate judicial acceptance

precludes application of estoppel where "the district court never *held*" the notion urged by the party).

"The showing of judicial acceptance must be a strong one." *Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010). And while a party may not need to have its proposition lead to a "favorable ruling on the merits," Appx18 (quoting *Perry*, 629 F.3d at 11); Appx95, the proposition still needs to be definitively "adopted" by the tribunal "either in a preliminary matter or as part of a final disposition," *Perry*, 629 F.3d at 11. The Board never credited—much less actually accepted and adopted—Implicit's inurement theory for antedating *Janevski*. Appx43-48; Appx118-126. Thus, the Board erred as a matter of law in its consideration of the second factor.

### C. Implicit Would Gain No "Unfair Advantage" If Judicial Estoppel Were Not Applied

The final factor—whether there is an "*unfair* advantage, *New Hampshire*, 532 U.S. at 750-51 (emphasis added)—does not support judicial estoppel either.

As an initial matter, there is nothing "unfair" about exercising a statutorily prescribed right to correct inventorship commensurate with relevant factfinding. Nor is there anything "unfair" about Implicit swearing behind references. Only with the benefit of the Board's findings regarding inurement did Implicit determine that Mr. Carpenter should be included as an inventor. This is how § 256's retroactivity is designed to work for the benefit of actual inventors. *Egenera*, 972

F.3d at 1376-78; *see infra* Section V. Both precedent and the text of § 256 recognize that "a patent cannot be invalidated if inventorship can be corrected instead." *Egenera*, 972 F.3d at 1376.

Nevertheless, the Board held that the "third factor of judicial estoppel is met" here. Appx18-19; Appx95-96. Specifically, the Board determined that continuation of the IPR proceedings under Implicit's corrected inventorship would require—"in order to comply with due process and the Administrative Procedure Act"—permitting Sonos "the opportunity to respond to the new inventorship theory, likely through additional briefing." Appx18-19; Appx95-96. And because "revisiting these proceedings under changed circumstances would require the additional expenditure of resources by Petitioner," the Board concluded that Sonos would face "detriment and prejudice." Appx19; Appx96.

But providing both parties an opportunity to address the impact of Implicit's corrected inventorship *was the point of this Court's remand*. D.I. 85, 2. Once the retroactivity of Implicit's inventorship corrections was properly established as a matter of law—the subject of the first briefing round—the Board should have permitted the parties an opportunity to submit additional briefing. Sonos even requested as much, but was denied in the Board's scheduling order. Appx1200 ("Petitioner also asserted that the briefing should be permitted to identify the issues which had not been addressed in the Final Written Decisions if it were to be

35

determined that there is retroactive effect of the certificates of correction on our

Final Written Decisions."); Appx4884. That additional briefing was required to

fulfill this Court's mandate cannot rise to "detriment and prejudice" under the third

prong of judicial estoppel.[4] Appx19; Appx96.

Moreover, Sonos's complaint that Implicit "is seeking to change the Board's

Final Written Decisions and this prejudices [Sonos] because it spent resources

litigating this matter to resolution" rings hollow. Appx18; Appx95. It is *Sonos* that

brought these Board proceedings in the first place, and it is *Sonos* that proffered the

alleged grounds of unpatentability all based on *Janevski*, *see SAS v. Iancu*, 138

S.Ct. 1348, 1355-56 (2018) ("the petitioner is the master of its complaint"). The

fact that Implicit has appealed "to change the Board's Final Written Decisions" is

no different from every other IPR appeal. *See* Appx18; Appx95. Sonos cannot

claim unfair prejudice simply because there is no final "resolution" until all

---

[4] The Board in a footnote states: "The Federal Circuit found that there was no unfair advantage to Egenera . . . because the Board considered the opposing party's prior art without addressing Egenera's priority arguments, so the change in inventorship 'ended up not making a difference.'" Appx20 n.10 (quoting *Egenera*, 972 F.3d at 1381); Appx97 n.20. But there would be no unfair advantage here either; as explained above, the Board never accepted Implicit's inurement arguments. And this Court remanded for the Board to determine in the first instance whether Implicit's corrected inventorship would "mak[e] a difference," Appx20 n.10 (quoting *Egenera*, 972 F.3d at 1381); Appx97 n.20, on the merits. *See* D.I. 85, 2 ("address[] what, if any, impact the certificates of correction would have on the final written decisions in these cases").

appellate procedures conclude. Appx18; Appx95. Nor can it claim unfair prejudice simply because Mr. Carpenter and Implicit corrected inventorship as permitted by Congress. *See* 35 U.S.C. § 256.

Because the Board erred as a matter of law in its consideration of all three equitable estoppel factors, this Court should again remand to the Board with explicit instructions to consider the merits of Sonos's patentability challenge in light of Implicit's corrected inventive entity.

## IV. Neither Forfeiture nor Waiver Apply Here

In a footnote in its "*Waiver*" section, the Board reveals that it is using the term "waiver" to denote "both waiver and forfeiture" indiscriminately throughout the Final Written Decisions on Remand. *See* Appx23 n.11; Appx100 n.11. While the Board acknowledges the substantive difference between these doctrines, *see id.*, it further explains that the Board "typically" uses the term "waiver" in IPR proceedings even when it is actually addressing "forfeiture." *See* Appx23 n.11; Appx100 n.11. But the footnote never indicates which passages are directed to "untimeliness" and which are to "intentionality"—only that it could be either. Appx23 n.11; Appx100 n.11. As such, this whole section of the Board's opinion on remand is confusing; Implicit has often had to guess what statements apply to each doctrine. Because the Board is knowingly conflating these words, *see* Appx23 n.11; Appx100 n.11, the Board's entire argument in this section lacks the

reasonable clarity required for review under the Administrative Procedure Act. *See* 5 U.S.C. § 706; *see also Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 992 (Fed. Cir. 2017) ("The Board, as an administrative agency, must articulate logical and rational reasons for its decision." (cleaned up) (citation omitted)).

Notwithstanding, Implicit attempts to address these distinct doctrines in separate sections, to the degree that it can accurately divine the Board's intent. Neither doctrine can be applied here. Not only did the Board err in its confusing use of the words, but also because the necessary elements are lacking for each.

### A. Forfeiture

While Sonos never used the word "forfeiture" in its briefing and the Board does so only in its cryptic footnote, Appx23, n.11; Appx100 n.11, it appears that most of the arguments are in that vein, i.e., "the failure to make the timely assertion of a right." *In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) (citation omitted). Implicit was in no way "untimely" in its assertion of Mr. Carpenter's rights under § 256, seeking to be added to the face of both patents and avoid the invalidation of patents he helped invent.

As a threshold, plain-language matter, § 256 on its face "*does not limit the time during which inventorship can be corrected,*" *Stark v. Advanced Magnetics, Inc.*, 29 F.3d 1570, 1573 (Fed. Cir. 1994) (emphasis added), and courts have unequivocally held that "*diligence is not a requirement* to correct inventorship

38

under section 256," *Stark*, 119 F.3d at 1554 (emphasis added). So there was no statutory requirement for Implicit to "timely" act to assert its right to an inventorship correction—it did so in December 2021 and the certificates were issued by the Director in August 2022. Appx174; Appx192. Having no timeliness requirement makes sense given the complexity of inventorship questions, the difficulty of discovering errors years after filing applications, the procedural requirements to effect a formal change under 37 C.F.R. § 1.324, and the legal implication of doing so. "Section 256 thus serves the public policy of preserving property rights from avoidable forfeiture." *See Stark*, 29 F.3d at 1573; *cf. Henderson v. Carbondale Coal & Coke Co.*, 140 U.S. 25, 33 (1891) ("[F]orfeitures are never favored. Equity always leans against them, and only decrees in their favor when there is full, clear and strict proof of a legal right thereto."). At bottom, Congress just wants to get inventorship right, no matter when. Accordingly, § 256 is not time-bound in any way and the correction adding Mr. Carpenter here was completed before any substantive review on appeal.

Next, there is no forfeiture due to an untimely assertion of Mr. Carpenter's inventorship rights during the proceedings below. In this case, Implicit sought correction of its patents *after* the Final Written Decisions in view of various Board statements and factfindings, while the proceedings were ongoing. *See supra* Section D. And as this Court explained in *Egenera*, the inventorship analysis can

be informed by a tribunal's view of the evidence. 972 F.3d at 1376-78. During the original Board trial, Implicit argued that the named inventors—Mr. Balassanian and Mr. Bradley—could antedate *Janevski* because the contributions of Mr. Carpenter inured to their benefit. Appx40-42; Appx112-116; *see supra* Section B. But in such a "complex" inquiry, the Board's conclusions "illuminated Mr. [Carpenter]'s necessary presence as an inventor," *see Egenera*, 972 F.3d at 1376, 1378, which timely led to correction petitions *before* Director Review finalizing the proceedings below. *See supra* Section D. Implicit had long advocated for such a review of these proceedings under *Arthrex*, and the Supreme Court provided this constitutional remedy. *See supra* Sections C-D. For all Sonos's protests with respect to timing, D.I. 79, 14-21; D.I. 82, 2-4, this Court already saw fit to first stay and then remand this case with the relevant timeline well-defined. D.I. 81; D.I. 85, 2. There is no suggestion from the Court that Implicit was not entitled to seek corrections *when* it did, D.I. 85, or it could simply have denied the remand request out of hand for forfeiture. It did not. *Id.*; *see LendingTree, LLC v. Zillow, Inc.*, 656 F. App'x 991, 999 (Fed. Cir. 2016) (remanding, where inventorship certificates of correction issued during the appeal, to allow the district court to reevaluate the judgment of invalidity due to previously misnamed inventorship, because "absent a remand, the judgment of invalidity will remain in place, which would appear to violate the letter and spirit of § 256") (citing *Airbus*

*DS Commc'ns, Inc. v. microDATA GIS, Inc.*, No. 15-1037, D.I. 28 (Fed. Cir. Mar. 18, 2015) (nonprecedential) (remanding, where inventorship certificates of correction issued during the appeal, to allow the district court to determine whether to vacate the invalidity judgment due to previously misnamed inventorship)).

The Board on remand, however, did not perform the merits analysis it should have and instead imposed a strict forfeiture rule on Implicit, faulting it for not correcting sooner: "If Patent Owner's evaluation of its own evidence now justifies a change in inventorship, *that evaluation should have also justified such a change during trial . . . .*" Appx23 (emphasis added); Appx100-101. Such a "during trial" timing requirement by the Board for inventorship corrections erroneously abrogates the plain language of the statute and subverts relevant case law. *E.g.*, *Egenera*, 972 F.3d at 1378-79.

### B.  Waiver

In opposing Implicit's motion to remand this case back to the Board so that patentability could be reconsidered in light of the corrected inventive entity, Sonos twice argued that Implicit had "waived" the issue. D.I. 79, 14-21; D.I. 82, 2-4. And twice, this Court granted Implicit's requested relief over Sonos's waiver objections. D.I. 81 (granting stay); D.I. 85 (granting remand). In fact, this Court ultimately remanded due to "intervening circumstances" and ordered the Board to

"address[] what, if any, impact the certificates of correction would have on the final written decisions in these cases." D.I. 85, 2.

On remand, rather than address the impact that the certificates of correction had on patentability, the Board determined that "waiver" precluded Implicit from relying on its corrected inventive entity. The Board states:

> [W]e determine that Patent Owner has waived its assertions on revised inventorship because it failed to present them during the trial in these proceedings. *Waiver is the intentional relinquishment of a known right. During the course of trial, Patent Owner was cautioned "that any arguments concerning patentability not raised in the response may be deemed waived."* This is consistent with the Board's Consolidated Trial Practice Guide to waive later arguments when issues are not raised in the patent owner response.

Appx22-23 (emphasis added) (citing Appx463; *In re Google Tech. Holdings*, 980 F.3d at 862; *In re Nuvasive, Inc.*, 842 F.3d 1376, 1379-82 (Fed. Cir. 2016)); Appx99-100.[5] If the Board is suggesting above that a *failure* to include an inventorship correction within the Patent Owner's Response constitutes an "intentional relinquishment of a known right," this cannot be. The Board's "Consolidated Trial Practice Guide" and agency regulations cannot limit by omission the inventorship corrections widely available under § 256. *Aerolineas*

---

[5] The Board's statement here underscores its confusion in terminology; there is no true waiver analysis discernible anywhere in the section. When the Board says "waiver," its focus appears to be on timeliness, i.e., forfeiture, but this cannot be verified. *See* Appx21-23; Appx98-100; *see supra* pp. 37-38.

*Argentinas v. United States*, 77 F.3d 1564, 1575 (Fed. Cir. 1996) ("We agree, for a regulation cannot override a clearly stated statutory enactment.") (citing *Skinner v. Brown,* 27 F.3d 1571, 1575 (Fed. Cir. 1994) ("We need not defer to the VA's regulation because it is contrary to the plain meaning of the statute.")).

At no point did Implicit ever intentionally communicate—explicitly or implicitly—that they would *not* seek such a correction after hearing the Board's views on the inurement evidence. Moreover, suggesting that Implicit intentionally parted with a "*known*" right to the correction at that point in time is baseless—the Director did not actually grant the certificates until much later.

It is irrelevant that "[d]uring the *inter partes* proceedings, Patent Owner had in its sole possession the evidence of inventorship and intentionally presented evidence asserting a certain inventorship. That evidence remained unchanged during the course of the trial." Appx23; Appx100. But the Board's view of it *did* change Implicit's legal analysis of inventorship—a complicated issue of law. And that is not waiver. Implicit was entitled to argue the presumptively correct inventorship on the patents without actively inserting into the trial an alternative inventive entity to preserve its rights under § 256. There is no such timing requirement in the statute.

The Board's characterization of the original inventorship entity as being "intentionally presented" by Implicit, Appx23; Appx100, cannot disqualify later

corrections under a waiver theory—that is, it cannot be that one waives the full panoply of § 256 correction rights simply by first relying on an inventive entity at one time and then on a corrected inventive entity at a later time, as if a 'change' suffices to show "intentionality." Appx23; Appx100. That would have made *Egenera*'s outcome impossible. *See* Appx24 n.13; Appx101 n.13. In fact, *Egenera* taught the opposite: the AIA liberalized the application of § 256 even further, making inventorship corrections available in *more* circumstances. 972 F.3d at 1377 ("[Section] 256 does not exclude 'considered acts,' or even 'deceptive intention,' from the meaning of 'error.'" (citation omitted)). Indeed, *every* Patent Owner seeking a change under § 256 has necessarily pursued another inventorship theory before the agency previously. That cannot effect a waiver—§ 256(b) *presumes* that the patentee is changing a previous inventorship position. *See* 37 C.F.R. § 1.41 (requiring patent applicants to specify inventorship upon filing a new application); *see also* 35 U.S.C. § 116(c); 37 C.F.R. § 1.48 (permitting applicants to correct inventorship during prosecution).

The Board's unprecedented application of waiver—if that was its holding— defied Congress's command and legislative intent for § 256.

## V. Equitable Doctrines Such as Judicial Estoppel, Waiver, and Forfeiture Should Not Nullify Application of a Savings Provision Enshrined in Statute

Congress mandated in strong terms that an error in inventorship "*shall not invalidate the patent*" when, as here, the error is corrected. 35 U.S.C. § 256(b) (emphasis added). Equitable doctrines should not be used if they have the effect of nullifying a curative statute like § 256 with mandatory "shall" verbiage in the text. *See Miller v. French*, 530 U.S. 327, 337 (2000) (explaining in the context of 18 U.S.C. § 3626(e)(2) that "[t]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion" (citation omitted)). The language and construction of the inventorship correction statute at § 256 displaces—by "inescapable inference"—the discretion of the agency here. *See id*. at 340-41 (citation omitted).

The Board's improper use of judicial estoppel, waiver, and forfeiture defeated the retroactive application of Implicit's inventorship corrections. These doctrines inherently conflict with § 256's retroactive nature. *See supra* Section II; *Egenera*, 972 F.3d at 1377; *cf. SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 331-46 (2017) (holding that equitable timeliness doctrines, e.g., laches, do not override the congressionally enacted statute of limitations for damages). Section 256 contains no hint of an exception for application of judicial estoppel, waiver, or forfeiture. And the Board cited no precedent for the

proposition that it can override § 256's command to permit correction of inventorship yet nevertheless apply such nonstatutory, discretionary doctrines to nullify the effect of that correction. *See generally* Appx11-24; Appx88-101. By relying on these equitable doctrines, the Board effectively faulted Implicit for actions—taken or not taken—*prior* to securing the retroactive correction that it was entitled to obtain when it did. *See Stark*, 29 F.3d at 1573 (holding that § 256 on its face "does not limit the time during which inventorship can be corrected").

Indeed, the plain reading of § 256 is consistent with the "strong public policy rationale for making a change of inventorship retroactive in effect." *See, e.g.*, *Roche*, 551 F. Supp. 2d at 357 n.5. This Court has recognized that § 256 was enacted as a "savings provision" to attenuate the harsh effects on actual inventors of errors in ascertaining proper inventorship. *See Egenera*, 972 F.3d at 1376-77 ("Our precedent recognizes that a patent cannot be invalidated if inventorship can be corrected instead."); *see also* S. Rep. No. 82-1979, at 7-8 (1952), *reprinted in* 1952 U.S.C.C.A.N. 2394, 2401 ("Very often two or three people make an invention together. They must apply as joint inventors. If they make a mistake in determining who are the true inventors, they do so at their peril. This provision permits a bona fide mistake in joining a person as [an] inventor or in failing to join a person as an inventor to be corrected."). The corrections by Implicit here align with the very purpose of § 256—to effect "title 35['s] policy of seeking to reward

46

the actual inventors of technological advances." *Egenera*, 972 F.3d at 1377 (citing

*Stark*, 119 F.3d at 1554). This is a rare case and one in which the retroactive effect

of § 256 should be considered and properly applied.

## CONCLUSION

Implicit requests that this Court vacate and remand for the Board to address

the impact of Implicit's corrected inventive entity on the merits of Sonos's

petitioned grounds, as required by this Court's previous order. D.I. 85.


Date: June 13, 2024                    Respectfully submitted,


  /s/  J. Derek McCorquindale
J. Derek McCorquindale
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
(571) 203-2700

Jason L. Romrell
Timothy P. McAnulty
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Counsel for Implicit, LLC*

47

# ADDENDUM

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SONOS, INC.,
Petitioner,

v.

IMPLICIT, LLC,
Patent Owner.

————————

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)[1]

————————

Before MICHELLE N. WORMMEESTER, SHEILA F. McSHANE, and
NABEEL U. KHAN, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
*35 U.S.C. §§ 144, 318; 37 C.F.R. § 42.5(a)*

---

[1] We exercise our discretion to issue one Order to be filed in each
proceeding. The parties are not authorized to use this style heading for any
subsequent papers.

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)

## I. INTRODUCTION

At trial, Implicit, LLC ("Patent Owner") attempted to antedate the principal prior art reference asserted by Sonos Inc. ("Petitioner"), arguing that the originally named inventors had conceived of the invention and communicated it to their engineering staff, who then reduced it to practice prior to the effective date of the prior art reference. We determined, however, that Patent Owner's evidence was insufficient to establish prior conception of the invention and the communication of the invention such that any actual reduction to practice could inure to the inventors' benefit. Patent Owner appealed our Final Written Decisions, and while the appeals were pending, Patent Owner sought changed inventorship of the patents-at-issue and the USPTO issued corrections to inventorship. The United States Court of Appeals for the Federal Circuit remanded the cases to us for an order addressing what impact, if any, the certificates of correction would have on the Final Written Decisions in the cases. Herein, we determine that, even in light of the general retroactive effect of 35 U.S.C. § 256, judicial estoppel and waiver apply under the specific circumstances of these cases. Accordingly, Patent Owner's certificates of correction of inventorship have no impact on the Final Written Decisions.

## II. BACKGROUND

### A. Initial Proceedings Before the Board

Petitioner filed Petitions requesting *inter partes* review of claims 1–3, 6–9, 12, 16, 19, and 23–25 of U.S. Patent No. 7,391,791 B2 (Ex. 1001, "the '791 patent") in IPR2018-00766 ("IPR766") and for review of claims 1–3, 8, 11, and 17 of U.S. Patent No. 8,942,252 B2 (Ex. 1001, "the '252 Patent") in IPR2018-00767 ("IPR767"). IPR766, Paper 1; IPR767, Paper 1. Patent Owner filed Preliminary Responses in both cases. IPR766, Paper 6; IPR767,

2

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)

Paper 6. On September 19, 2018, in IPR766, we instituted *inter partes* review on the grounds presented in the Petition as to whether claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent are anticipated by Janevski[2] or would have been obvious over Janevski alone and in combination with other prior art. IPR766, Paper 10. On September 19, 2018, in IPR767, we also instituted *inter partes* review on the grounds presented in the Petition as to whether claims 1–3, 8, 11, and 17 of the '252 patent would have been obvious in view of Janevski alone and in combination with other prior art. IPR767, Paper 8.

Trials were conducted in both IPR766 and IPR767. On September 16, 2019, we entered a Final Written Decision (IPR766, Paper 46, "Final Dec." or "Final Decision")[3] in IPR766, determining that Petitioner had demonstrated by a preponderance of the evidence that claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent are anticipated by Janevski or would have been obvious over Janevski, alone or in combination with other prior art. On September 16, 2019, we also entered a Final Written Decision (IPR767, Paper 40) in IPR767, determining that Petitioner had demonstrated by a preponderance of the evidence that claims 1–3, 8, 11, and 17 of the '252 patent would have been obvious in view of Janevski alone or in combination with other prior art.

An issue addressed in the Final Written Decisions was Patent Owner's assertion that Janevski did not constitute prior art to the challenged claims under § 102(e) because the subject matter of the claims was conceived and

---

[2] U.S. Patent No. 7,269,338 B2 (issued September 11, 2007) (Ex. 1007).

[3] Because of the substantial similarities in issues raised and the contents of the filings in IPR766 and IPR767, hereafter we refer to the filings of IPR766 as representative, unless otherwise noted.

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)

actually reduced to practice prior to Janevski's filing date of December 11, 2001. *See* Final Dec. 11. We determined that the evidence presented by Patent Owner was insufficient to carry its burden of production to establish conception of the invention and the communication of the invention such that any actual reduction to practice could inure to the inventors' benefit. *See id.* at 17–22.

*B. Proceedings Before the Federal Circuit*

On November 8, 2019, Patent Owner filed Notices of Appeal to the Federal Circuit for review of the Final Decisions. *See* Paper 47. On November 30, 2021, the Federal Circuit remanded the cases for the limited purpose of allowing Patent Owner the opportunity to request Director review of the Final Written Decisions. Ex. 3003. On December 17, 2021, Patent Owner petitioned for certificates of correction to add an individual, Guy Carpenter, as an inventor to the patents-at-issue. *See* Paper 62, 5 ("PO Remand Br."). On December 30, 2021, Patent Owner filed requests for Director review of the Final Written Decisions (Ex. 3100), which were denied on February 7, 2022 (*see* Paper 53). On March 7, 2022, Patent Owner filed Amended Notices of Appeal. *See* Paper 54.

On June 9, 2022, at the Federal Circuit, Patent Owner filed a motion for remand to await decision on the petitions and then to require the Board to consider the effect of changed inventorship. *See* PO Remand Br. 6. After the inventorship correction was granted by the USPTO on August 18, 2022, Patent Owner notified the Federal Circuit and reiterated its request for remand to the Board. *See id.* at 6; Ex. 2097 (Certificate of Correction).

On November 9, 2022, the Federal Circuit issued an Order, taking note of the intervening correction of inventorship certificates that Patent Owner alleged would serve to moot the appeals. Paper 59. The Federal

4

**Appx4**

Circuit stated that "[a]llowing the PTAB to consider the impact of these intervening circumstances on the decisions on appeal in the first instance may conserve party and judicial resources." *Id*. at 2. The Order directed that

> [t]hese appeals are remanded for the sole purpose of having the PTAB issue an order addressing what, if any, impact the certificates of correction would have on the final written decisions in these cases. This court retains jurisdiction over the appeals.

*Id*.

### C. Proceedings on Remand

The parties requested a conference call to discuss the procedure on remand. On January 25, 2023, a call was convened with counsel for Petitioner and Patent Owner. *See* Ex. 2096. During the call, both parties requested briefing, with opening briefs of 15 pages, and agreed that briefings were to be directed to the potential retroactive effect of the certificates of correction on the Final Written Decisions. Paper 60, 2. Petitioner asserted that the briefing should be permitted to identify the issues which had not been addressed in the Final Written Decisions, if it was determined that there is a retroactive effect of the certificates of correction on our Final Written Decisions. *Id*.

We permitted additional briefing to address the remand, with Petitioner filing an opening brief (Paper 64, "Pet. Remand Br."), and Patent Owner filing an opening brief (Paper 62, "PO Remand Br."). Petitioner filed a responsive brief (Paper 66, "Pet. Remand Resp. Br."), and Patent Owner filed a responsive brief (Paper 65, "PO Remand Resp. Br.").

5

**Appx5**

*D. Issues Related to the Status of Janevski as Prior Art*

Janevski is the primary prior art reference that Petitioner relied upon in its challenges to claims in IPR766 and IPR767. *See* Final Dec. 2–3. Patent Owner asserted that Janevski does not constitute prior art to the challenged claims under § 102(e) because the subject matter of the claims was conceived and actually reduced to practice prior to Janevski's filing date of December 11, 2001. *Id.* at 11. During the trials, Patent Owner contended that Edward Balassanian and Scott Bradley conceived of the inventions of the patents at least by December 11, 2001. *Id.* at 15. Patent Owner asserted that the inventors communicated the inventions to an internal engineering and development staff, working primarily with engineer Guy Carpenter for implementation.[4] *Id.* Patent Owner argued that source code corroborated Mr. Balassanian's testimony concerning the invention's conception and reduction to practice prior to December 11, 2001. *Id.*

We determined that the evidence was insufficient to establish the conception of the invention and the communication of the invention to Mr.

_____

[4] The most relevant evidence of record related to these issues is Mr. Balassanian's declaration testimony that:

> Mr. Bradley and I solved the synchronization problem and conceived the inventions set forth in the Claims of the Patents. We then began working on the implementation of the inventions thereafter, as detailed below. We communicated those inventions to BeComm's internal engineering and development staff to reduce them to practice. We worked primarily with Guy Carpenter, an Engineering Master at BeComm, to implement the inventions, as I describe below.

Ex. 2001 ¶ 33. Also relevant is Mr. Balassanian's deposition testimony: "Q. Did Guy Carpenter contribute to . . . to any conception of the claims? . . . THE WITNESS: I don't believe so." Ex. 1019, 59:9–18.

Carpenter such that any reduction to practice could inure to the inventors' benefit. *See* Final Dec. 18–22. We therefore found that because Patent Owner failed to meet its burden to demonstrate earlier conception of the invention such that antedating did not apply, Janevski constituted prior art to the challenged claims of the patents under § 102(e). *Id*. at 22. We found the challenged claims unpatentable as anticipated by Janevski or obvious over Janevski, alone or in combination with other prior art. *Id*. at 50.

Since the time of trial, as discussed above, Patent Owner petitioned for and received certificates of correction of inventorship, which name Guy Carpenter as an inventor of the patents in the proceedings. *See* Ex. 2097; Paper 62, 5–6. Below we discuss and evaluate the potential impact the certificates of correction have on the Final Written Decisions in these cases in accordance with the Federal Circuit's Order.

## III. DISCUSSION

### A. 35 U.S.C. § 256

The parties take differing positions on whether certificates of correction have retroactive effect on inventorship under 35 U.S.C. § 256. Patent Owner argues that the language of the statute strongly indicates that inventorship corrections have retroactive effect because, in contrast to other correction provisions, such as §§ 254 and 255, that "contain an explicit limitation 'for causes thereafter arising,' . . . such prospective-bound language is entirely absent from inventorship corrections of § 256." PO Remand Br. 7 (emphasis omitted). Patent Owner argues that under a plain language analysis of the statute, the legislative intent of these correction provisions is clear: a "Certificate of Correction issued for correction of inventorship has retroactive effect." *Id*. at 7–8 (quoting *Roche Palo Alto LLC v. Ranbaxy Labs. Ltd.*, 551 F. Supp. 2d 349, 357, 359 (D.N.J. 2008)).

7

**Appx7**

Patent Owner asserts that, in addition to the language of the statute, case law supports the retroactive effect of inventorship corrections. PO Remand Br. 8–11. For example, Patent Owner contends that in *SIPCO*, the Board analyzed the statutory language of § 256 in view of that of § 255 and found that § 256 has retroactive effect. *Id.* at 8–10 (citing *Emerson Elec. Co. v. SIPCO, LLC*, IPR2016-00984, Paper 52 at 17-21 (PTAB Jan. 24, 2020) ("*SIPCO*") (citing to *Vikase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1329 (Fed. Cir. 2001); *Roche*, 551 F. Supp. 2d at 355)).

Patent Owner also asserts "that § 256 was enacted as a 'savings Provision' to attenuate the harsh effects on actual inventors of errors in ascertaining proper inventorship." PO Remand Br. 11 (citing *Egenera, Inc. v. Cisco Systems, Inc.,* 972 F.3d 1367, 1377 (Fed. Cir. 2020) ("*Egenera*")). Patent Owner asserts that provisions such as § 256 should be given liberal construction in favor of applicants. *Id.* at 12 (citing *Patterson v. Hauck*, 341 F.2d 131, 138 (CCPA 1965)).

Petitioner asserts that a certificate of correction for inventorship cannot be used to cure a finding of invalidity under 35 U.S.C. §§ 102(a), (b), and (e), or 103(a). Pet. Remand Br. 2. More specifically, Petitioner contends that "the statute specifies that correcting inventorship can overcome invalidity if the invalidity arises from the act of misnaming inventors. The act of misnaming inventors invalidates a patent under pre-AIA § 102(f)." *Id.* Petitioner argues that Patent Owner "misreads § 256's invalidity-savings provision as granting it the right to use changed inventorship to retroactively address any type of invalidity," but "[t]he language of § 256 does not provide for this." *Id.* at 3. In support, Petitioner refers to *Egenera*, where the alleged infringer raised an improper inventorship issue under § 102(f) as an invalidity defense. *Id.* (citing

8

*Egenera* at 1372). Petitioner distinguishes other cases, not having to do with inventorship or corrections thereof, from the circumstances here. *Id*. at 5–6.

Petitioner further contends that the operative issue "is not whether § 256 applies retroactively in some scenarios, the question is 'does it apply retroactively in this scenario?'" Pet. Remand Resp. Br. 1–2 (emphasis omitted). Petitioner asserts that § 256 applies retroactively to misjoinder and nonjoinder of inventors, but here "correction does not remove the basis for invalidity – it has no direct effect on the §§ 102, 103 invalidity grounds here." *Id*. at 2. Petitioner argues that the case law cited by Patent Owner in its opening remand briefing does not support the retroactive application of § 256. *Id*. at 2–5.

Patent Owner responds by arguing that there are precedential Federal Circuit decisions that addressed the application of § 256 in cases where § 102(f) was not at issue. PO Remand Resp. Br. 2–4. Patent Owner acknowledges that § 102(f) challenges are the most common, but points to the *Riverwood* case, where the Federal Circuit considered the potential application of § 256 under an assessment of prior art under § 102(e). *Id*. at 2–3 (citing *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003)). Patent Owner also relies upon a *Google* case, which considered § 256 under an obviousness analysis with § 102(a) prior art. *Id*. at 3 (citing *Google LLC v. IPA Techs, Inc.*, 34 F.4th 1081, 1088 (Fed. Cir. 2022)). Patent Owner argues that "Section 256 is thus not limited to validity challenges under § 102(f) alone." *Id*.

We begin with the statute. Section 256 states, in relevant part:

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other

9

**Appx9**

> requirements as may be imposed, issue a certificate correcting such error.

> The error of omitting inventors or naming persons who are not inventors *shall not invalidate the patent* in which such error occurred *if it can be corrected* as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256 (emphasis added). In view of the language of the statute, we agree with Patent Owner that it supports the conclusion that a certificate of correction of inventorship should apply retroactively in general. Section 255 states that a certificate of correction "shall have the same effect and operation in law on the trial of actions for causes thereafter arising," indicating that the certificate shall only be effective after issuance. In contrast, § 256's statement "shall not invalidate the patent" "if it can be corrected" indicates that the correction of inventorship generally has a retroactive effect. *Id.*; 35 U.S.C. § 255; *see also SIPCO* at 10, 18–21. The interpretation of § 256 to allow for retroactivity is also consistent with the case law on this issue. *See Vikase*, 261 F.3d at 1329; *Roche*, 551 F. Supp. 2d at 357–358; *Riverwood*, 324 F.3d at 1356; *Google*, 34 F.4th at 1088.

As to Petitioner's arguments, generally, that the retroactive effect of § 256 applies only to 102(f) issues, we do not agree. Consideration of the *Google* case is instructive. In *Google*, the issue the Federal Circuit considered was effect of potential correction of inventorship on whether a reference would be considered prior art under 102(a) under § 256. *Google*, 34 F.4th at 1084, 1088. Similarly, in *Riverwood*, the Federal Circuit considered the potential effect of correction of inventorship to determine whether a reference would be prior art under § 102(e) under § 256. *Riverwood*, 324 F.3d at 1355–56.

We next turn to Petitioner's assertion that Section 256 should not be applied under the specific circumstances here because of judicial estoppel and waiver.

### B. Judicial Estoppel

Petitioner argues that judicial estoppel applies here to preclude the retroactive effect of § 256. Pet. Remand Br. 6–9. Petitioner asserts that judicial estoppel applies against a party when: (1) the party takes a later position that is "clearly inconsistent" with an earlier position; (2) the party succeeds in persuading a court to adopt the earlier position (which thus poses a "risk of inconsistent court determinations"); and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 7 (citing *Transclean Corp. v. Jiffy Lube Intern., Inc.,* 474 F.3d 1298, 1307 (Fed. Cir. 2007)). Petitioner contends that all three factors are met because Patent Owner asserted that Mr. Balassanian and Mr. Bradley were inventors and communicated the invention to Carpenter for his subsequent reduction to practice, the Board accepted the premise for the purposes of making findings of fact and rulings of law, and Patent Owner now seeks to derive the unfair advantage of revisiting the Final Written Decisions. *Id.* at 7–9.

In response, Patent Owner argues that estoppel factors 1 and 2 do not apply because its previous position was that "Balas[s]annian and Bradley were inventors of valid claims because the work of Mr. Carpenter inured to their benefit," but Patent Owner did not "'succeed in persuading' the Board of its position." PO Remand Resp. Br. 6 (emphasis omitted). Patent Owner asserts that "[b]eing legally wrong, moreover, is not the same as changing factual positions." *Id.* at 6–7 (emphasis omitted) (citing *Cleveland v. Policy Mgm't Sys.*, 526 U.S. 795, 802 (1999)).

11

Relying on *Egenera*, Patent Owner also contends that "the inventorship analysis can even be informed by a tribunal's view of the evidence, thereby provoking a subsequent correction petition." PO Remand Br. 12 (citing *Egenera* at 1376–78). Because contrary inventorship arguments were previously made, but correction was nevertheless permitted in *Egenera*, Patent Owner argues that it "was justified in correcting inventorship notwithstanding what it may have argued prior to the Board's extensive factfinding regarding Mr. Carpenter and his contributions." *Id*. Patent Owner also contends that § 256 "does not limit the time during which inventorship can be corrected" and "diligence is not a requirement to correct inventorship under section 256." *Id*. at 14 (quoting *Stark v. Advanced Magnetics, Inc*., 119 F.3d 1551, 1554 (Fed. Cir. 1997)) (emphasis omitted).

Petitioner contends that *Egenera* is distinguishable here because "inventorship of Implicit's patent was not at issue in the IPR proceedings." Pet. Remand Br. 4. Petitioner asserts that Patent Owner's decision to pursue change in inventorship was not informed by Board's view on the evidence on inventorship because "the Board did not conclude, and had no occasion to conclude, that Carpenter was either a proper inventor or that he was improperly omitted," nor did Patent Owner ever assert during the IPR proceedings that there was an error in inventorship. *Id*.

We begin our analysis with the first factor of judicial estoppel. Here, there is no dispute that Patent Owner's assertions and evidentiary testimony on the inventorship of the patent, which it raised in the context of its attempt to antedate certain prior art, have changed from the time of the trial to the position now taken on corrected inventorship. More specifically, at trial, Patent Owner explicitly asserted, with the support of the testimony of Mr. Balassanian, that Messrs. Balassanian and Bradley conceived of the

12

inventions of the patents and communicated those inventions to an internal engineering and development staff, including Mr. Carpenter, for implementation. Paper 13, 19–20; Ex. 2001 ¶¶ 6, 33, 42, 46; *see also* Ex. 1019, 59:9–18. Patent Owner has now changed its position and has sought and obtained a correction of inventorship to add Mr. Carpenter as an inventor. *See* PO Remand Br. 5–6; Ex. 2097.

We do not agree with Patent Owner's assertion that it "was justified in correcting inventorship" because "the subsequently filed corrections reflect the Board's determinations." *See* PO Remand Br. 12–13. The Final Written Decision analyzed whether there was sufficient evidence in the record to corroborate Mr. Balassanian's testimony on conception and communication of the invention to Mr. Carpenter. *See* IPR2018-00767, Paper 40, 22 ("In summary, none of the BeComm internal documents, demonstrations of BeComm technology, or BeComm source code *corroborate* Mr. Balassanian's testimony that he and Mr. Bradley conceived of the challenged claims or that they communicated the inventions to Mr. Carpenter.") (emphasis added); *see also* Final Dec. 19–20 (considering documents to determine if they corroborate conception). That is, the issue addressed in the Final Written Decisions was not the correct inventorship of the patents, but rather the *sufficiency* of corroborating evidence of conception and communication of the invention in order for the inventors to benefit from Mr. Carpenter's work. *See* Final Dec. 19–20. For instance, the document that eventually served as the provisional application, which appears to have been written by Mr. Carpenter, was considered only to determine whether it corroborated Mr. Balassanian's testimony. *See id.*

*Egenera* presents a different situation from that here. In *Egenera*, the district court's intervening claim construction justified the change in

13

inventorship. *Egenera* at 1376–79. The Federal Circuit acknowledged that "[i]nventorship . . . can depend on claim construction," and once claim construction was decided, "it was entirely consistent for Egenera" to request correction of inventorship. *Id.*; *see also id.* at 1376 ("Ultimately, *inventorship* is a legal conclusion premised on underlying factual findings, and one that *depends on claim construction.*" (citing *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018); *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002)) (emphases added)). The Federal Circuit found that "the district court's intervening claim-construction and inventorship determinations further justify any seeming inconsistency." *Id.* at 1376, 1379; *see also id.* at 1379 ("[O]nce those issues were decided ['a [claim] construction that the inventorship question was directly predicated on'], it was entirely consistent for Egenera to request an accompanying formal correction of inventorship.").

Here, however, Patent Owner has not identified any changed legal determination upon which inventorship depends that justifies setting aside judicial estoppel. The claim construction ruling in *Egenera* was a legal determination that was largely out of Egenera's control.[5] Our determination regarding the sufficiency of corroborating evidence, on the other hand, is a factual determination based on the documentary evidence of record as argued by Patent Owner, and which was in the sole control of Patent Owner. *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014) ("We have treated the sufficiency of corroboration as a question of fact."). The

---

[5] Indeed, Egenera opposed the district court's construction. *Egenera* at 1379 ("Egenera consistently protested the means-plus-function construction both at the district court and on appeal—a construction that that the inventorship question was directly predicated on.")

documentary evidence in the trial record could be consistent with Patent Owner's assertions during trial that Mr. Balassanian and Mr. Bradley conceived of the invention and then communicated that invention to Mr. Carpenter (had there been sufficient corroborating evidence of that communication). That documentary evidence could also be consistent with Patent Owner's current position that Mr. Carpenter was an inventor all along. We made no such determination, however, specifically regarding inventorship in our Final Written Decisions, nor do we make such a determination now. For example, although we noted in our Final Decision that Mr. Carpenter was the apparent author of the document upon which the provisional application was based and also the apparent author of the source code relied upon by Patent Owner (Final Dec. 20), that determination does not mean that Mr. Balassanian and Mr. Bradley were not the correct inventors of the challenged patents, nor does it mean that Mr. Carpenter was an inventor.[6] Indeed, that Mr. Carpenter authored the document and source code in question is consistent with Mr. Balassanian's testimony that Mr. Carpenter worked on his behalf in implementing the invention. As seen, correct inventorship in this instance does not depend on our determination in the Final Decision regarding the sufficiency of corroborating evidence presented by Patent Owner. Accordingly, *Egenera* is distinguishable from the situation here.

Additionally, Patent Owner sought the change of inventorship post-trial, and as discussed in *Egenera*, the Patent Office examines a change of inventorship request only for the presence of supporting statements and the

---

[6] As we note below, we have not determined whether the source code practices the claimed inventions.

required fee and "[n]o substantive examination occurs, and the PTO does not consider the substantive adequacy of the petition." *See Egenera* at 1380 (citing 37 C.F.R § 1.324(b); MPEP § 1481.02). Thus, under *Egenera*, the Patent Office's grant of a certificate of correction "without more, [does not] count[] as 'persuasion' . . . for judicial-estoppel purposes," and is limited to a ministerial, rather than a legal, determination. *Id*.

We are also not persuaded by Patent Owner's argument that being legally wrong about inventorship is not the same as changing factual positions. PO Remand Resp. Br. 6–7 (citing *Cleveland Policy Mgm't Sys.,* 526 U.S. at 802). To the extent that Patent Owner is suggesting that its initial identification of named inventors is merely "legally wrong" based on our determinations in the Final Decisions, rather than factually different, we do not agree. The Final Decisions did not make a determination on inventorship, that is, as discussed, the Decisions only addressed whether the documentary evidence corroborated testimonial evidence of conception and communication of the invention. *See* Final Dec. 20. Patent Owner possessed and presented its documentary evidence, including sworn inventorship testimony, in support of its antedating assertions at trial. Patent Owner's changed position on inventorship therefore, represents a change in factual positions, contrary to its argument. For instance, Mr. Balassanian's testimonial evidence concerning the conception and reduction to practice of the invention (Ex. 2001 ¶ 33), which formed the basis for our review of the documentary evidential support at trial, is now contrary to the current named inventorship. Patent Owner's positions are clearly inconsistent—at trial, Patent Owner asserted a certain inventorship, and Patent Owner then sought a different inventorship. Accordingly, the first factor for judicial estoppel is met.

16

As to the second factor, whether the party must have succeeded in persuading a court (or agency)[7] to adopt the earlier position, as discussed above, we started with the testimonial evidence on inventorship presented by Patent Owner at trial and evaluated other evidence in that light. More specifically, the supporting evidence presented to us includes the testimonial evidence of Mr. Balassanian, with that testimony stating, for example, "Mr. Bradley and I solved the synchronization problem and conceived the inventions set forth in the Claims of the Patents," and "[w]e communicated those inventions to BeComm's internal engineering and development staff to reduce them to practice." Ex. 2001 ¶ 33. Based on the testimonial evidence provided, during trial we accepted Patent Owner's representations as to the inventorship of the subject matter of the patents, and considered whether the documentary evidence provided corroboration of that testimony under a rule of reason—and our associated determinations were directed to the sufficiency of the documentary evidence.[8] *See* Final Dec. 18–22.

Moreover, although Patent Owner argues that it did not "'succeed in persuading' the Board of its position," (PO Remand Resp. Br. 6)[9], as

---

[7] Below we discuss the issue of whether judicial estoppel can be applied in an IPR administrative proceeding.

[8] The situation here differs from that in *Egenera*, where the Federal Circuit considered representations made to the PTO under the second factor because the district court relied only on the PTO's acceptance of representations in the inventorship petition. *Egenera* at 1380. Here, in contrast, the Board directly considered evidence provided to us by Patent Owner, which, as discussed, was part of the trial record.

[9] In Patent Owner's Rehearing Request for Director Review, Patent Owner also argued that "The Board's Decision identified the specific role that Mr. Carpenter played in the process of invention . . . While Implicit argued in the trial proceedings that the work of Mr. Carpenter, as a company employee,

17

explained above, the Final Decisions were based on Patent Owner's representations on inventorship—we evaluated the documentary evidence in light of Patent Owner's testimony and arguments on the correct inventorship. "[A] party need not show that the earlier representation led to a favorable ruling on the merits . . . but must show that the court adopted and relied on the represented position either in a preliminary matter or as part of a final disposition." *Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010); *see also Transclean Corp. v. Jiffy Lube Intern., Inc.*, 474 F.3d 1298, 1307 (Fed. Cir. 2007). Accordingly, the second factor of judicial estoppel is met.

For the third factor, Petitioner argues that Patent Owner is seeking to change the Board's Final Written Decisions and this prejudices Petitioner because it spent resources litigating this matter to resolution. Pet. Remand Br. 9. In opposition, Patent Owner argues that "[a]fter the Board made its determinations," Patent Owner "saw the need to correct inventorship in order to avoid future § 102(f) assertions." PO Remand Resp. Br. 7. Patent Owner asserts that "[t]here is nothing 'unfair' about exercising a statutory right to correct inventorship commensurate with Board factfinding." *Id*.

Patent Owner may avail itself of its statutory rights; however, the issue is not the exercise of those rights, but rather whether this results in a detriment to Petitioner. If there were a continuation of these proceedings under changed circumstances, in order to comply with due process and the

---

ought to inure to the benefit of Messrs. Balassanian and Bradley as named coinventors, the Board rejected this view." Paper 52, 10. Although Patent Owner's argument suggests some determination of inventorship at trial, that is not accurate. As discussed above, we evaluated the evidence to determine where there was communication of the invention to Mr. Carpenter for implementation, and there was no determination as to whether Mr. Carpenter was, or should have been named, as an inventor. Final Dec. 21.

18

Administrative Procedure Act (APA), Petitioner would be permitted the opportunity to respond to the new inventorship theory, likely through additional briefing, as further discussed below. Accordingly, revisiting these proceedings under changed circumstances would require the additional expenditure of resources by Petitioner. Patent Owner's arguments are further premised on an alleged requirement to change inventorship as a result of the findings of the Final Written Decisions. As discussed, however, the Decisions' evaluation of the evidence provided by Patent Owner was limited to determining whether it provided sufficient evidentiary support for antedating. Accordingly, we do not find Patent Owner's arguments persuasive. In view of the detriment and prejudice to Petitioner, the third factor of judicial estoppel is met.

We now turn to the issue of whether judicial estoppel applies in a situation with a Section 256 inventorship correction. Patent Owner argues that "[j]udicial estoppel—as an equitable doctrine—cannot override a curative statute like § 256." PO Remand Resp. Br. 5. Patent Owner asserts that Section 256 was enacted as a "savings provision" to mitigate the harsh effects of errors on actual inventors. PO Remand Br. 11 (citing *Egenera* at 1377). Patent Owner urges that provisions such as Section 256 "should be given a liberal construction in favor of applicants." *Id*. at 12 (quoting *Hauck*, 341 F.2d at 138).

We disagree with Patent Owner. In *Egenera*, the Federal Circuit acknowledged judicial estoppel can be applied in the context of an administrative tribunal. *Egenera* at 1380 (". . . we agree that judicial estoppel can occur in an administrative tribunal"); *see also id*. n.10 (citing *Trs. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010) ("Judicial estoppel applies just as much when one of the *tribunals is an administrative*

*agency* as it does when both tribunals are courts.") (emphasis added)). Of note, the Federal Circuit in *Egenera* did not reach the issue of whether "judicial estoppel can *never* prevent § 256 from saving a patent's validity" because the criteria for judicial estoppel were not met. *Egenera* at 1378; *see also id*. at 1378–1382. The Federal Circuit further held that "*[w]e do not go so far as to declare that there would be no potential for judicial estoppel* had the Board fully considered and adopted Egenera's swearing-behind arguments."[10] *Id.* (emphasis added).

Here, unlike *Egenera*, Patent Owner represented and provided evidence on its asserted correct inventorship directly to the Board. As discussed, Patent Owner asserted and provided evidence that Messrs. Balassanian and Bradley were the inventors of the patents and Mr. Carpenter implemented the invention. Paper 13, 19–20; Ex. 2001 ¶¶ 6, 33, 42, 46; *see also* Ex. 1019, 59:9–18. Patent Owner's representations were not contested by Petitioner during trial, and Patent Owner's representations were further consistent with the argument and evidence developed and considered by the Board during trial. Now, Patent Owner's position on inventorship is inconsistent with its earlier position and Petitioner would be prejudiced absent estoppel. Accordingly, in this particular circumstance, judicial estoppel applies. Judicial estoppel is an equitable doctrine that prohibits a party from taking inconsistent positions in the same or related proceedings and its purpose is "to protect the integrity of the judicial process."

---

[10] The Federal Circuit found that there was no unfair advantage to Egenera and no prejudice to the opposing party because the Board considered the opposing party's prior art without addressing Egenera's priority arguments, so the change in inventorship "ended up not making a difference." *Egenera* at 1381.

20

*Transclean Corp. v. Jiffy Lube Intern., Inc.*, 474 F.3d 1298, 1307 (quoting *Hossaini v. W. Mo. Med. Ctr.,* 140 F.3d 1140, 1142–43 (8th Cir. 1998)). The application of judicial estoppel is appropriate to hold Patent Owner to its inventorship representations and to the evidence it presented to the Board.

We agree with Petitioner that after Patent Owner was unsuccessful at trial due to the failure of its own evidence, Patent Owner now seeks to have the evidence reconsidered under changed inventorship. Pet. Remand Br. 8–9. Patent Owner had in its sole possession the evidence of inventorship, and we believe that under these circumstances, Patent Owner should be held to the consequences of its choices as to the representations and evidence of antedating that it presented at trial. To hold otherwise would result in prejudice to Petitioner. We consider the potential prejudice to be significant; as discussed, redoing these proceedings would require Petitioner to expend additional resources. Further, under these specific circumstances where Patent Owner has made the inventorship change under its volition, Patent Owner would be afforded the unfair advantage of a "do-over," absent the application of judicial estoppel.

Accordingly, under these specific circumstances, we determine that judicial estoppel applies precluding Patent Owner from relying on the certificates of correction of inventorship in these proceedings.

### C. Waiver

Petitioner contends that waiver provides an independent basis that the certificates of correction should not upset the Final Written Decisions. Pet. Remand Br. 9. Petitioner asserts that Patent Owner "waived the opportunity to argue Carpenter was an inventor by not raising it when it had the chance during the proceeding and, in fact, argu[ed] the opposite – *i.e.*, that

21

**Appx21**

Carpenter was not an inventor and merely reduced the invention to practice." *Id*. at 10. Petitioner argues that waiver is the intentional relinquishment of a known right, and that "[i]t is a hallmark of practice before the PTAB that the failure to raise an argument before the Board is a waiver of that argument." *Id*. (citing, *inter alia*, *VirnetX Inc. v. Apple Inc.*, 665 F. App'x 880, 884 (Fed. Cir. 2016); *Finjan, Inc. v. Cisco Sys., Inc.*, 837 F. App'x 799, 811 (Fed. Cir. 2020)). Petitioner further asserts that Patent Owner "was in possession of all the facts concerning its alleged conception and reduction to practice," and "specifically chose the argument that Balassanian and Bradley conceived and specifically declined to argue that Balassanian, Bradley, and Carpenter conceived." *Id*. at 10–11.

Patent Owner argues that waiver does not apply under *Egenera* because "[i]t does not matter that" Patent Owner never tried to change inventorship during the *inter partes* proceeding or failed to timely raise this argument when it had the chance during the proceeding. PO Remand Resp. Br. 5. Patent Owner asserts that it "was permitted to seek inventorship corrections when it did. The Board's conclusions 'illuminated Mr. [Carpenter]'s necessary presence as an inventor,' and timely led to correction petitions." *Id*. (citing *Egenera* at 1378). Patent Owner contends that Section 256 provides "unique statutory rights" and "is not time-bound." *Id*.

For reasons similar to the discussion on judicial estoppel, we determine that Patent Owner has waived its assertions on revised inventorship because it failed to present them during the trial in these proceedings. Waiver is the intentional relinquishment of a known right. *In*

22

*re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020). [11]

During the course of trial, Patent Owner was cautioned "that any arguments concerning patentability not raised in the response may be deemed waived." Paper 11, 5; *see also In re Nuvasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding Patent Owner waived an argument by not raising the argument in the Patent Owner Response). This is consistent with the Board's Consolidated Trial Practice Guide to waive later arguments when issues are not raised in the patent owner response. Consolidated Trial Practice Guide (Nov. 2019), 52. This is also consistent with the requirement that parties develop their positions through trial and "a party's argument should not be a moving target." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) (quoting *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999)).

During the *inter partes* proceedings, Patent Owner had in its sole possession the evidence of inventorship and intentionally presented evidence asserting a certain inventorship. That evidence remained unchanged during the course of the trial. If Patent Owner's evaluation of its own evidence now justifies a change in inventorship, that evaluation should have also justified such a change during trial when Petitioner had the opportunity to respond to Patent Owner's changed position. As discussed above, the Final Written Decisions evaluated the sufficiency of the evidence on antedating and did

---

[11] *Google* notes that, although "waiver" and "forfeiture" are commonly used interchangeably, waiver is different than forfeiture. *Google*, 980 F.3d at 862 ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'"). Here, as above, both the criteria of untimeliness and intentionality are met, and therefore both waiver and forfeiture apply. We use the term waiver herein, as that is the terminology typically used in IPR proceedings.

not reach findings on inventorship[12]—it was Patent Owner who opted later on an untimely basis to seek a change in inventorship and present it as the basis for revisiting determinations of the Final Written Decisions. Further, in this instance, Patent Owner not only waited until after its Patent Owner Response and Sur-reply was filed, but waited until after the trial had already been complete, and an appeal was pending, to seek a certificate of correction. This set of circumstances is more egregious than the typical set of circumstances under which waiver applies in *inter partes* proceedings.[13]

Accordingly, under these specific circumstances, we determine that waiver applies, precluding Patent Owner from relying on the certificates of correction of inventorship in these proceedings.

---

[12] As discussed above, we disagree with Patent Owner that the findings in the Final Written Decisions "illuminated" the issue of inventorship. That is, Mr. Carpenter's apparent authorship of the document that eventually served as the provisional application is consistent with Patent Owner's argument and testimony at trial that Mr. Carpenter implemented the inventions alleged to be conceived by Messrs. Balassanian and Bradley. Further, as discussed, we evaluated the evidence for communication of the invention to Mr. Carpenter for implementation, but there was no determination as to whether Mr. Carpenter was, or should have been named, as an inventor. *See* Final Dec. 21.

[13] Although waiver was not at issue in *Egenera*, we note that the circumstances here are also distinct from those in *Egenera* where Patent Owner changed inventorship under § 256 during the district court proceeding and during a time when the opposing party would have the opportunity to address the new inventorship position had the court adopted it. *See Egenera* at 1371–72.

24

*C. Impact Of Certificates of Correction on Final Written Decisions*

For the foregoing reasons, we determine that judicial estoppel and waiver apply. Accordingly, the certificates of correction for inventorship have no impact on the Final Written Decisions in these cases.

We also note that if judicial estoppel and waiver had been found not to apply and these proceedings were recommenced under changed inventorship, Petitioner should be permitted the opportunity to respond to Patent Owner's new inventorship of the patents-at-issue at least by being allowed additional briefing in order to comply with due process and the Administrative Procedure Act (APA). *See* Pet. Remand Br. 1. Additionally, if judicial estoppel and waiver had been found not to apply, we also would likely have to determine whether the source code evidence, in view of the related testimonial evidence and argument that is already in the trial record, supports the actual reduction to practice prior to Janevski's effective date, as Patent Owner argues it does. *See* Paper 13, 28–31; Paper 22, 12–22. Amongst other things, this determination would likely entail resolving a claim construction dispute between the parties that may affect the determination of whether the source code practices the claimed invention. *See* Paper 22, 15–16.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Patent Owner's certificates of correction of inventorship have no impact on the Final Written Decisions.

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)


PETITIONER:
Rory P. Shea
Cole B. Richter
George I. Lee
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
shea@ls3ip.com
richter@ls3ip.com
lee@ls3ip.com
boyea@ls3ip.com


PATENT OWNER:

Christian Hurt
THE DAVIS FIRM, PC
churt@davisfirm.com

Timothy P. McAnulty
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
timothy.mcanulty@finnegan.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

SONOS, INC.,
Petitioner,

v.

IMPLICIT, LLC,
Patent Owner.

————————

IPR2018-00766
Patent 7,391,791 B2

————————

Before MICHELLE N. WORMMEESTER, SHEILA F. McSHANE, and
NABEEL U. KHAN, *Administrative Patent Judges.*

McSHANE, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*Inter Partes* Review
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

We have jurisdiction to hear this *inter partes* review under 35 U.S.C. § 6. This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed herein, we determine that Petitioner has shown, by a preponderance of the evidence, that claims 1–3, 6–9, 12, 16, 19, and 23–25 ("the challenged claims") of U.S. Patent No. 7,391,791 B2 (Ex. 1001, "the '791 patent") are unpatentable.

## A. *Procedural Background*

Sonos Inc. ("Petitioner") filed a Petition ("Pet.") requesting *inter partes* review of claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent pursuant to 35 U.S.C. §§ 311–319. Paper 1. Petitioner also filed the supporting Declaration of Roman Chertov, Ph.D. ("Chertov Declaration") to support its positions. Ex. 1009. Implicit, LLC ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6. Pursuant to 35 U.S.C. § 314(a), on September 19, 2018, we instituted *inter partes* review on the grounds of

whether claims 1–3, 6–9, 12, 16, 19, and 23–25 are anticipated by Janevski[1] under 35 U.S.C. § 102(e);[2]

whether claims 1–3, 6–9, and 12 would have been obvious over Janevski under 35 U.S.C. § 103(a); and

whether claims 1–3, 6–9, and 12 would have been obvious over Janevski and Schneidewend[3] under 35 U.S.C. § 103(a).

---

[1] U.S. Patent No. 7,269,338 B2 (issued September 11, 2007) (Ex. 1007).
[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), amended 35 U.S.C. §§ 102 and 103. Because the '791 patent was filed before the effective date of the relevant amendments, the pre-AIA versions of §§ 102 and 103 apply.

2

*See* Paper 10 ("Inst. Dec." or "Dec.").

Patent Owner filed a Patent Owner Response ("PO Resp."). Paper 13. Patent Owner filed the Declaration of Dr. Atif Hashmi (Ex. 2080, "Hashmi Declaration"). Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 22. Petitioner also filed the supporting Rebuttal Declaration of Dr. Roman Chertov ("Rebuttal Chertov Declaration"). Ex. 1022. Patent Owner filed a Sur-Reply to Petitioner's Reply ("PO Sur-Reply"). Paper 28.

Petitioner filed a Motion to Exclude Evidence, Patent Owner filed a Response in Opposition to the Motion to Exclude, and Petitioner filed a Reply to Patent Owner's Opposition. Paper 36 ("Mot. Ex."); Paper 39 ("Mot. Ex. Opp."); Paper 40 ("Mot. Ex. Reply").

An oral hearing was held on June 17, 2019, which was consolidated with IPR2018-00767. A transcript of the hearing is included in the record. Paper 45 ("Tr.").

### B. Related Proceedings

The parties indicate that a related matter is *Implicit, LLC v. Sonos, Inc.*, No. 1:17-CV-00259-LPS (D. Del.) ("the Litigation"). Pet. 2; Paper 5, 2. Patent Owner also indicates that *Implicit, LLC v. D&M Holdings U.S. Inc.*, No. 1:17-CV-00258-LPS (D. Del.) is a related district court matter. Paper 5, 2.

### C. The '791 Patent

The '791 patent is entitled "Method and System for Synchronization of Content Rendering" and issued on June 24, 2008 from an application filed on December 17, 2002. Ex. 1001, [22], [45], [54]. The '791 patent claims

---

[3] U.S. Patent No. 8,286,207 B1 (issued October 9, 2012) (Ex. 1008).

priority to U.S. Provisional Application No. 60/341,574, filed on December 17, 2001. *Id*. at [60].

The '791 patent is directed generally to synchronizing the rendering of content at multiple rendering devices. Ex. 1001, Abs., 1:50–52, Fig. 1. Rendering devices are presentation devices that present video, audio, and text displays, for instance. *Id*. at 1:19–24, 3:60–64, Fig. 1. The '791 patent explains that different rendering devices may have different time domains that make synchronized presentation difficult and a goal of the invention is to render multimedia presentation in a synchronized manner. *Id*. at 1:36–38, 1:50–52.

Each rendering device may have a "device time" and a "rendering time." Ex. 1001, 2:14–16. The "device time" is described as "the time indicated by a designated clock (e.g., system clock) of the rendering device," and the "rendering time" is described as "the time represented by the amount of content that has been rendered by that rendering device." *Id*. at 2:16–19. The rendering time for content has a corresponding device time, "which is the device time at which the rendering occurred." *Id*. at 2:22–24. The '791 patent discloses that in order to synchronize the respective rendering devices, "the synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices." *Id*. at 2:28–32.

The '791 patent discloses a method for calculations of the time domain differential between two devices, illustrated by Figure 2, which is reproduced below. Ex. 1001, 1:58–59.

4



Fig 2

Figure 2, above, depicts the exchange of time domain messages between a master device and a slave device and calculates the average of the differences in the send and receive times of the messages to determine a time domain differental between the two devices. Ex. 1001, 4:47–5:35. Additionally, the master device sends a rendering time message to the slave device, which indicates the master device rendering time. *Id*. at 2:34–36, 7:50–59, Fig. 9.

In an embodiment of the '791 patent, the slave device converts the master device time value into the slave device time domain using the time domain differential. Ex. 1001, 3:45–48, 4:28–32. The difference between the master rendering time and the slave rendering time is determined and applied in different manners to compensate for the differences in the

5

rendering times in the embodiments. *Id*. at 2:39–61, 4:35–46, 7:66–8:11, Fig. 10.

Claims 1, 16, and 23 are independent claims. Claims 1 and 23 are reproduced below, with annotations added to the step limitations for reference purposes.

1. A method for synchronizing a rendering of a content provided by a source at one or more devices which are nodes of a network, the content having a rendering time, the method comprising:

[a] designating one of the one or more devices a master device, the master device having a master device time and a master rendering time;

[b] designating remaining devices among one of the one or more devices as at least one slave device, the at least one slave device having a slave device time and a slave rendering time;

[c] receiving the content for rendering by the master and at least one slave device;

[d] sending from the master device to the at least one slave device an indication of when the master device renders content corresponding to the master rendering time;

[e] determining a master device time domain, a slave device time domain, and a source time domain;

[f] determining whether a time domain differential exists between the master rendering time, the slave rendering time; and

[g] adjusting, based on the received indication, the rendering of the content at the at least one slave device within the slave device time domain and in proportion to the time domain differential when present to account for variation between when the master device and the at least one slave device to render content that should be rendered at the same time.

23. A method for synchronizing rendering of content at devices which are nodes of a network, each device having a device time and a rendering time, the device time of a device being in a time domain of the device, the method comprising:

6

[a] designating one of the devices as a master device having a master rendering time and the one or more slave devices having a slave rendering time; and for each slave device,

[b] exchanging time domain information between the master and one or more slave devices;

[c] calculating a time domain difference between the master rendering time of the master device and the slave rendering time of the slave device based on a master device time adjusted for a difference in time domains of the slave device and the master device; and

[d] rendering content at the slave device to account for the calculated time domain difference.

Ex. 1001, 8:25–53, 10:37–52.

## II. ANALYSIS

### A. *The Parties' Post-Institution Arguments*

In our Decision on Institution, we concluded that the arguments and evidence advanced by Petitioner demonstrated a reasonable likelihood that claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent would have been unpatentable under 35 U.S.C. § 102 and/or § 103 over the asserted prior art. Dec. 9–22. We now determine whether Petitioner has established by a preponderance of the evidence that claims 1–3, 6–9, 12, 16, 19, and 23–25 are unpatentable. We previously instructed Patent Owner "that any arguments concerning patentability not raised in the response will be deemed waived." Paper 9, 5; *see also* 37 C.F.R. § 42.23(a) ("Any material fact not specifically denied may be considered admitted."); *In re Nuvasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding Patent Owner waived an argument addressed in Preliminary Response by not raising the same argument in the Patent Owner Response). Additionally, the Board's Trial Practice Guide states that the Patent Owner Response "should identify all the involved claims that are believed to be patentable and state the basis

for that belief." Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

With a complete record before us, we note that we have reviewed arguments and evidence advanced by Petitioner to support its unpatentability contentions where Patent Owner chose not to address certain limitations in its Patent Owner Response. Where Patent Owner has provided argument and evidence in the Patent Owner Response, it has been considered. In this regard, the record contains persuasive arguments and evidence presented by Petitioner and based on the preponderance of the evidence before us, we conclude that the art identified by Petitioner discloses, teaches, or suggests all of the limitations of claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent.

### *B. Claim Construction*

In an *inter partes* review, the Board interprets claim terms in an unexpired patent according to the broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b).[4] Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning, as they would be understood by one of ordinary skill in the art at the time of the invention. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). A claim term, however, "will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim

---

[4] The amendment to this rule does not apply here because the Petition was filed on March 9, 2018, which is prior to the November 13, 2018 effective amendment date. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340, 51,343–44 (Oct. 11, 2018).

term in either the specification or prosecution history." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

*"device time"*

Petitioner proposes that the claim term "device time" be interpreted as "the time as indicated by a designated clock (e.g., system clock) of the rendering device." Pet. 17. Petitioner asserts that this proposed interpretation is consistent with the disclosure in the '791 patent. *Id.* (citing Ex. 1001, 2:16–17).

Patent Owner proposes that claim terms "master device time," "slave device time," and "device time" of a "slave" should be construed as "time indicated by a designated clock of the [master/slave] device," which was the agreed-upon construction by the parties in a related district court proceeding. PO Resp. 32 (citing Ex. 2010, 2).

In this instance, the '791 patent specification clearly sets forth a specific meaning for the term "device time," which is that proposed by Petitioner. *See* Ex. 1001, 2:16–17. Therefore, in accordance with the specification, we adopt the interpretation of "device time" as "the time as indicated by a designated clock (e.g., system clock) of the rendering device."

*"rendering time"*

Petitioner points to the '791 patent's disclosure stating that a device's "rendering time" is "the time represented by the amount of content that has been rendered by that rendering device." Pet. 17 (citing Ex. 1001, 2:18–19). This interpretation of the claim term has not been disputed by Patent Owner. *See* PO Resp. 13, 32–38.

We agree with Petitioner that the '791 patent specification clearly sets forth a specific meaning for the term "rendering time," which is that

9

proposed by Petitioner. *See* Ex. 1001, 2:18–19. Therefore, in accordance with the specification, we adopt the interpretation of "rendering time" as "the time represented by the amount of content that has been rendered by that rendering device."

*"time domain"*

Patent Owner asserts that "time domain" should be construed as "the way a device clock tracks time," which is the interpretation that Petitioner proposed in a co-pending litigation. PO Resp. 37 (citing Ex. 2010, 2). In support, Patent Owner points to the '791 specification that indicates that an example of a time domain is that rending devices "may have system clocks that operate at slightly different frequencies" (Ex. 1001, 1:38–40), and as part of system synchronization, device times may be exchanged as indicated by a designated clock, such as a system clock (*Id.*, 4:46–5:60). PO Resp. 37.

Petitioner proposes that under the broadest reasonable interpretation that "time domain differential" as used in the claims should be interpreted to cover "any synchronization between a time measure of a master rendering device and a corresponding time measure of a slave rendering device during playback, where the time measure could either be device time or rendering time." Pet. 18. In its Reply, Petitioner argues that Patent Owner attempts to limit the interpretation of the "time domain" term to only a device clock, when the '791 patent discloses that rendering devices may have multiple time domains that include a system clock. Pet. Reply 25. Petitioner cites to the '791 patent specification, which states that "some rendering devices may have multiple time domains," with one example being "an audio rendering device may have a system clock and a clock on a digital signal processing ('DSP') interface card." *Id.* (citing Ex. 1001, 1:44–47). In response, Patent

Owner asserts that even if there is a combination of clocks disclosed, that does not preclude Patent Owner's proposed construction. PO Sur-Reply 22–23.

In view of the specification's disclosures, we adopt the construction of "time domain" as "the way a device clock tracks time." We note that the '791 patent discloses that a device may have multiple clocks and different types of clocks, such as a system clock or a clock on a digital signal processing interface card. *See* Ex. 1001, 1: 45–47.

*Other Claim Terms*

We determine that it is not necessary to provide an express interpretation of any other term of the claims. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

*C. Status of Janevski as Prior Art*

Patent Owner asserts that Janevski does not constitute prior art to the challenged claims under § 102(e) because the subject matter of the claims was conceived and actually reduced to practice prior to Janevski's filing date of December 11, 2001. *See* PO Resp. 13–31. In response, Petitioner asserts that Patent Owner's antedating assertions are legally and substantively defective. Pet. Reply 1–22. More specifically, Petitioner argues that Patent Owner provides only uncorroborated inventor testimony on the conception of the invention and the communication of the invention for the reduction to practice, and, therefore, inurement to the benefit of the inventor has not been sufficiently demonstrated. *Id*. at 5–9. Petitioner also asserts that the evidence of the actual reduction to practice is insufficient to demonstrate the

11

**Appx37**

practice of every claim limitation. *Id*. at 12–22. For the reasons set forth below, we are not persuaded that Patent Owner has provided sufficient evidence to meet its burden to demonstrate antedating the '791 patent prior to the December 11, 2001 filing date of Janevski.

### *1. Antedating, Generally*

Petitioner bears the burden of persuasion, by a preponderance of the evidence, that the challenged claims are unpatentable. 35 U.S.C. § 316(e). Petitioner has proffered Janevski, which presumptively constitutes prior art under 35 U.S.C. § 102(e), because it was filed in the U.S. Patent and Trademark Office on December 11, 2001, which is prior to the filing date of December 17, 2002, of the '791 patent, and its priority claim to U.S. Provisional Application No. 60/341,574, filed on December 17, 2001. This difference in dates gives rise to Patent Owner's burden to produce evidence supporting a date of invention before Janevski's filing date. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576–77 (Fed. Cir. 1996).

"To antedate . . . an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice." *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). A party seeking to establish an actual reduction to practice must satisfy a two-prong test: (1) the party must construct an embodiment or perform a process that satisfies every element of the claim at issue, and (2) the embodiment or process must operate for its intended purpose. *See Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000). The constructed embodiment must have been tested sufficiently to demonstrate that it will work for its intended purpose, but it need not be in a commercially satisfactory stage of development. *See, e.g.,*

*Scott v. Finney*, 34 F.3d 1058, 1062 (Fed. Cir. 1994); *see also Wells v. Fremont*, 177 USPQ 22, 24–25 (BPAI 1972). An actual reduction to practice can be done by another on behalf of the inventor. *De Solms v. Schoenwald*, 15 USPQ2d 1507, 1510 (BPAI 1990).

Acts by others working explicitly or implicitly at the inventor's request can inure to an inventor's benefit. *Cooper v. Goldfarb*, 154 F.3d 1321, 1332 (Fed. Cir. 1998). Inurement involves a claim by an inventor that, as a matter of law, the acts of another person should accrue to the benefit of the inventor. *Genentech, Inc. v. Chiron Corp.*, 220 F.3d 1345, 1353 (Fed. Cir. 2000). However, when a person relies on the activities of others to show actual reduction to practice, proof of conception is relevant to inurement. *See NFC Tech., LLC v. Matal*, 871 F.3d 1367, 1371–72 (Fed. Cir. 2017); *see also Sensio, Inc. v. Select Brands, Inc.*, Case IPR2013–00580, slip op. at 10–15 (PTAB Feb. 9, 2015) (Paper 31). Under *Genentech*, 220 F.3d at 1354, and *Cooper v. Goldfarb*, 240 F.3d 1378, 1383 (Fed. Cir. 2001), a Patent Owner must show that the inventor conceived the subject matter of the challenged claims and communicated that subject matter in order to inure to inventor's benefit. In *Genentech*, in the context of deciding whether the reduction to practice inured to the inventor's benefit, the Federal Circuit held that the inventor first must show that it conceived the invention. *Genentech*, 220 F.3d at 1354 ("[W]e glean at least three requirements that must be met before a non-inventor's recognition of the utility of an invention can inure to the benefit of the inventor. First, the inventor must have conceived of the invention.").

Priority of invention and its constituent issues of conception and reduction to practice "are questions of law predicated on subsidiary factual

findings." *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003).
Conception is "the formation, in the mind of the inventor of a definite and
permanent idea of the complete and operative invention, as it is thereafter to
be applied in practice." *Coleman v. Dines*, 754 F.2d 353, 359 (Fed. Cir.
1985) (citing *Gunter v. Stream*, 573 F.2d 77, 80 (CCPA 1978)) (emphasis
omitted). The conception analysis "necessarily turns on the inventor's
ability to describe his invention with particularity. Until he can do so, he
cannot prove possession of the complete mental picture of the invention."
*Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir.
1994). Proof of conception cannot turn on the inventor's testimony alone,
but must include "corroborating evidence which shows that the inventor
disclosed to others his 'completed thought expressed in such clear terms as
to enable those skilled in the art' to make the invention." *Coleman*, 754 F.2d
at 359. The sufficiency of corroboration is determined according to a "rule
of reason." *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993) (citation
omitted). This, however, does not dispense with the requirement that some
independent evidence must provide corroboration. *Coleman*, 754 F.2d at
360; *see also NTP, Inc.*, 654 F.3d at 1291–92 (noting requirement of
evidence corroborating inventor testimony).

> *2. Conception and Inurement to the Benefit of Inventor*
> *a. Patent Owner's Arguments*

Patent Owner alleges that the genesis of what ultimately became the
inventions of the challenged claims of the '791 patent started in connection
with BeComm's Juno project, which was a project for Intel. PO Resp. 18
(citing Ex. 2001 ¶¶ 26–32). Edward Balassanian, one of the named
inventors of the '791 patent, was the President and CEO of BeComm, and

was named in the Juno project team.  *Id*. (citing Ex. 2001 ¶ 32; Ex. 2011, 8).

The other named co-inventor, Scott Bradley, was also named as a member of

the Juno project.  *Id*.  Patent Owner argues that the Juno project recognized

that true synchronization was "an unsolved computer science project, but a

best effort will be made in this regard."  *Id*. at 18–19 (citing Ex. 2009, 15;

Ex. 2011, 37–38; Ex. 2001 ¶¶ 29–30).  Patent Owner alleges that although

Intel put the Juno project on hold in February 2001, BeComm continued to

work on the synchronization problem.  *Id*. at 19 (citing Ex. 2001 ¶ 30; Ex.

2012).

Patent Owner alleges that Messrs. Balassanian and Bradley conceived

of the inventions of the '791 patent at least by December 11, 2001.  PO

Resp. 19 (citing Ex. 2001 ¶¶ 33, 42–47); *see also id*. at 15 (citing Ex. 2001

¶¶ 6, 33, 42).  Patent Owner contends that the inventors communicated the

inventions to an internal engineering and development staff, working

primarily with Guy Carpenter, an engineer, for implementation.  *Id*. (citing

Ex. 2001 ¶ 33).

Patent Owner asserts that BeComm source code corroborates Mr.

Balassanian's testimony concerning the invention's conception and

reduction to practice prior to December 11, 2001.  PO Resp. 19–20.  Patent

Owner also asserts that BeComm's internal documents provide additional

corroboration of Mr. Balassanian's testimony.  *Id*. at 20–22.  Patent Owner

points to a document entitled "Using Strings to Compose Applications from

Reusable Components," dated October 4, 2001, as providing support.  *Id*. at

21 (citing Ex. 2021; Ex. 2001 ¶¶ 61–62, 109).  Patent Owner also points to a

case study printed on December 3, 2001, that describes synchronization

functionality.  *Id*. at 22 (citing Ex. 2029, 5–7; Ex. 2077, 28–30).  Finally,

Patent Owner refers to a "synchronization.doc" file, which was allegedly completed on December 9, 2001, which describes functionality using beads. *Id*. (citing Ex. 2001 ¶ 75; Ex. 2037; Ex. 2077, 33; Ex. 2078). Patent Owner argues that synchronization.doc was filed as the provisional patent application on December 17, 2001, without any substantive changes, and this further evidences prior conception. *Id*. (citing Ex. 2001 ¶ 75, Ex. 2037; Ex. 2038; Ex. 2077, 33; Ex. 2078).

Patent Owner argues that the cited documentary evidence should serve as corroborating evidence because the documents were stored in a Concurrent Version System ("CVS") repository, where the documents were time stamped when added and updated in the repository. PO Sur-Reply 3. Patent Owner argues that this evidence should be considered under a rule of reason, which considers the body of evidence as a whole. *Id*. Patent Owner notes that it produced to Petitioner the source code repository for Strings, the hard drive of the BeComm demo laptop, and the website root directory from the 2000–2001 time period, and allowed copying by a forensic expert. *Id*., 2, n.1.

### b. Petitioner's Arguments

Petitioner argues that to demonstrate conception a party must show possession of every feature recited in the claims, and Mr. Balassanian's declaratory testimony fails to address the claims at issue. Pet. Reply 1–2. Petitioner contends that Patent Owner relies on an expert to make a mapping of code to the elements of the invention, but that does not demonstrate that the inventor conceived of the elements of the claims. *Id*. at 4. Petitioner argues that when a party seeks to prove conception through an inventor's testimony, the party must offer evidence in addition to that testimony. *Id*. at

16

5 (citing *Mahurkar*, 79 F.3d at 1577). Petitioner asserts that even if the sufficiency of corroboration is determined under a rule of reason, the evidence of corroboration must not be solely dependent on the inventor's testimony. *Id.* at 5–6 (citing *Cooper*, 154 F.3d at 1330).

Petitioner argues that Patent Owner relies on the source code written by a non-inventor, Guy Carpenter, to establish conception of the invention. Pet. Reply 9. Petitioner contends that Patent Owner presents no evidence, short of uncorroborated inventor testimony, that the inventors communicated the invention to Mr. Carpenter. *Id.* Petitioner contends that because the record is devoid of evidence that Mr. Carpenter's work inured to the benefit of the inventors, the Board should not rely on the code in assessing either conception or reduction to practice. *Id.*

### c. Analysis

Because the invention of the claims of the '791 patent was allegedly reduced to practice by a non-inventor, Mr. Carpenter, Patent Owner must sufficiently demonstrate conception of the invention in order to carry its burden to antedate the Janevski reference. *Genentech*, 220 F.3d at 1354. Patent Owner does not argue otherwise—and Patent Owner provides its purported support for conception of the claimed invention in its briefing (*see* PO Resp. 18–22), and at oral hearing (*see* Tr. 35:2–5, 40:2–43:7).

We examine the evidence of record on conception under a rule of reason. Here, documentary evidence could serve to corroborate Mr. Balassanian's testimony under a rule of reason, and here that evidence is the documents that Patent Owner refers to which had been stored in an electronic CVS repository. Petitioner filed a Motion to Exclude this evidence arguing that it had not been properly authenticated under the

Federal Rules of Evidence 901. However, as discussed *infra* Section III, Petitioner's Motion is denied because there is no dispute that the documents were stored in the CVS repository, with repository logs produced (Ex. 2077), and Petitioner was permitted to forensically examine the electronic evidence, which included date stamps and other metadata, which provides supplemental information in support of authentication.

Although we consider the documentary evidence that Patent Owner relies upon for corroboration of Mr. Balassanian's testimony under a rule of reason, the issue considered is whether the documents do provide factual support for Patent Owner's allegations concerning conception of the invention, which we discuss below. If the documents do not provide that support, all that remains is Mr. Balassanian's testimony.

Regarding the conception of the invention of the claims of the '791 patent, Mr. Balassanian's testimony is limited to:

> Around the time of the Juno project (and after the project for Intel went on hold), I contemplated how to achieve the best-possible synchronization of content across multiple devices as we continued our work. Mr. Bradley and I solved the synchronization problem and conceived the inventions set forth in the Claims of the Patents. We then began working on the implementation of the inventions thereafter, as detailed below. We communicated those inventions to BeComm's internal engineering and development staff to reduce them to practice.

Ex. 2001 ¶ 33.

Patent Owner does not provide a specific date of conception in the time between February 2001—when Patent Owner indicates that the synchronization problem was still unsolved—and December 11, 2001. Patent Owner instead contends that the conception date was at least prior to the date of the Janevski priority date of December 11, 2011, which is also at

least the date by which the invention was allegedly actually reduced to practice.[5]  PO Resp. 18–19.

On the issue of who conceived of the invention, Patent Owner relies upon Juno development documents, wherein Mr. Balassanian and Mr. Bradley were listed as "Document Contributors," in support of conception. *See* Ex. 2009, 5; Ex. 2011, 8.  The Juno development documents state, however, that synchronization was an unsolved issue.  *See* Ex. 2009, 15; Ex. 2011, 37–38 ("We have not yet finalized how Juno will implement the requirement that a Media Server session be able to simultaneously serve multiple concurrent Adapters and keep their playback synchronized . . . In all cases, the Adapter synchronization in these cases will be difficult at best.").  Patent Owner refers to the document "Using Strings to Compose Applications from Reusable Components" (Ex. 2021), for support of conception, however, this document does not name any authors nor does it identify who contributed to its development.[6]  Similarly, a case study on

---

[5] At the oral hearing, Patent Owner also alternatively alleged that conception occurred at least by October 28, 2001, because that is when the actual reduction to practice occurred.  *See* Tr. 40:2–42:26 (stating that the beads were fully operational on October 23, 2001, and "there's some time stamps [on related documents] that are a few days after the 23rd of October so that's why I went with that." (*id.* at 42:21–22)).

[6] Petitioner argues that Patent Owner fails to establish conception by showing possession of every feature recited in the claim.  Pet. Reply 1 (citing *Coleman*, 754 F.2d at 359).  We note that Patent Owner argues that under the "Strings" document's disclosures the BeComm technology provided the "best possible synchronization" and used a clock synchronization modules encapsulated in a bead placed in the data flow as late as possible for each rendering device.  PO Resp. 20–21 (citing Ex. 2021, 9; Ex. 2001 ¶¶ 61–62, 109; Ex. 2077, 18).  The disclosure in this document is directed to the placement of general clock synchronization functionality in

19

distributed media (Ex. 2029) fails to identify any authors or contributors. A February 2, 2001 internal email (Ex. 2012) does not suggest or indicate that Mr. Balassanian continued to work on the synchronization problem identified in the Juno project after the project was terminated in mid-February 2001, and there is no other documentary support on that issue.

The document entitled "synchronization.doc" (Ex. 2037), which served as the disclosure for the provisional application, does not name any authors or contributors, however, in the metadata for this document the author is listed as "guyc," which appears to identify Guy Carpenter, who wrote the source code. *See* Ex. 2077, 33. This identification is confirmed in a December 15, 2001 email written by Mr. Bradley, who stated that this document was written by Mr. Carpenter. Ex. 2038. In that email, which copied Mr. Balassanian, Mr. Bradley indicated that the document as written was "sufficient for the patent provisional as is," and his additional comments did not appear to be needed for submittal. *See id.* This documentary evidence does not provide support that Messrs. Balassanian and Bradley conceived of the invention of the challenged claims of the '791 patent, and is dated after the December 11, 2001 priority date of Janevski.

We have reviewed other evidence in the record, including a technical presentation (Ex. 2002) and a case study (Ex. 2029), and find no indication or suggestions that corroborate conception. The documents do not identify Messrs. Balassanian and Bradley nor do they provide disclosures that evince possession of invention of the claims of the '791 patent.

---

a data stream, but does not disclose or suggest the invention of the claims of '791 patent, which is how clock synchronization is actually performed.

There is no documentary evidence in the record, besides the limited testimony in Mr. Balassanian's declaration reproduced above, that supports that there was recognition of the conception of the invention, or that there was any communication of the invention from Messrs. Balassanian and Bradley to BeComm's internal engineering and development staff, or more specifically, to Mr. Carpenter. Patent Owner does not address the issue of communication of the invention in order to inure to inventor's benefit in its briefing. *See* PO Sur-Reply 2–7. There are no arguments or evidence presented by Patent Owner that anyone else was involved in development of the source code besides Mr. Carpenter. *See* PO Resp. 18–31; PO Sur-Reply 2–19.

In sum, there is no evidence provided by Patent Owner as to who conceived of the invention, when the conception occurred, whether there was a recognition of conception of the invention embodied in the claims of the '791 patent, whether the inventors communicated the invention to Mr. Carpenter, or whether Mr. Carpenter was working at the inventors' request to reduce the invention to practice—with the exception of the limited testimony of Mr. Balassanian. It is Patent Owner's burden to produce evidence supporting conception before Janevski's filing date, and that evidence is required in addition to the testimony of an alleged inventor. *See Mahurkar*, 79 F.3d at 1577 (Fed. Cir. 1996). Even if we were to consider the statements in Mr. Balassanian's declaration, we would still find them insufficient to carry Patent Owner's burden of production to establish conception of the invention and the communication of the invention to Mr. Carpenter such that any actual reduction to practice could inure to the inventors' benefit. *Cooper*, 240 F.3d at 1383 (Fed. Cir. 2001).

21

At the oral hearing, Patent Owner argued that Mr. Carpenter, a source code developer, worked for BeComm, and Mr. Balassanian was a principal of that company, so common sense dictated that inurement should be found. Tr. 56:22–57:10. We recognize that to establish inurement, another person may be working "implicitly at the inventor's request." *Cooper*, 154 F.3d at 1332. However, we decline to find that the generalized relationship of the individuals within an organization is sufficient to make a requisite showing, especially in view of the scarcity of other evidence of conception in the record.

In view of the failure of Patent Owner to carry its burden to demonstrate conception of the invention, we need not address issues relating to reduction to practice of the invention.

Accordingly, because we do not find that antedating applies, Janevski constitutes prior art to the challenged claims of the '791 patent under § 102(e).

*D. Level of Ordinary Skill in the Art*

Petitioner proposes that one of ordinary skill in the art would possess "the equivalent of a four-year degree from an accredited institution in computer science, computer engineering, electrical engineering, or the equivalent, and approximately 2–4 years of professional experience in the fields of networked systems and networked-based applications, or an equivalent level of skill and knowledge." Pet. 70, n.5. Dr. Chertov provides supporting testimony for the proposed qualifications. Ex. 1009 ¶ 45. Patent Owner does not propose any assessment of the level of ordinary skill in the art or object to Petitioner's propose qualifications. *See generally* PO Resp.

1–41. Patent Owner's expert, Dr. Hashmi, declined to offer an opinion on the qualifications of one of ordinary skill in the art. Ex. 2080 ¶ 16.

On this record, we adopt Petitioner's proposed assessment. In addition, we note that the art of record in this proceeding—namely, Janevski and Schneidewend—is indicative of the level of ordinary skill in the art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Further, neither Dr. Chertov nor Dr. Hashmi testifies that adoption of a different definition would change the outcome of this case.

### E. Alleged Anticipation of Claims 1–3, 6–9, 12, 16, 19, and 23–25 by Janevski

Petitioner contends that claims 1–3, 6–9, 12, 16, 19, and 23–25 are anticipated by Janevski. Pet. 38–69. To support its contentions, Petitioner provides explanations as to how Janevski discloses each claim limitation. *Id*. Petitioner also relies upon the Chertov Declaration (Ex. 1009) and the Rebuttal Chertov Declaration (Ex. 1022) to support its positions.

We begin our discussion with a brief summary of Janevski, and then address the evidence and arguments presented.

### 1. Janevski (Ex. 1007)

Janevski is directed to synchronizing playback of digital streams based on rendering personal video recorder ("PVR") devices. Ex. 1007, 1:8–20, Fig. 1. During playback, one PVR may be designated as the initiator PVR and the other is designated as the participant PVR. *Id*. at 6:16–22. PVRs can account for misalignment of times by synchronization. *See id*. at 8:39–47. Time synchronization can be implemented in different ways, and one method includes the exchange of synchronization messages as depicted in Figure 4, reproduced below. *Id*. at 8:53–10:23, 11:52–12:4, 13:21–22.

23



Figure 4, above, depicts different "cases" that represent scenarios wherein the respective PVRs exchange synchronization messages (402 and 404), which allows time misregistrations to be calculated. *See* Ex. 1007, 8:65–10:20. Messaging exchanges include time stamps. *See id.* at 10:4–12, 11:52–55.

The initiator PVR sends a status message to the participant PVR that may include calculated time misregistrations, "the time into the program," and identifying information for a "query frame," which is a frame that had just been played by the initiator PVR. *See* Ex. 1007, 7:36–50, 10:19–35, 12:5–36. The identifying information includes a query signature and query time stamp. *Id.* at 10:19–35, 12:5–36. Janevski discloses that time

24

misregistrations between the initiator and participant PVRs are compensated for in synchronization. *Id*. at 12:59–13:21.

After time synchronization, frame synchronization for fine tuning is done in a second phase. Ex. 1007, 10:52–62. The query frame and its identifying information are used to determine if there are differentials between the frames rendered by the initiator and participant PVRs, respectively, that include differences in video time, and are referred to as differential "frame misregistration." *Id*. at 10:36–60, 13:24–14:63. Frame misregistration between the devices is compensated for by adjusting the speed/direction of the video rendering. *Id*. at 10:60–62, 13:24–30, 14:35–63.

### 2. Analysis

A claim is unpatentable under 35 U.S.C. § 102 if a prior art reference discloses each and every limitation of the claimed invention, either explicitly or inherently. *Glaxo Inc. v. Novopharm Ltd.*, 52 F.3d 1043, 1047 (Fed. Cir. 1995); *see MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999) ("To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention . . . ;" any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field); *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991) (the dispositive question is "whether one skilled in the art would reasonably understand or infer" that a reference teaches or discloses all of the limitations of the claimed invention).

#### a. Independent Claim 1

##### i. Petitioner's Assertions

Petitioner asserts that Janevski discloses every limitation of claim 1. Pet. 55–64. Beginning with the preamble, Petitioner contends, and we

agree, that Janevski discloses a method of synchronizing a rendering of a content from a source at a device, which is a node of a network.[7]  *Id.* at 56. Petitioner asserts, and we agree, that the rendering devices, such as PVRs, are nodes of a network, and are interconnected by an Internet network.  *Id.* (citing Ex. 1007, 1:13–17, 3:13–16, 6:6–10).  Janevski discloses the broadcast of a television program from a network that is communicated by various means, including the Internet, to PVRs, for viewers.  *Id.*

For limitation 1[a], which recites "designating one of the one or more devices a master device, the master device having a master device time and a master rendering time," Petitioner contends, and we agree, that the "initiator" PVR of Janevski amounts to the "master device" of the claim. Pet. 56 (citing Ex. 1007, 6:4–25 ("Initially, the 'initiator' is the PVR that starts the session . . . [a]ll other PVRs participating in the session are 'participants.'")).  Petitioner asserts, and we agree, that the PVR has a "time count" provided by its video timer, which equates to the "master device time."  *Id.* (citing Ex. 1007, 7:51–62, 8:39–10:3 (disclosing the "respective timings of the video timers"), Figs. 2, 4; Ex. 1009 ¶ 157).  Petitioner further asserts, and we agree, that Janevski discloses that the PVR keeps track of the amount of time that a video program has been rendered by "the time or frame into the program," which amounts to the claimed "master rendering time."  *Id.* at 56–57 (Ex. 1007, 1:65–2:5, 7:41–50; Ex. 1009 ¶ 157).

For limitation 1[b], which recites designating a slave device, having a slave device time and a slave rendering time, Petitioner asserts, and we agree, that a "participant" PVR amounts to a slave device.  Pet. 57.  Similar

---

[7] For purposes of this Decision, we assume, without deciding, that the preamble of claim 1 is limiting.

to limitation 1[a], Petitioner contends, and we agree, that the participant PVR has a time count provided by the video timer, which is the "slave device time," as well as keeping track of the amount of a video program that has been rendered in terms of "the time or frame into the program." *Id*. at 57–58.

For limitation 1[c], Petitioner asserts, and we agree, that the claimed "receiving content" is disclosed by Janevski's disclosure of "synchronized PVR viewing system" in which the respective initiator and participant PVRs receive broadcasts of video content. Pet. 58–59 (citing Ex. 1007, 1:13–17, 3:13–16 ("As the broadcasts 112a, b enter House 1 and House 2, respectively, they are received by receivers 113a, b."), 6:5–39, Fig. 1).

For limitation 1[d], which recites "sending from the master device to . . . slave device an indication of when the master device renders content corresponding to the master rendering time," Petitioner contends, and we agree, that Janevski discloses sending the query time stamp for "a frame that the initiator has just played or has recently played," which "represent[s] where the [initiator PVR's] playback is in the content at a particular time which is current." Pet. 59–60 (citing Ex. 1007, 10:19–35, 12:5–36; Ex. 1009 ¶ 163).

For limitation 1[e], which recites "determining a master device time domain, a slave device time domain, and a source time domain," Petitioner asserts, and we agree, that Janevski discloses that the determination of the time misregistration between initiator and participant PVRs discloses their respective time domains relative to each other. Pet. 61 (citing Ex. 1007, 8:53–10:20, 11:52–12:4; Ex. 1009 ¶ 166). Petitioner further asserts, and we agree, that Janevski's disclosed capability to find and record a television

27

program necessarily shows that the PVR has an indication of the time domain of the service provider, thus disclosing the "source time domain." *Id.* at 62 (citing Ex. 1007, 1:13–24 ("PVRs may be programmed to automatically find and record a user's favorite television program or programs . . . .")). Dr. Chertov provides additional support, testifying that a person of ordinary skill in the art "would understand that having an indication of the times-of-day when a service provider will be broadcasting television programming is a necessary requirement for a PVR—it would not be possible for a PVR to automatically find and record the correct television program without this information." Ex. 1009 ¶ 167. We find that Janevski inherently discloses the determination of a source time domain in view of Janevski's disclosure of the capability to record television programs and Dr. Chertov's testimony that one of skill would know that this functionality requires determination of the time domain of the source service provider.

For limitation 1[f], which recites "determining whether a time domain differential exists between the master rendering time, the slave rendering time," Petitioner asserts, and we agree, that each participant PVR in Janevski synchronizes its time count with the initiator PVR's time count and then uses this adjusted "time count" during rendering. Pet. 62 (citing Ex. 1007, 12:59–13:21). With this, Petitioner argues, and we agree, that a time differential is calculated between the amount of content that has already been rendered by a master device and that rendered by the slave device. *Id.*

Limitation 1[g] recites the step of "adjusting, based on the received indication, the rendering of the content at the . . . slave device within the slave device time domain and in proportion to the time domain differential when present to account for variation between when the master device and

the . . . slave device to render content that should be rendered at the same time." Petitioner contends, and we agree, that "rendering of the content" of the slave device "in proportion" to the "time domain differential" is disclosed in Janevski by its synchronized time count of the participant PVR with the initiator PVR time count, and the adjusted time count used during rendering. Pet. 63–64 (citing Ex. 1007, 12:59–13:21; Ex. 1009 ¶¶ 170–173). Petitioner further asserts, and we agree, that Janevski discloses that "after each 'participant' PVR calculates its 'video time' differential with the 'initiator' PVR, the 'participant' PVR compensates for the 'video time' differential by adjusting its rendering of video content." *Id*. at 64 (citing Ex. 1007, Abs., 3:52–57, 10:60–62, 13:24–30, 14:35–63; Ex. 1009 ¶ 173).

In sum, we agree with Petitioner that Janevski discloses every limitation of the preamble and steps of claim 1 and credit Dr. Chertov's supporting testimony (Ex. 1009 ¶¶ 153–173), as it is consistent with the prior art disclosures.

### ii. Patent Owner's Arguments

Patent Owner argues that Janevski fails to disclose limitations associated with two claim terms: "device time" and "time domain." We do not find these arguments persuasive for the reasons discussed below.

### (a) Device Time

Patent Owner alleges that Janevski fails to disclose a "device time" because its disclosed video timer is not linked to any clock of the PVR or a device within the DVR. PO Resp. 33. Patent Owner argues that the video timer is a timer only and not a clock. *Id*. Patent Owner contends that the purpose of the device clock is to synchronize the operations on a device, and Janevski's video timer only discloses the playout time of the content. *Id*.

29

Patent Owner refers to Janevski's disclosure of the timer advancing or rolling back to move the location of video for playback. *Id*. at 33–34 (citing Ex. 1007, 2:29–32). Patent Owner additionally asserts that Janevski recognizes that its synchronization method does not use a device clock, and instead is "based on the differences in the playout time within the video to synchronize multiple PVRs." *Id*. at 34 (citing Ex. 1007, 8:53–56, 8:63–10:3). Patent Owner further alleges that Janevski describes both "timers" and "clocks" and uses them differently; with that, Patent Owner alleges that timers are linked to the time in a video to current playback, but not to broadcast of clock times to synchronize devices. PO Sur-Reply 21–22 (citing Ex. 1007, 8:48–52).

In sum, Patent Owner argues that Janevski's video timer: (i) is not linked to any clock of the PVR or a device within the PVR; (ii) is not a clock; and (iii) is only disclosed as the playout time for content. These arguments are based on attempts to add limitations to the claim term and overlook Janevski's disclosures. Janevski is directed, in significant part, to timer synchronization of the "respective timers of the video timers" of the PVRs. *See* Ex. 1007, 8:65–10:20, Fig. 4. Claim 1 recites that the respective master and slave devices have "a device time," which is construed as "the time as indicated by a designated clock (e.g., system clock) of the rendering device." *See supra* Section II.B. We agree with Petitioner's assertion that a "device time" does not have to be a time indicated by either a "system clock" or a "device clock" under that interpretation; rather, the device time can be rendered by any designated clock, with a "system clock" serving as

only one example.[8]  *See* Pet. Reply 23.  Moreover, we agree with Petitioner that, under the claim interpretation adopted, "device time" does not have to perform a specific function, short of reflecting the device time.  *See id.*

Janevski discloses its "message flow design" is to "determine the misalignment, if any, in the respective timings of the video timers 212 of two PVRs." Ex. 1007, 8:39–41.  As part of synchronization, messaging of times (shown in hours ("H"), minutes ("M"), and seconds ("S") in Figure 4), according to video timers 212 of the respective PVRs, is exchanged.  *See e.g.*, Ex. 1007, 9:15–29, Fig. 4 (reproduced *supra* p. 24).  Although the video timer may also provide the time for how long the PVR has been playing the video, it also provides a device time under this disclosure of Janevski.  Dr. Chertov provides testimony, unrebutted by Dr. Hashmi, that the PVR video timer of Janevski amounts to a clock of the PVR, and the "time count" rendered by the video timer is device time (Ex. 1009 ¶¶ 102, 157, 159).  This testimony is supported by the transmissions of times represented in hours, minutes, and seconds as described and shown in Janevski's Figure 4.  We agree with Petitioner that Janevski uses "clock" and "timer" synonymously in descriptions of time synchronization implementations, rather than drawing distinctions in the use of the terms, as Patent Owner argues.  *See* Pet. Reply 24 (citing Ex. 1007, 8:39–64[9]); *see also* PO Sur-Reply 21–22 (citing Ex.

---

[8] Even if we were to adopt Patent Owner's proposed claim construction of "device time" as "time indicated by a designated clock of the [master/slave] device" (*supra* Section II.B), the same Patent Owner argument would be at issue, that is, whether Janevski discloses "device time" as it is rendered by any designated clock.

[9] Petitioner cites to Exhibit 1001 in its Reply; however, the Reply's discussion is directed to the video timers in Janevski (Ex. 1007).  Pet. Reply 24.  Thus, it appears that the Reply's citation should have been to Janevski.

1007, 8:48–52). Additionally, under the claim construction adopted here for "device time," which is not limited to a specific type of clock (short of it being "designated"), and under the ordinary meaning of a "clock" as "a device for measuring and indicating time" (Ex. 1023, 3), we find that Dr. Chertov's testimony regarding Janevski's disclosure of "device time" is consistent with the term's interpretation.

Patent Owner also asserts that Petitioner has not shown that the "query time stamp" constitutes a device time. PO Resp. 35. Patent Owner argues that "Janevski does not indicate if the query time stamp contains a time indicated by a designated clock of any particular device, such as the initiator device." *Id*. Patent Owner contends that the query time stamp references the current location of the query frame in the video. *Id*. Patent Owner asserts that in Janevski, the query frame and its time stamp represent "where the playback is in the content at a particular time which is current," and the destination PVR compares that time stamp with the time stamps for other frames to determine the right frame to select for playback, so there is no disclosure of a device time within the query time stamp. *Id*. at 36 (citing Ex. 1007, 12:10–11, 14:1–14).

On this issue as well, Patent Owner attempts to read in additional limitations into the claim. Here, for limitation 1[d], Petitioner refers to Janevski's initiator PVR sending a status message with a query time stamp for "a frame that the initiator has just played or has recently played." *See* Pet. 59–60 (citing Ex. 1007, 10:19–35, 12:5–36). Dr. Chertov testifies that the transmission of the query time stamp represents the functionality of sending an indication of when the rendering occurs corresponding to the master rendering time. Ex. 1009 ¶ 163. The evidence supports that the

query time stamp is part of a message that is generated to perform time synchronization and the time in the query time stamp is similarly set to other time stamps as shown in Figure 4 of Janevski (Ex. 1007, 10:4–22, Figs. 4, Fig. 5), which as discussed above represents a device time, and additionally supports that the query time stamp represents when rendering occurs corresponding to the master rendering time. And, there is no requirement that the rendering time has to be measured by a certain kind of clock.

We find the evidence provided by Petitioner demonstrates that Janevski discloses "device time" as claimed.

### (b) Time Domain

Patent Owner argues that the recited "time domain" is tied into a device time, and for reasons similar to the "device time" limitations discussed above, Patent Owner asserts Petitioner has failed to show that Janevski discloses the "time domain" limitations of the challenged claims. PO Resp. 37. Patent Owner asserts that "time domain" refers to the way a device clock tracks time, and is therefore linked to the "clock of a device." *Id*. Patent Owner argues that "[t]he video timer does not indicate a device time, but how long the PVR has been playing the video for. The query timestamp likewise does not indicate the initiator's device time; it is only affiliated with a particular frame in the video." *Id*. at 38.

Here, Patent Owner's arguments are directed to alleged deficiencies in Janevski's disclosures related to the "device time" limitations, which we addressed above, and found unpersuasive. We note also that the "master time domain" and "slave time domain" of limitation 1[e] are addressed by Petitioner by reliance on Janevski's determination of the time misregistration between initiator and participant PVRs, which is asserted to disclose the

33

respective time domains relative to each other.  Pet. 61 (citing Ex. 1007, 8:53–10:20, 11:52–12:4; Ex. 1009 ¶ 166).  We have addressed the manner of the determination of the time misregistration above, and find Janevski's disclosures evince the respective time domains.

### iii. Summary

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 1 of the '791 patent is anticipated by Janevski.

### b. Independent Claim 23

Petitioner asserts that Janevski discloses every limitation of claim 23.  Pet. 38–46.  Petitioner asserts, and we agree, that Janevski discloses the preamble's method for synchronizing the rendering of content at devices, which are nodes of a network, which have a device time and a rendering time, where the device time is in its time domain.[10]  *Id.* at 38.  Petitioner references Janevski's disclosure of rendering devices, i.e., PVRs, which are mapped as nodes, which are interconnected by an Internet network.  *Id.* (citing Ex. 1007, 1:8–11, 6:4–39, 6:45–51, Abs., Fig. 1).  Petitioner asserts, and we agree, that the PVR has a "time count," provided by the PVR "video timer," which is the claimed "device time" that is in a "time domain" of the PVR.  *Id.* (citing Ex. 1007, 7:51–62, 8:39–10:3, Figs. 2, 4).  Petitioner also contends, and we agree, that Janevski discloses that each PVR discloses tracking the amount of content that has been rendered in terms of "the time or frame into the program," which is the claimed rendering time.  *Id.* (citing Ex. 1007, 1:65–2:5, 7:41–50; Ex. 1006, 147).

---

[10] For purposes of this Decision, we assume, without deciding, that the preamble of claim 23 is limiting.

Limitation 23[a] is the step of designating a master device that has a master rendering time and a slave device having a slave rendering time, where Petitioner identifies the PVR that initiates a "synchronized PVR viewing system" as the initiator or master device. Pet. 40 (citing Ex. 1007, Abs., 6:4–25, 7:36–39, 8:39–10:3, Fig. 1). Other PVRs participating are the "participant" PVRs, which are mapped as the slave devices. *See id*. Petitioner asserts, and we agree, that Janevski discloses that each PVR keeps track of the amount of content of a video program that has been rendered in terms of "the time or frame into the program," which is the claimed rendering time. *Id*. (citing Ex. 1007, 1:65–2:5, 7:41–50; Ex. 1009 ¶ 105).

Limitation 23[b] is the step of exchanging time domain information between the master and slave devices. Petitioner asserts, and we agree, that Janevski discloses a message flow for exchanging "synchronization messages" between the master and slave PVRs that include information regarding the respective "time counts." Pet. 41 (citing Ex. 1007, 8:39–10:3, Fig. 4). Petitioner asserts, and we agree, that Janevski also includes the exchange of time domain information by broadcasts of respective clock values periodically to maintain synchronization or with relays of synchronization messages. *Id*. at 41–42 (citing Ex. 1007, 8:53–64; Ex. 1009 ¶ 109).

Limitation 23[c] recites "calculating a time domain difference between the master rendering time of the master device and the slave rendering time of the slave device based on a master device time adjusted for a difference in time domains of the slave device and the master device," which Petitioner asserts, and we agree, is disclosed in Janevski. Pet. 42–45 (citing Ex. 1009 ¶¶ 110–116). Petitioner relies upon Janevski's disclosure

that each "participant" PVR periodically determines whether there is any misalignment between the "initiator" PVR's rendering and the "participant" PVR's rendering using a two-phase process that involves a determination of two separate time differentials between the PVRs. *Id*. at 42 (citing Ex. 1007, Abs., 7:36–50, 10:36–60, 12:59–13:29, 15:32–33). In the first phase, PVRs perform a time synchronization exchange to determine a differential in time counts. *Id*. at 43 (citing Ex. 1007, Abs., 8:39–10:3, 11:43–12:4). Then, in the second phase, a status message on time misregistration is sent between the PVRs that includes a query signature and query time stamp. *Id*. at 43 (citing Ex. 1007, Abs., 7:36–50, 10:19–35, 12:5–36). The time misregistration is compensated for by adjusting the "time count" (Ex. 1007, 12:59–13:21), and the participant PVR uses its adjusted time count along with the other information included in the status message to calculate a differential between the video frames that have been rendered by the PVRs, which may be represented in terms of video time. *Id*. (citing Ex. 1007, 10:36–60, 13:24–14:63).

For limitation 23[d], which recites "rendering content at the slave device to account for the calculated time domain difference," Petitioner asserts, and we agree, that Janevski discloses this limitation by the functionality that synchronizes the time counts of the PVRs and then uses the adjusted time count during rendering. Pet. 45 (citing Ex. 1007, 12:59–13:21). Petitioner also refers to Janevski's disclosure of calculating a video time differential between PVRs and adjusting the rendering of video content. *Id*. (citing Ex. 1007, Abs., 3:52–57, 10:60–62, 13:24–30, 14:35–63).

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond the alleged

deficiencies in Janevski's disclosures of the recited "device time" and "time domain," which we addressed above in our analysis of claim 1. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 23 of the '791 patent is anticipated by Janevski.

### c. Independent Claim 16

Independent claim 16 contains claim limitations that are similar to those in claim 1. *Compare* Ex. 1001, 8:25–53, *with* Ex. 1001, 9:45–10:6. We agree with Petitioner that Janevski discloses the limitations of claim 16 for the reasons discussed above for claim 1. *See* Pet. 47–54.

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond the alleged deficiencies in Janevski's disclosures of the recited "device time" and "time domain," which we addressed above in our analysis of claim 1. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 16 of the '791 patent is anticipated by Janevski.

### d. Claims 2 and 3

Claim 2 depends from claim 1, and includes the additional limitation that "the indication sent from the master device to the at least one slave device includes the master device time at which the master device renders content corresponding to the master rendering time." Ex. 1001, 8:54–57. Claim 3 depends from claim 2 and includes the additional limitation that "the indication sent from the master device to the at least one slave device

IPR2018-00766
Patent 7,391,791 B2

includes the master rendering time." *Id*. at 8:58–60. Petitioner asserts, and we agree, that Janevski discloses the limitations of claims 2 and 3 by its disclosure of the "initiator" PVR (the recited "master device") sending each "participator" PVR (the recited "slave devices") a status message that includes a query time stamp for "a frame that the initiator has just played or has recently played," which "represent[s] where the [initiator PVR's] playback is in the content at a particular time which is current." *See* Pet. 49–50, 65 (citing Ex. 1007, 10:19–35, 12:5–6; Ex. 1009 ¶¶ 133–34, 175–176).

Patent Owner presents no additional arguments on the merits of the prior art disclosures of the claim limitations of dependent claims 2 and 3, beyond those arising from alleged deficiencies in Janevski's disclosures of the limitations of claim 1, which we addressed above. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 2 and 3 of the '791 patent are anticipated by Janevski.

*e. Claim 6*

Claim 6 depends from claim 1 and includes the additional limitation "wherein the determining the time domains of the master device, the slave device, and the source includes determining the time domains relative to another device by sending the send and receive times of at least one of the master device, the slave device, and the source to the other device." Ex. 1001, 8:65–9:3. Petitioner asserts, and we agree, that Janevski discloses this claim limitation in its description of the time synchronization message flow by, at least, the disclosure of a participant PVR sending the "initiator" PVR a "reply synchronization message 404" that includes both a receive time (referred to as "time B") and a send time of the "participant" PVR

**Appx64**

(referred to as "time C"). *See* Pet. 65–66. Petitioner also relies upon Janevski's disclosure of messaging, as depicted in Figures 4 and 5. *Id*.

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond those arising from alleged deficiencies in Janevski's disclosures of the limitations of claim 1, which we addressed above. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 6 of the '791 patent is anticipated by Janevski.

### f. Claim 7

Claim 7 further depends from claim 6 and includes additional limitations directed to calculating a "first difference" and "second difference" between receive and send times and associated summing. Ex. 1001, 9:4–12. Petitioner asserts, and we agree, that Janevski discloses these claim limitations by its disclosures associated with time misregistration between the initiator and participant PVRs' time count. *See* Pet. 66–67.

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond those arising from alleged deficiencies in Janevski's disclosures of the limitations of claim 1, which we addressed above. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 7 of the '791 patent is anticipated by Janevski.

### g. Claim 8

Claim 8 further depends from claim 7 and includes the additional limitation directed to "conforming the slave rendering time to the master

device rendering time so that the master device time and the at least one slave device operate in the same time domain; and deducting or adding the time domain differential to the same time domain." Ex. 1001, 9:13–20. Petitioner asserts, and we agree, that Janevski discloses these claim limitations by the disclosure of participant PVRs periodically time synchronizing time counts with the initiator PVR time count to account for the calculated time misregistration, which acts to deduct or add the time count differential. Pet. 68 (citing Ex. 1007, 12:59–13:21; Ex. 1009 ¶ 184).

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond those arising from alleged deficiencies in Janevski's disclosures of the limitations of claim 1, which we addressed above. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 8 of the '791 patent is anticipated by Janevski.

*h. Claim 9*

Claim 9 depends from claim 1 and includes the additional limitation that "the sending of the indication from the master device to the slave devices occurs at various times so that the at least one slave device can adjust the rendering of the content as appropriate." Ex. 1001, 9:21–24. Petitioner asserts, and we agree, that Janevski discloses that the status message containing the query time stamp is periodically sent by the initiator PVR to ensure that the respective PVRs remain synchronous. Pet. 68–69 (citing Ex. 1007, 7:36–38, 15:32–33; Ex. 1009 ¶ 185).

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond those arising from

alleged deficiencies in Janevski's disclosures of the limitations of claim 1, which we addressed above. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claim 9 of the '791 patent is anticipated by Janevski.

### i. Claims 12 and 19

Claim 12 depends from claim 1 and includes the additional limitation wherein "the content is sent from different sources to the master device and the slave devices." Ex. 1001, 9:31–33. Claim 19 depends from claim 16 and recites a similar limitation. *Id.* at 10:24–26. Petitioner asserts, and we agree, that Janevski discloses this claim limitation by its disclosure that the initiator and participant PVRs each receive respective broadcasts of video content that may be sent by "different cable or satellite providers." Pet. 54–55, 69 (citing Ex. 1007, 3:13–16, 6:5–39; Ex. 1009 ¶ 51). Petitioner also relies on Janevski's disclosure that the video content may be sent by other types of sources such as Internet sources, DVD players, and/or VHS players. *Id*. at 55 (citing Ex. 1007, 1:13–17, 16:6–16).

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond those arising from alleged deficiencies in Janevski's disclosures of the "device time" and "time domain" limitations recited in independent claims 1 and 16, which we addressed above in our analysis of claim 1. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 12 and 19 of the '791 patent are anticipated by Janevski.

*j. Claims 24 and 25*

Claim 24 depends from claim 23 and additionally recites "including sending a master device time and the master rendering time to each slave device for use in calculating the time domain difference," and claim 25 depends from claim 24 and includes the limitation "wherein the master device sends the master device time and the master rendering time to the slave devices." Ex. 1001, 10:53–58. Petitioner asserts, and we agree, that Janevski discloses that the initiator PVR sends the participator PVRs a status message that includes information used for synchronizing the PVRs' renderings, which includes an indication of the time into the video program and a query time stamp for a recently played video frame. Pet 46 (citing Ex. 1007, Abs., 7:36–50, 10:19–35, 12:5–36; Ex. 1009 ¶ 120).

Patent Owner presents no additional arguments on the merits of the prior art disclosures of these claim limitations, beyond those arising from alleged deficiencies in Janevski's disclosures of the "device time" and "time domain" limitations recited in independent claim 23, which we addressed above in our analysis of claim 1. *See* PO Resp. 32–38.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 24 and 25 of the '791 patent are anticipated by Janevski.

B.    *Alleged Obviousness of Claims 1–3, 6–9, and 12*
*Over Janevski and Schneidewend, or Over Janevski Alone*

*1. Obviousness, Generally*

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

42

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Huai–Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *Kao*, 639 F.3d at 1068. The stronger the showing of nexus to the claimed invention, the greater the weight accorded the objective indicia of nonobviousness. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 306 (Fed. Cir. 1985). We apply "a [rebuttable] presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 (Fed. Cir. 2016).

### 2. Analysis

Petitioner contends that Janevski inherently discloses the claim element of "determining . . . a source time domain" as recited in claims 1–3, 6–9, and 12 in its anticipation challenges; however, to the extent that there is

disagreement, Petitioner also relies upon obviousness under Janevski or the combination of Janevski and Schneidewend to demonstrate obviousness of these claims in the alternative. Pet. 29, 69–70.

To support its contentions, Petitioner provides explanations as to how Janevski and Schneidewend are directed to, particularly, "determining . . . a source time domain" of claim 1. Pet. 69–72. Petitioner refers to Schneidewend, which is directed to receiving and rendering video content from multiple sources, as is Janevski, and its disclosures relating to a "digital video receiving system" ("DVRS") configured to receive and render video content broadcasts from multiple sources, and the use of the Program and System Information Protocol for Terrestrial Broadcast and Cable standard ("PSIP") with the broadcast of ancillary information, including "system timing information providing a time clock reference enabling determination of a time at which a specific program is to be broadcast," for the teaching of the limitation. *Id*. at 70 (quoting Ex. 1008, 1:19–55, 2:37–44; citing Ex. 1008, 3:1–36). Dr. Chertov testifies that a person of ordinary skill in the art would have had reason to combine the teachings of Schneidewend with Janevski in order to comply with the PSIP standards and that such a combination would have benefits, including avoidance of time clock inaccuracies. *Id*. at 72 (citing Ex. 1008, 5:11–36; Ex. 1009 ¶¶ 198–199).

We agree with Petitioner that Schneidewend teaches the source time domain limitation of the claims and Petitioner has demonstrated articulated reasoning with rational underpinnings to support the combination of Schneidewend and Janevski. *See KSR*, 550 U.S. at 417 (2007) ("if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the

same way, using the technique is obvious unless its actual application is beyond his or her skill." )

Patent Owner presents no arguments on the merits of the prior art disclosures or teachings of "source time domain," which therefore stand unrebutted, nor does Patent Owner present arguments related to the rationale to combine Janevski and Schneidewend. PO Resp. 13–41.

Patent Owner argues, however, that the claims would not have been obvious in view of objective evidence. PO Resp. 38. Patent Owner asserts that there was unmet need for a solution to synchronize across multiple devices the playback of audio and video received from a source. *Id*. (citing Ex. 2001 ¶¶ 26–30; Ex. 2009, 15; Ex. 2012, 37–38). Patent Owner refers to the Juno project with Intel that recognized that synchronization of audio playback was an unsolved problem at the time (late 2000 to early 2001) and that synchronization would be difficult, at best, to achieve. *Id*. at 39 (citing Ex. 2001 ¶¶ 29–30; Ex. 2009, 14–15; Ex. 2011, 37–38). Patent Owner argues that, at that time, Intel had not solved this problem. *Id*.

Petitioner argues, and we agree, that the evidence of long-felt unmet need provided by Patent Owner is insufficient. Pet. Reply 26. Rather than identifying a long-term industry-wide need, the evidence provided is limited to Patent Owner's own evidence, predominantly focused on the Intel project, with no industry-wide evidence provided. Ex. 2001 ¶¶ 26–30; Ex. 2009, 15. Moreover, Patent Owner's identification of the timeframe at issue is limited to the short-term period of late 2000 to 2001. *Id*. This is insufficient to demonstrate that there was an industry-recognized long-felt need for the invention. *Ecolochem, Inc. v. S. Cal. Edison Co*., 227 F.3d 1361, 1377 (Fed. Cir. 2000).

Patent Owner also contends that Intel's willingness to pay significant value for the Juno project provides supporting evidence that the solution was not obvious at the time. PO Resp. 39. Patent Owner argues that the licensing of technology from the patents flowing from BeComm's innovations, of which the instant patent is a part, are evidence of nonobviousness. *Id*. at 40 (citing Ex. 2001 ¶ 10). It is additionally argued that the success of Petitioner (Sonos) is unlikely to have been achieved if it were built on technology that had been obvious since 2001. *Id*. at 40–41.

We do not find persuasive Patent Owner's arguments of commercial success based on Petitioner's products, licensing of patents, or a willingness to pay for technology development because they are not supported by sufficient evidence, and most notably, there is insufficient evidence provided demonstrating a nexus with the claims of the '791 patent. "Evidence of [objective indicia] is only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (Fed. Cir. 2006)). Here, there is no evidence provided by Patent Owner to show that Petitioner's products are covered by the claims of the '791 patent. *See* PO Resp. 40–41. Nor does Patent Owner provide evidence that the licenses granted to other companies were for products that are covered by the claims of the '791 patent. *Id*. at 40; Ex. 2001 ¶ 10; *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) (noting that licenses "may constitute evidence of nonobviousness; however, only little weight can be attributed to such evidence if the patentee does not demonstrate a nexus between the merits of the invention and the licenses of record" (quoting *In re*

46

*GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995)). Finally, Patent Owner does not provide an explanation of the nexus of the Intel Juno project with the '791 patent claims, and Patent Owner's allegation that the invention of the patent was conceived after the Juno project had been terminated cuts against a possible nexus. *See* PO Resp. 19, 39–40. Thus, we cannot significantly credit the objective evidence alleged in view of the deficiencies of supporting evidence.

Turning to the claim limitations, as discussed above, for the "source time domain" limitation of claim 1 (*supra* pp. 27–28), we determined that the Petition provides evidence that demonstrates that Janevski's capability to find and record a television program necessarily shows that the PVR has an indication of the time domain of the service provider, thus, disclosing the "source time domain." Also, based on the Petition's showing that Janevski discloses the other limitations of claim 1 (*supra* pp. 25–34), we determined that Petitioner has shown that Janevski anticipates the claim. Further, as discussed above, in view of the deficiencies of the supporting evidence, we do not significantly credit the objective evidence of record. Inasmuch as "anticipation is the epitome of obviousness" (*In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002)), we find that claims 1–3, 6–9, and 12 are rendered obvious by Janevski.

In addition, we agree with Petitioner's showing, discussed above, that the combination of Janevski and Schneidewend teaches every limitation of claims 1–3, 6–9, and 12, as it is consistent with the prior art disclosures and crediting Dr. Chertov's supporting testimony for the rationale to combine Schneidewend and Janevski (Ex. 1009 ¶¶ 189–201). And, as discussed above, in view of the deficiencies of the supporting evidence, we do not

47

significantly credit the objective evidence of record. We, therefore, determine that the Petition provides sufficient evidence supporting the obviousness of claims 1–3, 6–9, and 12 over the combination of Janevski and Schneidewend.

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 1–3, 6–9, and 12 of the '791 patent are unpatentable as obvious over Janevski alone and obvious over the combination of Janevski and Schneidewend.

## III. MOTION TO EXCLUDE

Petitioner moves to exclude Patent Owner's Exhibits 2002–2009, 2011–2078, and 2083–2088 due to alleged lack of sufficient authentication and Exhibits 2081 and 2082 as improperly incorporated by reference. Mot. Ex. 1–7.

Petitioner argues that Exhibits 2002–2009, 2011–2078, and 2083–2088 lack sufficient authentication because Patent Owner relies on the testimony of Mr. Balassanian, one of the inventors, for authentication of these exhibits. Mot. Ex. 2. Petitioner asserts that although the testimony of a witness with personal knowledge of an exhibit would normally be sufficient to authenticate, that is not the situation here because Patent Owner relies on these exhibits to prove the invention predates the prior art, so independent evidence of authentication is required besides inventor testimony. *Id*. at 3.

Federal Rule of Evidence 901 requires that a proponent need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is" to meet its burden on authentication. Fed. R. Evid. 901(a). Authenticity is, therefore, not an especially high hurdle for a party

48

to overcome. *See United States v. Patterson*, 277 F.3d 709, 713 (4th Cir. 2002). We disagree with Petitioner that the only evidence concerning authenticity of these Exhibits that should be considered is Mr. Balassanian's testimony. *See* Mot. Ex. 3. Mr. Balassanian testifies that the majority of documents produced were from records that included metadata records (Ex. 2001 ¶¶ 91–166), and there is no dispute that the documents were stored electronically. *See* Mot. Ex. Opp. 2. There is also no dispute that Patent Owner provided the BeComm demo laptop hard drive and a CD backup of its CVS repository as well as documents in native format to Petitioner's forensic expert. *See id.* at 2–3. Petitioner presents no contentions that the electronic data associated with the exhibits at issue is suspect. Mot. Ex. Reply 1–5. The only exhibit for which a metadata record is not presented is an email (Ex. 2038), which Patent Owner argues is dated on its face and discusses another exhibit (Exhibit 2037), which has an associated metadata record. Mot. Ex. Opp. 9.

Here, document logs were produced (Ex. 2077), albeit from files held by Mr. Balassanian, but Petitioner was permitted to forensically examine the electronic evidence, which includes date stamps and other metadata. Under these circumstances, our view is that the document logs provide additional support for the authenticity of the exhibits, which we find to be sufficient. Accordingly, we *deny* Petitioner's Motion to Exclude Exhibits 2002–2009, 2011–2078, and 2083–2088.

Exhibits 2081 and 2082 are claim charts that allegedly explain Dr. Hashmi's source code trace. We have not relied on these exhibits in rendering this Decision. Therefore, we *dismiss as moot* the Motion to Exclude these Exhibits.

## IV. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–3, 6–9, 12, 16, 19, and 23–25 are anticipated by Janevski; that claims 1–3, 6–9, and 12 would have been obvious in view of Janevski; and that claims 1–3, 6–9, and 12 would have been obvious in view of Janevski and Schneidewend.

## V. ORDER

Accordingly, it is

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that any one of claims 1–3, 6–9, 12, 16, 19, and 23–25 of U.S. Patent No. 7,391,791 B2 is unpatentable;

FURTHER ORDERED that the Motion to Exclude Exhibits 2002–2009, 2011–2078, and 2083–2088 is *denied*;

FURTHER ORDERED that the Motion to Exclude Exhibits 2081 and 2082 is *dismissed as moot*; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2018-00766
Patent 7,391,791 B2


PETITIONER:

Rory P. Shea
Cole B. Richter
George I. Lee
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
224 N Desplaines St, Suite 250
Chicago, Illinois 60661
shea@ls3ip.com
richter@ls3ip.com
lee@ls3ip.com
boyea@ls3ip.com

PATENT OWNER:

Christian Hurt
Kirk A. Voss
William E. Davis, III
THE DAVIS FIRM, PC
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
churt@davisfirm.com
kvoss@davisfirm.com
bdavis@davisfirm.com

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SONOS, INC.,
Petitioner,

v.

IMPLICIT, LLC,
Patent Owner.

————————

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)[1]

————————

Before MICHELLE N. WORMMEESTER, SHEILA F. McSHANE, and
NABEEL U. KHAN, *Administrative Patent Judges*.

McSHANE, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
*35 U.S.C. §§ 144, 318; 37 C.F.R. § 42.5(a)*

———

[1] We exercise our discretion to issue one Order to be filed in each
proceeding. The parties are not authorized to use this style heading for any
subsequent papers.

## I. INTRODUCTION

At trial, Implicit, LLC ("Patent Owner") attempted to antedate the principal prior art reference asserted by Sonos Inc. ("Petitioner"), arguing that the originally named inventors had conceived of the invention and communicated it to their engineering staff, who then reduced it to practice prior to the effective date of the prior art reference. We determined, however, that Patent Owner's evidence was insufficient to establish prior conception of the invention and the communication of the invention such that any actual reduction to practice could inure to the inventors' benefit. Patent Owner appealed our Final Written Decisions, and while the appeals were pending, Patent Owner sought changed inventorship of the patents-at-issue and the USPTO issued corrections to inventorship. The United States Court of Appeals for the Federal Circuit remanded the cases to us for an order addressing what impact, if any, the certificates of correction would have on the Final Written Decisions in the cases. Herein, we determine that, even in light of the general retroactive effect of 35 U.S.C. § 256, judicial estoppel and waiver apply under the specific circumstances of these cases. Accordingly, Patent Owner's certificates of correction of inventorship have no impact on the Final Written Decisions.

## II. BACKGROUND

### A. Initial Proceedings Before the Board

Petitioner filed Petitions requesting *inter partes* review of claims 1–3, 6–9, 12, 16, 19, and 23–25 of U.S. Patent No. 7,391,791 B2 (Ex. 1001, "the '791 patent") in IPR2018-00766 ("IPR766") and for review of claims 1–3, 8, 11, and 17 of U.S. Patent No. 8,942,252 B2 (Ex. 1001, "the '252 Patent") in IPR2018-00767 ("IPR767"). IPR766, Paper 1; IPR767, Paper 1. Patent Owner filed Preliminary Responses in both cases. IPR766, Paper 6; IPR767,

2

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)

Paper 6. On September 19, 2018, in IPR766, we instituted *inter partes* review on the grounds presented in the Petition as to whether claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent are anticipated by Janevski[2] or would have been obvious over Janevski alone and in combination with other prior art. IPR766, Paper 10. On September 19, 2018, in IPR767, we also instituted *inter partes* review on the grounds presented in the Petition as to whether claims 1–3, 8, 11, and 17 of the '252 patent would have been obvious in view of Janevski alone and in combination with other prior art. IPR767, Paper 8.

Trials were conducted in both IPR766 and IPR767. On September 16, 2019, we entered a Final Written Decision (IPR766, Paper 46, "Final Dec." or "Final Decision")[3] in IPR766, determining that Petitioner had demonstrated by a preponderance of the evidence that claims 1–3, 6–9, 12, 16, 19, and 23–25 of the '791 patent are anticipated by Janevski or would have been obvious over Janevski, alone or in combination with other prior art. On September 16, 2019, we also entered a Final Written Decision (IPR767, Paper 40) in IPR767, determining that Petitioner had demonstrated by a preponderance of the evidence that claims 1–3, 8, 11, and 17 of the '252 patent would have been obvious in view of Janevski alone or in combination with other prior art.

An issue addressed in the Final Written Decisions was Patent Owner's assertion that Janevski did not constitute prior art to the challenged claims under § 102(e) because the subject matter of the claims was conceived and

---

[2] U.S. Patent No. 7,269,338 B2 (issued September 11, 2007) (Ex. 1007).

[3] Because of the substantial similarities in issues raised and the contents of the filings in IPR766 and IPR767, hereafter we refer to the filings of IPR766 as representative, unless otherwise noted.

3

actually reduced to practice prior to Janevski's filing date of December 11, 2001. *See* Final Dec. 11. We determined that the evidence presented by Patent Owner was insufficient to carry its burden of production to establish conception of the invention and the communication of the invention such that any actual reduction to practice could inure to the inventors' benefit. *See id.* at 17–22.

B. *Proceedings Before the Federal Circuit*

On November 8, 2019, Patent Owner filed Notices of Appeal to the Federal Circuit for review of the Final Decisions. *See* Paper 47. On November 30, 2021, the Federal Circuit remanded the cases for the limited purpose of allowing Patent Owner the opportunity to request Director review of the Final Written Decisions. Ex. 3003. On December 17, 2021, Patent Owner petitioned for certificates of correction to add an individual, Guy Carpenter, as an inventor to the patents-at-issue. *See* Paper 62, 5 ("PO Remand Br."). On December 30, 2021, Patent Owner filed requests for Director review of the Final Written Decisions (Ex. 3100), which were denied on February 7, 2022 (*see* Paper 53). On March 7, 2022, Patent Owner filed Amended Notices of Appeal. *See* Paper 54.

On June 9, 2022, at the Federal Circuit, Patent Owner filed a motion for remand to await decision on the petitions and then to require the Board to consider the effect of changed inventorship. *See* PO Remand Br. 6. After the inventorship correction was granted by the USPTO on August 18, 2022, Patent Owner notified the Federal Circuit and reiterated its request for remand to the Board. *See id.* at 6; Ex. 2097 (Certificate of Correction).

On November 9, 2022, the Federal Circuit issued an Order, taking note of the intervening correction of inventorship certificates that Patent Owner alleged would serve to moot the appeals. Paper 59. The Federal

4

Circuit stated that "[a]llowing the PTAB to consider the impact of these intervening circumstances on the decisions on appeal in the first instance may conserve party and judicial resources." *Id*. at 2. The Order directed that

> [t]hese appeals are remanded for the sole purpose of having the PTAB issue an order addressing what, if any, impact the certificates of correction would have on the final written decisions in these cases. This court retains jurisdiction over the appeals.

*Id*.

### C. Proceedings on Remand

The parties requested a conference call to discuss the procedure on remand. On January 25, 2023, a call was convened with counsel for Petitioner and Patent Owner. *See* Ex. 2096. During the call, both parties requested briefing, with opening briefs of 15 pages, and agreed that briefings were to be directed to the potential retroactive effect of the certificates of correction on the Final Written Decisions. Paper 60, 2. Petitioner asserted that the briefing should be permitted to identify the issues which had not been addressed in the Final Written Decisions, if it was determined that there is a retroactive effect of the certificates of correction on our Final Written Decisions. *Id*.

We permitted additional briefing to address the remand, with Petitioner filing an opening brief (Paper 64, "Pet. Remand Br."), and Patent Owner filing an opening brief (Paper 62, "PO Remand Br."). Petitioner filed a responsive brief (Paper 66, "Pet. Remand Resp. Br."), and Patent Owner filed a responsive brief (Paper 65, "PO Remand Resp. Br.").

5

*D. Issues Related to the Status of Janevski as Prior Art*

Janevski is the primary prior art reference that Petitioner relied upon in its challenges to claims in IPR766 and IPR767. *See* Final Dec. 2–3. Patent Owner asserted that Janevski does not constitute prior art to the challenged claims under § 102(e) because the subject matter of the claims was conceived and actually reduced to practice prior to Janevski's filing date of December 11, 2001. *Id.* at 11. During the trials, Patent Owner contended that Edward Balassanian and Scott Bradley conceived of the inventions of the patents at least by December 11, 2001. *Id.* at 15. Patent Owner asserted that the inventors communicated the inventions to an internal engineering and development staff, working primarily with engineer Guy Carpenter for implementation.[4] *Id.* Patent Owner argued that source code corroborated Mr. Balassanian's testimony concerning the invention's conception and reduction to practice prior to December 11, 2001. *Id.*

We determined that the evidence was insufficient to establish the conception of the invention and the communication of the invention to Mr.

---

[4] The most relevant evidence of record related to these issues is Mr. Balassanian's declaration testimony that:

> Mr. Bradley and I solved the synchronization problem and conceived the inventions set forth in the Claims of the Patents. We then began working on the implementation of the inventions thereafter, as detailed below. We communicated those inventions to BeComm's internal engineering and development staff to reduce them to practice. We worked primarily with Guy Carpenter, an Engineering Master at BeComm, to implement the inventions, as I describe below.

Ex. 2001 ¶ 33. Also relevant is Mr. Balassanian's deposition testimony: "Q. Did Guy Carpenter contribute to . . . to any conception of the claims? . . . THE WITNESS: I don't believe so." Ex. 1019, 59:9–18.

**Appx83**

Carpenter such that any reduction to practice could inure to the inventors' benefit. *See* Final Dec. 18–22. We therefore found that because Patent Owner failed to meet its burden to demonstrate earlier conception of the invention such that antedating did not apply, Janevski constituted prior art to the challenged claims of the patents under § 102(e). *Id*. at 22. We found the challenged claims unpatentable as anticipated by Janevski or obvious over Janevski, alone or in combination with other prior art. *Id*. at 50.

Since the time of trial, as discussed above, Patent Owner petitioned for and received certificates of correction of inventorship, which name Guy Carpenter as an inventor of the patents in the proceedings. *See* Ex. 2097; Paper 62, 5–6. Below we discuss and evaluate the potential impact the certificates of correction have on the Final Written Decisions in these cases in accordance with the Federal Circuit's Order.

## III. DISCUSSION

*A. 35 U.S.C. § 256*

The parties take differing positions on whether certificates of correction have retroactive effect on inventorship under 35 U.S.C. § 256. Patent Owner argues that the language of the statute strongly indicates that inventorship corrections have retroactive effect because, in contrast to other correction provisions, such as §§ 254 and 255, that "contain an explicit limitation 'for causes thereafter arising,' . . . such prospective-bound language is entirely absent from inventorship corrections of § 256." PO Remand Br. 7 (emphasis omitted). Patent Owner argues that under a plain language analysis of the statute, the legislative intent of these correction provisions is clear: a "Certificate of Correction issued for correction of inventorship has retroactive effect." *Id*. at 7–8 (quoting *Roche Palo Alto LLC v. Ranbaxy Labs. Ltd*., 551 F. Supp. 2d 349, 357, 359 (D.N.J. 2008)).

7

**Appx84**

Patent Owner asserts that, in addition to the language of the statute, case law supports the retroactive effect of inventorship corrections. PO Remand Br. 8–11. For example, Patent Owner contends that in *SIPCO*, the Board analyzed the statutory language of § 256 in view of that of § 255 and found that § 256 has retroactive effect. *Id*. at 8–10 (citing *Emerson Elec. Co. v. SIPCO, LLC*, IPR2016-00984, Paper 52 at 17-21 (PTAB Jan. 24, 2020) ("*SIPCO*") (citing to *Vikase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1329 (Fed. Cir. 2001); *Roche*, 551 F. Supp. 2d at 355)).

Patent Owner also asserts "that § 256 was enacted as a 'savings Provision' to attenuate the harsh effects on actual inventors of errors in ascertaining proper inventorship." PO Remand Br. 11 (citing *Egenera, Inc. v. Cisco Systems, Inc.,* 972 F.3d 1367, 1377 (Fed. Cir. 2020) ("*Egenera*")). Patent Owner asserts that provisions such as § 256 should be given liberal construction in favor of applicants. *Id*. at 12 (citing *Patterson v. Hauck*, 341 F.2d 131, 138 (CCPA 1965)).

Petitioner asserts that a certificate of correction for inventorship cannot be used to cure a finding of invalidity under 35 U.S.C. §§ 102(a), (b), and (e), or 103(a). Pet. Remand Br. 2. More specifically, Petitioner contends that "the statute specifies that correcting inventorship can overcome invalidity if the invalidity arises from the act of misnaming inventors. The act of misnaming inventors invalidates a patent under pre-AIA § 102(f)." *Id*. Petitioner argues that Patent Owner "misreads § 256's invalidity-savings provision as granting it the right to use changed inventorship to retroactively address any type of invalidity," but "[t]he language of § 256 does not provide for this." *Id*. at 3. In support, Petitioner refers to *Egenera*, where the alleged infringer raised an improper inventorship issue under § 102(f) as an invalidity defense. *Id*. (citing

8

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)

*Egenera* at 1372). Petitioner distinguishes other cases, not having to do with inventorship or corrections thereof, from the circumstances here. *Id.* at 5–6.

Petitioner further contends that the operative issue "is not whether § 256 applies retroactively in some scenarios, the question is 'does it apply retroactively in this scenario?'" Pet. Remand Resp. Br. 1–2 (emphasis omitted). Petitioner asserts that § 256 applies retroactively to misjoinder and nonjoinder of inventors, but here "correction does not remove the basis for invalidity – it has no direct effect on the §§ 102, 103 invalidity grounds here." *Id.* at 2. Petitioner argues that the case law cited by Patent Owner in its opening remand briefing does not support the retroactive application of § 256. *Id.* at 2–5.

Patent Owner responds by arguing that there are precedential Federal Circuit decisions that addressed the application of § 256 in cases where § 102(f) was not at issue. PO Remand Resp. Br. 2–4. Patent Owner acknowledges that § 102(f) challenges are the most common, but points to the *Riverwood* case, where the Federal Circuit considered the potential application of § 256 under an assessment of prior art under § 102(e). *Id.* at 2–3 (citing *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1356 (Fed. Cir. 2003)). Patent Owner also relies upon a *Google* case, which considered § 256 under an obviousness analysis with § 102(a) prior art. *Id.* at 3 (citing *Google LLC v. IPA Techs, Inc.*, 34 F.4th 1081, 1088 (Fed. Cir. 2022)). Patent Owner argues that "Section 256 is thus not limited to validity challenges under § 102(f) alone." *Id.*

We begin with the statute. Section 256 states, in relevant part:

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent, the Director may, on application of all the parties and assignees, with proof of the facts and such other

9

> requirements as may be imposed, issue a certificate correcting such error.
>
> The error of omitting inventors or naming persons who are not inventors *shall not invalidate the patent* in which such error occurred *if it can be corrected* as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

35 U.S.C. § 256 (emphasis added). In view of the language of the statute, we agree with Patent Owner that it supports the conclusion that a certificate of correction of inventorship should apply retroactively in general. Section 255 states that a certificate of correction "shall have the same effect and operation in law on the trial of actions for causes thereafter arising," indicating that the certificate shall only be effective after issuance. In contrast, § 256's statement "shall not invalidate the patent" "if it can be corrected" indicates that the correction of inventorship generally has a retroactive effect. *Id.*; 35 U.S.C. § 255; *see also SIPCO* at 10, 18–21. The interpretation of § 256 to allow for retroactivity is also consistent with the case law on this issue. *See Vikase*, 261 F.3d at 1329; *Roche*, 551 F. Supp. 2d at 357–358; *Riverwood*, 324 F.3d at 1356; *Google*, 34 F.4th at 1088.

As to Petitioner's arguments, generally, that the retroactive effect of § 256 applies only to 102(f) issues, we do not agree. Consideration of the *Google* case is instructive. In *Google*, the issue the Federal Circuit considered was effect of potential correction of inventorship on whether a reference would be considered prior art under 102(a) under § 256. *Google*, 34 F.4th at 1084, 1088. Similarly, in *Riverwood*, the Federal Circuit considered the potential effect of correction of inventorship to determine whether a reference would be prior art under § 102(e) under § 256. *Riverwood*, 324 F.3d at 1355–56.

We next turn to Petitioner's assertion that Section 256 should not be applied under the specific circumstances here because of judicial estoppel and waiver.

### B. Judicial Estoppel

Petitioner argues that judicial estoppel applies here to preclude the retroactive effect of § 256. Pet. Remand Br. 6–9. Petitioner asserts that judicial estoppel applies against a party when: (1) the party takes a later position that is "clearly inconsistent" with an earlier position; (2) the party succeeds in persuading a court to adopt the earlier position (which thus poses a "risk of inconsistent court determinations"); and (3) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 7 (citing *Transclean Corp. v. Jiffy Lube Intern., Inc.,* 474 F.3d 1298, 1307 (Fed. Cir. 2007)). Petitioner contends that all three factors are met because Patent Owner asserted that Mr. Balassanian and Mr. Bradley were inventors and communicated the invention to Carpenter for his subsequent reduction to practice, the Board accepted the premise for the purposes of making findings of fact and rulings of law, and Patent Owner now seeks to derive the unfair advantage of revisiting the Final Written Decisions. *Id.* at 7–9.

In response, Patent Owner argues that estoppel factors 1 and 2 do not apply because its previous position was that "Balas[s]annian and Bradley were inventors of valid claims because the work of Mr. Carpenter inured to their benefit," but Patent Owner did not "'succeed in persuading' the Board of its position." PO Remand Resp. Br. 6 (emphasis omitted). Patent Owner asserts that "[b]eing legally wrong, moreover, is not the same as changing factual positions." *Id.* at 6–7 (emphasis omitted) (citing *Cleveland v. Policy Mgm't Sys.,* 526 U.S. 795, 802 (1999)).

11

Relying on *Egenera*, Patent Owner also contends that "the inventorship analysis can even be informed by a tribunal's view of the evidence, thereby provoking a subsequent correction petition." PO Remand Br. 12 (citing *Egenera* at 1376–78). Because contrary inventorship arguments were previously made, but correction was nevertheless permitted in *Egenera*, Patent Owner argues that it "was justified in correcting inventorship notwithstanding what it may have argued prior to the Board's extensive factfinding regarding Mr. Carpenter and his contributions." *Id*. Patent Owner also contends that § 256 "does not limit the time during which inventorship can be corrected" and "diligence is not a requirement to correct inventorship under section 256." *Id*. at 14 (quoting *Stark v. Advanced Magnetics, Inc*., 119 F.3d 1551, 1554 (Fed. Cir. 1997)) (emphasis omitted).

Petitioner contends that *Egenera* is distinguishable here because "inventorship of Implicit's patent was not at issue in the IPR proceedings." Pet. Remand Br. 4. Petitioner asserts that Patent Owner's decision to pursue change in inventorship was not informed by Board's view on the evidence on inventorship because "the Board did not conclude, and had no occasion to conclude, that Carpenter was either a proper inventor or that he was improperly omitted," nor did Patent Owner ever assert during the IPR proceedings that there was an error in inventorship. *Id*.

We begin our analysis with the first factor of judicial estoppel. Here, there is no dispute that Patent Owner's assertions and evidentiary testimony on the inventorship of the patent, which it raised in the context of its attempt to antedate certain prior art, have changed from the time of the trial to the position now taken on corrected inventorship. More specifically, at trial, Patent Owner explicitly asserted, with the support of the testimony of Mr. Balassanian, that Messrs. Balassanian and Bradley conceived of the

inventions of the patents and communicated those inventions to an internal engineering and development staff, including Mr. Carpenter, for implementation. Paper 13, 19–20; Ex. 2001 ¶¶ 6, 33, 42, 46; *see also* Ex. 1019, 59:9–18. Patent Owner has now changed its position and has sought and obtained a correction of inventorship to add Mr. Carpenter as an inventor. *See* PO Remand Br. 5–6; Ex. 2097.

We do not agree with Patent Owner's assertion that it "was justified in correcting inventorship" because "the subsequently filed corrections reflect the Board's determinations." *See* PO Remand Br. 12–13. The Final Written Decision analyzed whether there was sufficient evidence in the record to corroborate Mr. Balassanian's testimony on conception and communication of the invention to Mr. Carpenter. *See* IPR2018-00767, Paper 40, 22 ("In summary, none of the BeComm internal documents, demonstrations of BeComm technology, or BeComm source code *corroborate* Mr. Balassanian's testimony that he and Mr. Bradley conceived of the challenged claims or that they communicated the inventions to Mr. Carpenter.") (emphasis added); *see also* Final Dec. 19–20 (considering documents to determine if they corroborate conception). That is, the issue addressed in the Final Written Decisions was not the correct inventorship of the patents, but rather the *sufficiency* of corroborating evidence of conception and communication of the invention in order for the inventors to benefit from Mr. Carpenter's work. *See* Final Dec. 19–20. For instance, the document that eventually served as the provisional application, which appears to have been written by Mr. Carpenter, was considered only to determine whether it corroborated Mr. Balassanian's testimony. *See id.*

*Egenera* presents a different situation from that here. In *Egenera*, the district court's intervening claim construction justified the change in

13

**Appx90**

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)

inventorship. *Egenera* at 1376–79. The Federal Circuit acknowledged that "[i]nventorship . . . can depend on claim construction," and once claim construction was decided, "it was entirely consistent for Egenera" to request correction of inventorship. *Id.*; *see also id.* at 1376 ("Ultimately, *inventorship* is a legal conclusion premised on underlying factual findings, and one that *depends on claim construction.*" (citing *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018); *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002)) (emphases added)). The Federal Circuit found that "the district court's intervening claim-construction and inventorship determinations further justify any seeming inconsistency." *Id.* at 1376, 1379; *see also id.* at 1379 ("[O]nce those issues were decided ['a [claim] construction that the inventorship question was directly predicated on'], it was entirely consistent for Egenera to request an accompanying formal correction of inventorship.").

Here, however, Patent Owner has not identified any changed legal determination upon which inventorship depends that justifies setting aside judicial estoppel. The claim construction ruling in *Egenera* was a legal determination that was largely out of Egenera's control.[5] Our determination regarding the sufficiency of corroborating evidence, on the other hand, is a factual determination based on the documentary evidence of record as argued by Patent Owner, and which was in the sole control of Patent Owner. *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014) ("We have treated the sufficiency of corroboration as a question of fact."). The

---

[5] Indeed, Egenera opposed the district court's construction. *Egenera* at 1379 ("Egenera consistently protested the means-plus-function construction both at the district court and on appeal—a construction that that the inventorship question was directly predicated on.")

14

documentary evidence in the trial record could be consistent with Patent Owner's assertions during trial that Mr. Balassanian and Mr. Bradley conceived of the invention and then communicated that invention to Mr. Carpenter (had there been sufficient corroborating evidence of that communication). That documentary evidence could also be consistent with Patent Owner's current position that Mr. Carpenter was an inventor all along. We made no such determination, however, specifically regarding inventorship in our Final Written Decisions, nor do we make such a determination now. For example, although we noted in our Final Decision that Mr. Carpenter was the apparent author of the document upon which the provisional application was based and also the apparent author of the source code relied upon by Patent Owner (Final Dec. 20), that determination does not mean that Mr. Balassanian and Mr. Bradley were not the correct inventors of the challenged patents, nor does it mean that Mr. Carpenter was an inventor.[6] Indeed, that Mr. Carpenter authored the document and source code in question is consistent with Mr. Balassanian's testimony that Mr. Carpenter worked on his behalf in implementing the invention. As seen, correct inventorship in this instance does not depend on our determination in the Final Decision regarding the sufficiency of corroborating evidence presented by Patent Owner. Accordingly, *Egenera* is distinguishable from the situation here.

Additionally, Patent Owner sought the change of inventorship post-trial, and as discussed in *Egenera*, the Patent Office examines a change of inventorship request only for the presence of supporting statements and the

---

[6] As we note below, we have not determined whether the source code practices the claimed inventions.

required fee and "[n]o substantive examination occurs, and the PTO does not consider the substantive adequacy of the petition." *See Egenera* at 1380 (citing 37 C.F.R § 1.324(b); MPEP § 1481.02). Thus, under *Egenera*, the Patent Office's grant of a certificate of correction "without more, [does not] count[] as 'persuasion' . . . for judicial-estoppel purposes," and is limited to a ministerial, rather than a legal, determination. *Id*.

We are also not persuaded by Patent Owner's argument that being legally wrong about inventorship is not the same as changing factual positions. PO Remand Resp. Br. 6–7 (citing *Cleveland Policy Mgm't Sys.,* 526 U.S. at 802). To the extent that Patent Owner is suggesting that its initial identification of named inventors is merely "legally wrong" based on our determinations in the Final Decisions, rather than factually different, we do not agree. The Final Decisions did not make a determination on inventorship, that is, as discussed, the Decisions only addressed whether the documentary evidence corroborated testimonial evidence of conception and communication of the invention. *See* Final Dec. 20. Patent Owner possessed and presented its documentary evidence, including sworn inventorship testimony, in support of its antedating assertions at trial. Patent Owner's changed position on inventorship therefore, represents a change in factual positions, contrary to its argument. For instance, Mr. Balassanian's testimonial evidence concerning the conception and reduction to practice of the invention (Ex. 2001 ¶ 33), which formed the basis for our review of the documentary evidential support at trial, is now contrary to the current named inventorship. Patent Owner's positions are clearly inconsistent—at trial, Patent Owner asserted a certain inventorship, and Patent Owner then sought a different inventorship. Accordingly, the first factor for judicial estoppel is met.

16

As to the second factor, whether the party must have succeeded in persuading a court (or agency)[7] to adopt the earlier position, as discussed above, we started with the testimonial evidence on inventorship presented by Patent Owner at trial and evaluated other evidence in that light. More specifically, the supporting evidence presented to us includes the testimonial evidence of Mr. Balassanian, with that testimony stating, for example, "Mr. Bradley and I solved the synchronization problem and conceived the inventions set forth in the Claims of the Patents," and "[w]e communicated those inventions to BeComm's internal engineering and development staff to reduce them to practice." Ex. 2001 ¶ 33. Based on the testimonial evidence provided, during trial we accepted Patent Owner's representations as to the inventorship of the subject matter of the patents, and considered whether the documentary evidence provided corroboration of that testimony under a rule of reason—and our associated determinations were directed to the sufficiency of the documentary evidence.[8] *See* Final Dec. 18–22.

Moreover, although Patent Owner argues that it did not "'succeed in persuading' the Board of its position," (PO Remand Resp. Br. 6)[9], as

---

[7] Below we discuss the issue of whether judicial estoppel can be applied in an IPR administrative proceeding.

[8] The situation here differs from that in *Egenera*, where the Federal Circuit considered representations made to the PTO under the second factor because the district court relied only on the PTO's acceptance of representations in the inventorship petition. *Egenera* at 1380. Here, in contrast, the Board directly considered evidence provided to us by Patent Owner, which, as discussed, was part of the trial record.

[9] In Patent Owner's Rehearing Request for Director Review, Patent Owner also argued that "The Board's Decision identified the specific role that Mr. Carpenter played in the process of invention . . . While Implicit argued in the trial proceedings that the work of Mr. Carpenter, as a company employee,

explained above, the Final Decisions were based on Patent Owner's representations on inventorship—we evaluated the documentary evidence in light of Patent Owner's testimony and arguments on the correct inventorship. "[A] party need not show that the earlier representation led to a favorable ruling on the merits . . . but must show that the court adopted and relied on the represented position either in a preliminary matter or as part of a final disposition." *Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010); *see also Transclean Corp. v. Jiffy Lube Intern., Inc.*, 474 F.3d 1298, 1307 (Fed. Cir. 2007). Accordingly, the second factor of judicial estoppel is met.

For the third factor, Petitioner argues that Patent Owner is seeking to change the Board's Final Written Decisions and this prejudices Petitioner because it spent resources litigating this matter to resolution. Pet. Remand Br. 9. In opposition, Patent Owner argues that "[a]fter the Board made its determinations," Patent Owner "saw the need to correct inventorship in order to avoid future § 102(f) assertions." PO Remand Resp. Br. 7. Patent Owner asserts that "[t]here is nothing 'unfair' about exercising a statutory right to correct inventorship commensurate with Board factfinding." *Id.*

Patent Owner may avail itself of its statutory rights; however, the issue is not the exercise of those rights, but rather whether this results in a detriment to Petitioner. If there were a continuation of these proceedings under changed circumstances, in order to comply with due process and the

---

ought to inure to the benefit of Messrs. Balassanian and Bradley as named coinventors, the Board rejected this view." Paper 52, 10. Although Patent Owner's argument suggests some determination of inventorship at trial, that is not accurate. As discussed above, we evaluated the evidence to determine where there was communication of the invention to Mr. Carpenter for implementation, and there was no determination as to whether Mr. Carpenter was, or should have been named, as an inventor. Final Dec. 21.

Administrative Procedure Act (APA), Petitioner would be permitted the opportunity to respond to the new inventorship theory, likely through additional briefing, as further discussed below. Accordingly, revisiting these proceedings under changed circumstances would require the additional expenditure of resources by Petitioner. Patent Owner's arguments are further premised on an alleged requirement to change inventorship as a result of the findings of the Final Written Decisions. As discussed, however, the Decisions' evaluation of the evidence provided by Patent Owner was limited to determining whether it provided sufficient evidentiary support for antedating. Accordingly, we do not find Patent Owner's arguments persuasive. In view of the detriment and prejudice to Petitioner, the third factor of judicial estoppel is met.

We now turn to the issue of whether judicial estoppel applies in a situation with a Section 256 inventorship correction. Patent Owner argues that "[j]udicial estoppel—as an equitable doctrine—cannot override a curative statute like § 256." PO Remand Resp. Br. 5. Patent Owner asserts that Section 256 was enacted as a "savings provision" to mitigate the harsh effects of errors on actual inventors. PO Remand Br. 11 (citing *Egenera* at 1377). Patent Owner urges that provisions such as Section 256 "should be given a liberal construction in favor of applicants." *Id*. at 12 (quoting *Hauck*, 341 F.2d at 138).

We disagree with Patent Owner. In *Egenera*, the Federal Circuit acknowledged judicial estoppel can be applied in the context of an administrative tribunal. *Egenera* at 1380 (". . . we agree that judicial estoppel can occur in an administrative tribunal"); *see also id*. n.10 (citing *Trs. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010) ("Judicial estoppel applies just as much when one of the *tribunals is an administrative*

19

**Appx96**

*agency* as it does when both tribunals are courts.") (emphasis added)). Of note, the Federal Circuit in *Egenera* did not reach the issue of whether "judicial estoppel can *never* prevent § 256 from saving a patent's validity" because the criteria for judicial estoppel were not met. *Egenera* at 1378; *see also id.* at 1378–1382. The Federal Circuit further held that "*[w]e do not go so far as to declare that there would be no potential for judicial estoppel* had the Board fully considered and adopted Egenera's swearing-behind arguments."[10] *Id.* (emphasis added).

Here, unlike *Egenera*, Patent Owner represented and provided evidence on its asserted correct inventorship directly to the Board. As discussed, Patent Owner asserted and provided evidence that Messrs. Balassanian and Bradley were the inventors of the patents and Mr. Carpenter implemented the invention. Paper 13, 19–20; Ex. 2001 ¶¶ 6, 33, 42, 46; *see also* Ex. 1019, 59:9–18. Patent Owner's representations were not contested by Petitioner during trial, and Patent Owner's representations were further consistent with the argument and evidence developed and considered by the Board during trial. Now, Patent Owner's position on inventorship is inconsistent with its earlier position and Petitioner would be prejudiced absent estoppel. Accordingly, in this particular circumstance, judicial estoppel applies. Judicial estoppel is an equitable doctrine that prohibits a party from taking inconsistent positions in the same or related proceedings and its purpose is "to protect the integrity of the judicial process."

---

[10] The Federal Circuit found that there was no unfair advantage to Egenera and no prejudice to the opposing party because the Board considered the opposing party's prior art without addressing Egenera's priority arguments, so the change in inventorship "ended up not making a difference." *Egenera* at 1381.

*Transclean Corp. v. Jiffy Lube Intern., Inc.*, 474 F.3d 1298, 1307 (quoting *Hossaini v. W. Mo. Med. Ctr.,* 140 F.3d 1140, 1142–43 (8th Cir. 1998)). The application of judicial estoppel is appropriate to hold Patent Owner to its inventorship representations and to the evidence it presented to the Board.

We agree with Petitioner that after Patent Owner was unsuccessful at trial due to the failure of its own evidence, Patent Owner now seeks to have the evidence reconsidered under changed inventorship. Pet. Remand Br. 8–9. Patent Owner had in its sole possession the evidence of inventorship, and we believe that under these circumstances, Patent Owner should be held to the consequences of its choices as to the representations and evidence of antedating that it presented at trial. To hold otherwise would result in prejudice to Petitioner. We consider the potential prejudice to be significant; as discussed, redoing these proceedings would require Petitioner to expend additional resources. Further, under these specific circumstances where Patent Owner has made the inventorship change under its volition, Patent Owner would be afforded the unfair advantage of a "do-over," absent the application of judicial estoppel.

Accordingly, under these specific circumstances, we determine that judicial estoppel applies precluding Patent Owner from relying on the certificates of correction of inventorship in these proceedings.

### C. Waiver

Petitioner contends that waiver provides an independent basis that the certificates of correction should not upset the Final Written Decisions. Pet. Remand Br. 9. Petitioner asserts that Patent Owner "waived the opportunity to argue Carpenter was an inventor by not raising it when it had the chance during the proceeding and, in fact, argu[ed] the opposite – *i.e.*, that

21

**Appx98**

Carpenter was not an inventor and merely reduced the invention to practice." *Id.* at 10. Petitioner argues that waiver is the intentional relinquishment of a known right, and that "[i]t is a hallmark of practice before the PTAB that the failure to raise an argument before the Board is a waiver of that argument." *Id.* (citing, *inter alia*, *VirnetX Inc. v. Apple Inc.*, 665 F. App'x 880, 884 (Fed. Cir. 2016); *Finjan, Inc. v. Cisco Sys., Inc.*, 837 F. App'x 799, 811 (Fed. Cir. 2020)). Petitioner further asserts that Patent Owner "was in possession of all the facts concerning its alleged conception and reduction to practice," and "specifically chose the argument that Balassanian and Bradley conceived and specifically declined to argue that Balassanian, Bradley, and Carpenter conceived." *Id.* at 10–11.

Patent Owner argues that waiver does not apply under *Egenera* because "[i]t does not matter that" Patent Owner never tried to change inventorship during the *inter partes* proceeding or failed to timely raise this argument when it had the chance during the proceeding. PO Remand Resp. Br. 5. Patent Owner asserts that it "was permitted to seek inventorship corrections when it did. The Board's conclusions 'illuminated Mr. [Carpenter]'s necessary presence as an inventor,' and timely led to correction petitions." *Id.* (citing *Egenera* at 1378). Patent Owner contends that Section 256 provides "unique statutory rights" and "is not time-bound." *Id.*

For reasons similar to the discussion on judicial estoppel, we determine that Patent Owner has waived its assertions on revised inventorship because it failed to present them during the trial in these proceedings. Waiver is the intentional relinquishment of a known right. *In*

*re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020).[11]
During the course of trial, Patent Owner was cautioned "that any arguments concerning patentability not raised in the response may be deemed waived." Paper 11, 5; *see also In re Nuvasive, Inc.*, 842 F.3d 1376, 1379–82 (Fed. Cir. 2016) (holding Patent Owner waived an argument by not raising the argument in the Patent Owner Response). This is consistent with the Board's Consolidated Trial Practice Guide to waive later arguments when issues are not raised in the patent owner response. Consolidated Trial Practice Guide (Nov. 2019), 52. This is also consistent with the requirement that parties develop their positions through trial and "a party's argument should not be a moving target." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) (quoting *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999)).

During the *inter partes* proceedings, Patent Owner had in its sole possession the evidence of inventorship and intentionally presented evidence asserting a certain inventorship. That evidence remained unchanged during the course of the trial. If Patent Owner's evaluation of its own evidence now justifies a change in inventorship, that evaluation should have also justified such a change during trial when Petitioner had the opportunity to respond to Patent Owner's changed position. As discussed above, the Final Written Decisions evaluated the sufficiency of the evidence on antedating and did

---

[11] *Google* notes that, although "waiver" and "forfeiture" are commonly used interchangeably, waiver is different than forfeiture. *Google*, 980 F.3d at 862 ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'"). Here, as above, both the criteria of untimeliness and intentionality are met, and therefore both waiver and forfeiture apply. We use the term waiver herein, as that is the terminology typically used in IPR proceedings.

not reach findings on inventorship[12]—it was Patent Owner who opted later on an untimely basis to seek a change in inventorship and present it as the basis for revisiting determinations of the Final Written Decisions. Further, in this instance, Patent Owner not only waited until after its Patent Owner Response and Sur-reply was filed, but waited until after the trial had already been complete, and an appeal was pending, to seek a certificate of correction. This set of circumstances is more egregious than the typical set of circumstances under which waiver applies in *inter partes* proceedings.[13]

Accordingly, under these specific circumstances, we determine that waiver applies, precluding Patent Owner from relying on the certificates of correction of inventorship in these proceedings.

---

[12] As discussed above, we disagree with Patent Owner that the findings in the Final Written Decisions "illuminated" the issue of inventorship. That is, Mr. Carpenter's apparent authorship of the document that eventually served as the provisional application is consistent with Patent Owner's argument and testimony at trial that Mr. Carpenter implemented the inventions alleged to be conceived by Messrs. Balassanian and Bradley. Further, as discussed, we evaluated the evidence for communication of the invention to Mr. Carpenter for implementation, but there was no determination as to whether Mr. Carpenter was, or should have been named, as an inventor. *See* Final Dec. 21.

[13] Although waiver was not at issue in *Egenera*, we note that the circumstances here are also distinct from those in *Egenera* where Patent Owner changed inventorship under § 256 during the district court proceeding and during a time when the opposing party would have the opportunity to address the new inventorship position had the court adopted it. *See Egenera* at 1371–72.

*C. Impact Of Certificates of Correction on Final Written Decisions*

For the foregoing reasons, we determine that judicial estoppel and waiver apply. Accordingly, the certificates of correction for inventorship have no impact on the Final Written Decisions in these cases.

We also note that if judicial estoppel and waiver had been found not to apply and these proceedings were recommenced under changed inventorship, Petitioner should be permitted the opportunity to respond to Patent Owner's new inventorship of the patents-at-issue at least by being allowed additional briefing in order to comply with due process and the Administrative Procedure Act (APA). *See* Pet. Remand Br. 1. Additionally, if judicial estoppel and waiver had been found not to apply, we also would likely have to determine whether the source code evidence, in view of the related testimonial evidence and argument that is already in the trial record, supports the actual reduction to practice prior to Janevski's effective date, as Patent Owner argues it does. *See* Paper 13, 28–31; Paper 22, 12–22. Amongst other things, this determination would likely entail resolving a claim construction dispute between the parties that may affect the determination of whether the source code practices the claimed invention. *See* Paper 22, 15–16.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that Patent Owner's certificates of correction of inventorship have no impact on the Final Written Decisions.

25

**Appx102**

IPR2018-00766 (Patent 7,391,791 B2)
IPR2018-00767 (Patent 8,942,252 B2)


PETITIONER:
Rory P. Shea
Cole B. Richter
George I. Lee
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
shea@ls3ip.com
richter@ls3ip.com
lee@ls3ip.com
boyea@ls3ip.com


PATENT OWNER:

Christian Hurt
THE DAVIS FIRM, PC
churt@davisfirm.com

Timothy P. McAnulty
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
timothy.mcanulty@finnegan.com

26

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

SONOS, INC.,
Petitioner,

v.

IMPLICIT, LLC,
Patent Owner.

———————————

Case IPR2018-00767
Patent 8,942,252 B2

———————————

Before MICHELLE N. WORMMEESTER, SHEILA F. McSHANE, and
NABEEL U. KHAN, *Administrative Patent Judges.*

KHAN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

### *A. Background*

Sonos, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") to institute an *inter partes* review of claims 1–3, 8, 11, and 17 (the "challenged claims") of U.S. Patent No. 8,942,252 B2 (Ex. 1001, "the '252 Patent"). Implicit, LLC ("Patent Owner") timely filed a Preliminary Response. Paper 6 ("Prelim. Resp."). On September 19, 2018, upon consideration of the Petition, the Preliminary Response, and the evidence cited by the parties, we determined that Petitioner established a reasonable likelihood that it would prevail with respect to at least one of the claims challenged in the Petition and instituted review to determine the patentability of the challenged claims on all grounds. Paper 8 ("Dec. Inst."), 1.

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 9, "PO Resp."). Petitioner filed a Reply (Paper 17, "Pet. Reply") thereto, and Patent Owner filed a Sur-Reply (Paper 22, "PO Sur-Reply"). Petitioner supports its challenge with the Declaration and Rebuttal Declaration of Roman Chertov, Ph.D. (Exs. 1009, 1022). Patent Owner supports its Response with the Declarations of Edward Balassanian (Ex. 2001), and Atif Hashmi, Ph.D. (Ex. 2080).

Further, Petitioner filed a Motion to Exclude. Paper 30. Patent Owner filed a Response to Petitioner's Motion to Exclude (Paper 33) and Petitioner filed a Reply in support of its Motion to Exclude (Paper 34). We address these papers below.

An oral hearing was held on June 17, 2019, and the hearing transcript is included in the record. Paper 39 ("Tr.").

2

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and evidence raised during the *inter partes* review. For the reasons that follow, Petitioner demonstrates by a preponderance of the evidence that claims 1–3, 8, 11, and 17 of the '252 Patent are unpatentable.

### B. Related Proceedings

The parties inform us that the '252 Patent is asserted in *Implicit, LLC v. Sonos, Inc.*, No. 1:17-cv-00259-LPS (D. Del.). Pet 2; Paper 5, 2. Additionally, Patent Owner identifies *Implicit, LLC v. D&M Holdings U.S. Inc.*, No. 1:17-cv-00258-LPS (D. Del) as a related matter. Paper 5, 2.

### C. The '252 Patent

The '252 Patent is generally directed to "rendering of content at multiple rendering devices in a synchronized manner." Ex. 1001, 1:18–19. The '252 Patent explains that a multimedia presentation may include different types of content, such as video, audio, and text, that are rendered on different devices (e.g., a video display and a stereo system). *Id.* at 1:23–25. However, their rendering often needs to occur in a synchronized manner because the video, audio, and text content may correspond with each other. *Id.* at 1:25–31. Rendering content on different devices in a synchronized manner may be difficult, however, because the devices may each have different time domains or system clocks that operate at slightly different frequencies. *Id.* at 1:40–44. This can lead video and audio content to gradually appear to be out of synchronization with each other. *Id.* at 1:44–46.

The '252 Patent provides a method and system for "synchronizing the rendering of content at various rendering devices." *Id.* at 2:17–18. In this

method, "each device has a device time and a rendering time." *Id*. at 2:18–20. "The device time is the time as indicated by a designated clock (e.g., system clock) of the rendering device. The rendering time is the time represented by the amount of content that has been rendered by that rendering device." *Id*. at 2:20–23. For example, if a rendering device is displaying 30 frames a second, then after 450 frames have been rendered, the rendering time will be 15 seconds. The corresponding device time may be 30 minutes and 15 seconds, if the device was initialized 30 minutes before rendering began. *Id*. at 2:23–32. "The synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices. Each slave rendering device adjusts the rendering of its content to keep it in synchronization with the master rendering device." *Id*. at 2:33–38. The master rendering device sends messages with its device and rendering time to the slave devices, which determine whether they are synchronized with the master device and determine the differential if they are not synchronized. *Id*. at 2:38–43. This determination can be made in a variety of ways that involve comparisons between the rendering times of the master and slave and the device times of the master and slave. *Id*. at 2:46–65. The time differentials between master device time and slave device time can be smoothed using various techniques such as averaging the last few time differentials using a decaying function to limit the impact of the oldest time differential. *Id*. at 7:16–26. Once the device and rendering time differentials are known, the slave rendering devices may adjust their rendering of content as appropriate to compensate for the difference. *Id*. at 4:24–40.

4

*D. Illustrative Claim*

Of the challenged claims, claims 1 and 11 are independent claims. Claims 2, 3, and 8 depend from claim 1 and claim 17 depends from claim 11.

Claim 1, reproduced below, is illustrative:

1.    A method comprising:

a master rendering device rendering a first content stream; and

sending, from the master rendering device to a first one of a plurality of slave devices, a plurality of master rendering times indicative of statuses of the rendering the first content stream at the master rendering device at different times;

wherein the first slave device is configured to smooth a rendering time differential that exists between the master rendering device and the first slave device in order to render a second content stream at the first slave device synchronously with the rendering of the first content stream at the master rendering device, wherein smoothing the rendering time differential includes calculations using the plurality of master rendering times.

*E. Asserted Grounds of Unpatentability*

Petitioner challenges claims 1–3, 8, 11, and 17 of the '252 Patent on the following grounds:

| Ground | Basis | Challenged Claims | Reference(s) |
|:---:|:---:|:---|:---|
| 1 | § 103(a) | 1–3, 8, 11, and 17 | Janevski[1] |

---

[1] Janevski, U.S. Patent No. 7,269,338, issued Sept. 11, 2007 (Ex. 1007, "Janevski").

| Ground | Basis | Challenged Claims | Reference(s) |
|--------|-------|-------------------|--------------|
| 2 | § 103(a) | 1–3, 8, 11, and 17 | Janevski and Azevedo[2] |
| 3 | § 103(a) | 1–3, 8, 11, and 17 | Janevski and Mills[3] |
| 4 | § 103(a) | 1–3, 8, 11, and 17 | Janevski and Berthaud[4] |
| 5 | § 103(a) | 1–3, 8, 11, and 17 | Janevski and Eidson[5] |
| 6 | § 103(a) | 1–3, 8, 11, and 17 | Janevski and Baumgartner[6] |

## II. DISCUSSION

### A. *Level of Ordinary Skill*

Petitioner proposes that a person of ordinary skill in the art "would have the equivalent of a four-year degree from an accredited institution in computer science, computer engineering, electrical engineering, or the equivalent, and approximately 2-4 years of professional experience in the fields of networked systems and networked-based applications, or an equivalent level of skill and knowledge." Pet. 24 n.2. Patent Owner does

---

[2] Azevedo, *Fault-Tolerant Clock Synchronization for Distributed Systems with High Message Delay Variation*, IEEE Workshop on Fault-Tolerance Par. and Dist. Syst., (1994) (Ex. 1010, "Azevedo").

[3] Mills, *Network Time Protocol (Version 3) Specification, Implementation and Analysis*, Network Working Group, University of Delaware (March 1992) (Ex. 1011, "Mills").

[4] Jean-Marc Berthaud, *Time Synchronization Over Networks Using Convex Closures*, IEEE/ACM Transactions on Networking (Apr. 2000) (Ex. 1012, "Berthaud").

[5] Eidson, U.S. Patent No. 6,278,710, issued Aug. 21, 2001 (Ex. 1013, "Eidson").

[6] Baumgartner, U.S. Patent No. 5,642,171, issued June 24, 1997 (Ex. 1014, "Baumgartner").

6

not provide an alternative proposal for the level of ordinary skill and Dr. Hashmi does not offer an opinion on a proposed level of ordinary skill. *See* Ex. 2080 ¶ 16. For purposes of this Decision, we adopt Petitioner's proposed level of ordinary skill as it is consistent with the prior art of record and the relevant field, and also reflects the necessary level and type of education and practical experience for one of ordinary skill in the art.

## B. Claim Interpretation

In an *inter partes* review, we construe claim terms in an unexpired patent according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b) (2017); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2144–46 (2016) (upholding the use of the broadest reasonable interpretation standard).[7] Consistent with the broadest reasonable construction, claim terms are presumed to have their ordinary and customary meaning as understood by a person of ordinary skill in the art in the context of the entire patent disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Only terms that are in controversy need to be construed, and only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs.,*

---

[7] A recent amendment to this rule does not apply here because the Petition was filed on March 9, 2018, which is prior to the November 13, 2018 change in the standard. *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018).

*Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))), *cert. denied*, 138 S. Ct. 1695 (Apr. 30, 2018).

Petitioner proposes constructions for the following terms: "device time," "rendering time," sending/receiving "a plurality of master rendering times," "smooth a rendering time differential," "determining a smoothed rendering time differential," and "window." Pet. 18–23. Patent Owner explicitly disputes the construction of "device time" in its Response, but does not otherwise raise any specific, substantive objections to Petitioner's other proposed constructions. *See* PO Resp. 13–14, 38–39. We determine that other than "device time," an explicit construction of the claim terms for which Petitioner proposes constructions is not necessary for purposes of this Decision.

### 1. *"device time"*

Petitioner proposes the term "device time" should be construed as "a time indicated by any clock of a given rendering device." Pet. 18. Patent Owner argues "device time" should be construed as a "time indicated by a designated clock of the [master/slave] device." PO Resp. 39. Patent Owner argues this construction "is sourced directly from the specification," which, according to Patent Owner, states that "[t]he device time is the time as indicated by a designated clock (e.g., system clock) of the rendering device." *Id*. Petitioner argues that, under the broadest reasonable interpretation standard, there is no difference in scope between the two proposed constructions because, even under Patent Owner's construction, there is no limitation on what kind of clock can be "a designated clock." Pet. Reply 26.

"In claim construction, [the Federal Circuit] gives primacy to the language of the claims, followed by the specification." *Tempo Lighting Inc.*

*v. Tivoli LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (citing *In re Morris*, 127 F.3d 1048, 1056 (Fed. Cir. 1997)).  The '252 Patent makes clear "[t]he device time is the time as indicated by a designated clock (e.g., system clock) of the rendering device."  Ex. 1001, 2:20–21.  This statement from the '252 Patent, which we take to be a clear definition of the term, is cited by both parties in support of their respective constructions.  Thus, we adopt it as our construction of the term and construe "device time" as "the time as indicated by a designated clock (e.g., system clock) of the rendering device."

### C. Antedating Janevski

Petitioner argues claims 1–3, 8, 11, and 17 would have been obvious over Janevski and over Janevski combined with the other cited references.  Pet. 24–26.  Patent Owner argues Janevski is not prior art to the '252 Patent.  PO Resp. 14.  For the reasons set forth below, we are not persuaded that the inventor's testimony is corroborated adequately, and we determine that Patent Owner has not met its burden of producing sufficient evidence to antedate Janevski.

### 1. Patent Owner's Contentions

The Janevski reference was filed on December 11, 2001 and does not claim an earlier effective filing date.  Ex. 1007, at [22].  The provisional patent application from which the '252 Patent claims priority was filed six days later on December 17, 2001.  Ex. 1001, at [60]; Pet. 7.  Patent Owner alleges that "[p]rior to December 11, 2001, . . . the inventors conceived of the inventions of the Challenged Claims, and those inventions were reduced to practice in time to remove Janevski as a prior art reference."  PO Resp. 14.  In support of this contention, Patent Owner provides a declaration of Mr. Edward Balassanian, one of the two named inventors of the '252 Patent

(Ex. 2001), certain internal documents from BeComm (the predecessor of Patent Owner, Implicit, LLC), and the declaration of Patent Owner's expert, Dr. Hashmi (Ex. 2080). Patent Owner alleges that the internal BeComm documents and Dr. Hashmi's expert declaration corroborate Mr. Balassanian's testimony that he and Mr. Bradley (the other named inventor) conceived of the inventions prior to December 11, 2001, and timely reduced them to practice. PO Resp. 15.

### a. Conception

In its Response, Patent Owner describes the "Juno" project as the genesis of what later became the invention of the '252 Patent. PO Resp. 19 (citing Ex. 2001 ¶¶ 26–32). According to Patent Owner, the Juno project began in late 2000 and Mr. Balassanian was involved as the President and CEO of BeComm. PO Resp. 19 (citing Ex. 2001 ¶ 32; Ex. 2011 at 8). Early Juno documents show that as of December 2000, BeComm believed "true synchronization [was] an unsolved computer science problem" (Ex. 2009 at 15) and that as of February of 2001, BeComm had "not yet finalized how Juno will implement the requirement that a Media Server session be able to simultaneously serve multiple concurrent Adapters and keep their playback synchronized" (Ex. 2011 at 37).

Relying on Mr. Balassanian's declaration, Patent Owner alleges that "in the ensuing months [after the Juno project ended] Mr. Balassanian and Mr. Bradley conceived of the inventions" (PO Resp. 19–20 (citing Ex. 2001 ¶¶ 33, 42–74)), and communicated the invention to BeComm's internal engineering and development staff (*id*. at 20 (citing Ex. 2001 ¶ 33)). Patent Owner alleges that Mr. Balassanian and Mr. Bradley worked with

10

BeComm's Engineering Master, Mr. Guy Carpenter, to implement the inventions. *Id.*

To corroborate Mr. Balassanian's testimony that Mr. Balassanian and Mr. Bradley conceived of the invention, Patent Owner relies on BeComm source code files and certain internal BeComm documents. PO Resp. 20–23. Patent Owner contends the source code files were initially checked in on September 10, 2001, and fully operational by the end of October 2001, as indicated by BeComm's Concurrent Version System ("CVS") repository check-in dates. PO Resp. 20–21 (citing Ex. 2001 ¶¶ 37–38; Ex. 2013 at 2; Ex. 2080 ¶¶ 39–49).

In addition to the source code, Patent Owner highlights four internal BeComm documents to corroborate Mr. Balassanian's testimony that he and Mr. Bradley conceived of the invention prior to December 11, 2001: (1) "Using Strings to Compose Applications from Reusable Components" dated October 2001, which describes a system using clock synchronization modules to "achieve the best possible synchronization" (PO Resp. 21 (citing Ex. 2021 at 8)); (2) certain documentation describing the Strings Audio Player demonstrations, which Patent Owner alleges incorporated the functionality of the source code (PO Resp. 22 (citing Ex. 2001 ¶¶ 64–69, 113–116; Exs. 2025–28, 2034)); (3) a case study that describes certain synchronization functionality that Patent Owner alleges was printed on December 3, 2001 (PO Resp. 23 (citing Ex. 2029 at 5–7; Ex. 2077 at 28–30)); and (4) "synchronization.doc," which Patent Owner contends was completed on December 9, 2002, and which was eventually filed on December 17, 2001, as the provisional patent application to which the '252 Patent claims priority (PO Resp. 23 (citing Exs. 2037, 2077)).

### b. Reduction to Practice

To corroborate Mr. Balassanian's testimony that the inventions were reduced to practice before December 11, 2001, Patent Owner relies primarily on two types of evidence. First, Patent Owner points to specific demonstrations, known internally as the "Fight Club demonstrations," of the synchronization functionality that Mr. Balassanian witnessed and participated in prior to December 11, 2001. PO Resp. 24–25 (citing Ex. 2001 ¶¶ 53–60). These demonstrations involved a video file, "fightclubrgb.avi," that Patent Owner contends has a date-modified timestamp of September 7, 2001. PO Resp. 24 (citing Ex. 2077 at 21). According to his testimony, Mr. Balassanian recalls the Fight Club demonstration operated by having a master device split the video and audio of the fightclubrgb.avi video file, play and render the video, and send the video and audio to separate slave devices where the video and audio were synchronized with the master device. PO Resp. 24–25 (citing Ex. 2001 ¶¶ 43, 58, 59).

Second, Patent Owner relies on source code packages dated October and November of 2001. PO Resp. 25 (citing Ex. 2031 at 2; Ex. 2032 at 2; Ex. 2034 at 2). Dr. Hashmi opines that the source code would practice the challenged claims when run and would operate in the way Mr. Balassanian recalls, i.e. by splitting video and audio and synchronizing between master and slave devices. PO Resp. 25–26 (citing Ex. 2082). The source code files that Dr. Hashmi analyzed are dated November 1 and 15 of 2001. Ex. 2080 ¶¶ 62–104.

Based on the dates of the Fight Club demonstration files and the source code files, and the fact that Dr. Hashmi testifies that the source code

12

practices the limitations of the challenged claims, Patent Owner contends that the inventions were reduced to practice before Janevski's December 11, 2001 priority date. PO Resp. 19–28.

### 2. Petitioner's Arguments

Petitioner presents several arguments against Patent Owner's attempt to swear behind Janevski's priority date, including (1) that Mr. Balassanian's testimony has not addressed the actual claim limitations (Pet. Reply 1–4); (2) that Mr. Balassanian's testimony is not independently corroborated (Pet. Reply 5–8); (3) that Patent Owner relies on source code written by non-inventor Mr. Carpenter to establish conception and reduction to practice of the invention without evidence that such reduction to practice inures to the benefit of the named inventors; and (4) that the source code upon which Patent Owner relies fails to practice each and every claim limitation. Pet. Reply 9.

Petitioner argues Mr. Balassanian's testimony regarding conception should be given no weight because Mr. Balassanian failed at this deposition to provide his understanding of the meaning of the claim limitations. Without providing such testimony, Petitioner argues, Mr. Balassanian cannot competently testify regarding any conception of the claimed inventions. Pet. Reply 2–3 (citing Ex. 1019, 20:16–22:24, 26:5–16, 36:3–19, 39:18–41:12, 44:22–45:3, 47:6–49:20, 50:11–22, 51:22–52:4, 53:1–24, 165:9–166:10).

Petitioner further argues that Mr. Balassanian's testimony is not independently corroborated because the documents cited in the declaration can only provide corroboration with the help of Mr. Balassanian's testimony, leading to a circular problem that the Federal Circuit criticized in *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293 (Fed. Cir. 2018), a case

Petitioner argues is particularly relevant to the facts at hand here. Pet. Reply 6–8. For example, Petitioner argues that documents related to the Fight Club demonstrations "are silent about any demonstrations actually being conducted prior to Janevski" and that only through Mr. Balassanian's testimony are the documents linked to any alleged demonstrations. Pet. Reply 8. Petitioner argues that the documents alone do not evidence that any demonstrations actually took place, when they allegedly took place, who was present, and what the results of the demonstrations were. Pet. Reply 8.

Petitioner argues that Patent Owner relies on source code written by a non-inventor, Mr. Guy Carpenter, to establish conception of the invention but that no evidence, other than Mr. Balassanian's testimony, is presented showing that the inventors communicated the invention to Mr. Carpenter. Pet. Reply 9 (citing Exs. 2019, 2017, 2020 (each of which lists Mr. Carpenter as the owner)). Thus, Petitioner argues, the record is devoid of evidence that Mr. Carpenter's work inured to the benefit of the inventors. Pet. Reply 9.

Finally, Petitioner argues that Patent Owner's source code fails to practice every limitation of the claim and thus cannot be relied upon to show conception and reduction to practice of the invention. Pet. Reply 12. Specifically, Petitioner argues the source code fails to meet the "render time" limitation because the portions of the source code that Patent Owner relies upon for teaching this limitation actually refer to the system time of the master device rather than the rendering time. Pet. Reply 13. Petitioner also argues the source code does not synchronize between master and slave and that the documentation shows that the system's goal was to synchronize between two slaves instead. Pet. Reply 15–20.

14

### 3. Analysis

"In an *inter partes* review, the burden of persuasion is on the petitioner to prove 'unpatentability by a preponderance of the evidence,' 35 U.S.C. § 316(e), and that burden never shifts to the patentee." *Dynamic Drinkware, LLC v. National Geographics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). The burden of production, however, is a shifting burden. *Id.* at 1379. Thus, Petitioner bears the burden of persuasion, by a preponderance of the evidence, that the challenged claims are unpatentable. 35 U.S.C. § 316(e). Petitioner has proffered Janevski, which presumptively constitutes prior art under 35 U.S.C. § 102(e), because it was filed on December 11, 2001, which is prior to the December 17, 2001 date of U.S. Provisional Application No. 60/341,574, to which the '252 Patent claims priority. This difference in dates shifts the burden of production to Patent Owner to produce evidence supporting a date of invention before Janevski's filing date. *See Dynamic Drinkware*, 800 F.3d at 1379.

"To antedate . . . an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). "Conception is the formation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998). Conception is complete when the idea is so clearly defined in the inventor's mind that only ordinary skill is necessary to reduce the invention to practice. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994). Actual reduction to practice occurs when: (1) a party constructs an embodiment or

15

performs a process that satisfies every element of the claim at issue, and (2) the embodiment or process operates for its intended purpose. *See Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000).

Acts by others working explicitly or implicitly at the inventor's request can inure to an inventor's benefit. *Cooper*, 154 F.3d at 1332. Inurement involves a claim by an inventor that, as a matter of law, the acts of another person should accrue to the benefit of the inventor. *Genentech, Inc. v. Chiron Corp.*, 220 F.3d 1345, 1353 (Fed. Cir. 2000). However, when a person relies on the activities of others to show actual reduction to practice, proof of conception is relevant to inurement. *See Sensio, Inc. v. Select Brands, Inc.*, IPR2013-00580, Paper 31 at 10–15 (PTAB Feb. 9, 2015) (Final Written Decision); *see also NFC Tech., LLC v. Matal*, 871 F.3d 1367, 1371–72 (Fed. Cir. 2017). In *Genentech*, in the context of deciding whether the reduction to practice inured to the inventor's benefit, the Federal Circuit held that the inventor first must show that she conceived the invention. *Genentech*, 220 F.3d at 1354 ("[W]e glean at least three requirements that must be met before a non-inventor's recognition of the utility of an invention can inure to the benefit of the inventor. First, the inventor must have conceived of the invention."). This requirement makes sense; otherwise, a person could antedate a prior art reference without showing that she was the first to reduce the invention to practice and also without showing that she was the first to conceive the invention, contrary to the requirements for antedating an invention. *See Purdue Pharma*, 237 F.3d at 1365. Thus, Patent Owner must show that the inventor conceived the subject matter of the invention in order to have someone else's reduction to practice inure to the inventor's benefit. *Genentech*, 220 F.2d at 1354.

It is well established that when a party seeks to prove conception through an inventor's testimony, the party must proffer independent evidence corroborating the inventor's testimony. *Cooper*, 154 F.3d at 1330. To be "independent," the corroborating evidence must be evidence other than the inventor's testimony. *In re NTP, Inc.*, 654 F.3d 1279, 1291 (Fed. Cir. 2011). The sufficiency of the proffered corroboration is determined by a "rule of reason" analysis in which all pertinent evidence is examined. *In re NTP*, 654 F.3d at 1291. Even under the "rule of reason" analysis, however, the "evidence of corroboration must not depend solely on the inventor himself." *Cooper*, 154 F.3d at 1321; *see also Hahn v. Wong*, 892 F.2d 1028, 1033 (Fed. Cir. 1989) (corroborating evidence must be "independent of information received from the inventor").

Petitioner argues that because Mr. Guy Carpenter, a non-inventor, authored the source code relied upon to show conception and reduction to practice, Patent Owner must show that Mr. Carpenter's actions inure to the benefit of the inventors. Pet. Reply 9. In order to do so, Patent Owner must show that the inventors conceived of the invention.

Mr. Balassanian testifies that:

> Around the time of the Juno project (and after the project for Intel went on hold), I contemplated how to achieve the best-possible synchronization of content across multiple devices as we continued our work. Mr. Bradley and I solved the synchronization problem and conceived the inventions set forth in the Claims of the Patents. We then began working on the implementation of the inventions thereafter, as detailed below. We communicated those inventions to BeComm's internal engineering and development staff to reduce them to practice. We worked primarily with Guy Carpenter, an Engineering Master at BeComm, to implement the inventions, as I describe below.

17

Ex. 2001 ¶ 33. Thus, Mr. Balassanian testifies that (1) he and Mr. Bradley conceived of the invention, (2) he and Mr. Bradley then communicated the inventions to BeComm's staff, including to Mr. Carpenter, and (3) he and Mr. Bradley worked with BeComm's staff, including Mr. Carpenter, to reduce the inventions to practice. If properly corroborated, this testimony would show that Mr. Carpenter's work in reducing the invention to practice inures to the benefit of Mr. Balassanian and Mr. Bradley. However, as we explain below, Patent Owner has not carried its burden of production to present sufficient evidence to independently corroborate Mr. Balassanian's testimony that he and Mr. Bradley conceived of the invention and communicated it to BeComm's staff.

Initially, we note Patent Owner does not provide a specific date on which Mr. Balassanian or Mr. Bradley conceived of the invention. Instead, Patent Owner presents evidence spanning a time period of roughly a year as support for the argument that conception occurred before the December 11, 2001 priority date of Janevski. This evidence includes internal BeComm documents, evidence of audio and video demonstrations that allegedly show the synchronization technology, and BeComm source code modules that Patent Owner contends practice the claim limitations. PO Resp. 19–29. However, as discussed below, none of this evidence supports the contention that it was Mr. Balassanian and/or Mr. Bradley who conceived of the invention and subsequently communicated the invention to Mr. Carpenter.

We start with evidence related to the Juno project, which Patent Owner argues was the "genesis of what ultimately became the synchronization technology." PO Resp. 19. We note that the two primary documents related to the Juno project relied upon by Patent Owner show the

18

invention had not yet been conceived during the December 2000 to February 2001 time frame when the project was active. For example, the "Juno Phase 0 Document," which lists Mr. Balassanian, Mr. Bradley, and Mr. Carpenter as "Document Contributors" (Ex. 2009 at 5), states that "[b]oth Jupiter [codename for Intel] and BeComm recognize that true synchronization is an unsolved computer science problem, but a best effort will be made in this regard" (Ex. 2009 at 15). The "Juno: Phase 1" document also lists Mr. Balassanian, Mr. Bradley, and Mr. Carpenter as "Document Contributors" (Ex. 2011 at 8), and states "[w]e have not yet finalized how Juno will implement the requirement that a Media Server session be able to simultaneously serve multiple concurrent Adapters and keep their playback synchronized." Ex. 2011 at 37. These documents make clear that a "permanent idea of the complete and operative invention" had not yet been formulated during this time period. *See Cooper*, 154 F.3d at 1327.

The next document relied upon is titled "Using Strings to Compose Applications from Reusable Components." This document, dated October 4, 2001, does not list either of the two inventors as authors and only names "BeComm Corporation" as the source of the document. Ex. 2021 at 1. Mr. Balassanian's testimony also does not indicate who the authors of the document are, referring to it only as "BeComm documentation." *See* Ex. 2001 ¶ 61. Moreover, the document discusses synchronization only briefly and details corresponding to the claim limitations are missing from the document.

Documents related to the Strings Audio Player (Exs. 2025–28) also do not list either of the two inventors as authors, and neither Patent Owner nor Mr. Balassanian indicates that the two inventors are authors of these

documents. Because the documents do not indicate their date of creation, Patent Owner relies on metadata showing the documents were created on November 9 or November 14 of 2001. *See* Ex. 2077 at 23–26. These dates occur after Patent Owner contends the source code that practices the claim limitations had already become fully operational and, thus logically, also after the invention would have already been conceived. PO Resp. 20–21 (citing Ex. 2001 ¶¶ 37–38; Ex. 2013 at 2; Ex. 2080 ¶¶ 39–49). None of the Strings Audio Player demonstration documents, save the audioplayerapp.rule document, refers to synchronization at all. *See generally* Exs. 2025–27, 2034. The audioplayerapp.rule mentions synchronization only by referring to source code modules such as clocksync. *See* Ex. 2028 at 2.

The cited case study document similarly does not list an author. *See* Ex. 2029. Again, the document itself has no indication of a date, but Patent Owner, relying on metadata, contends the document was created by December 3, 2001 (PO Resp. 23 (citing Ex. 2077 at 28–30)), which is after Patent Owner contends the invention was conceived.

The remaining document mentioned in Patent Owner's Response is "synchronization.doc," which was filed on December 17, 2001, as the provisional application to which the '252 Patent claims priority and which Patent Owner contends was drafted at least as early as December 9, 2001. The evidence shows, however, that the December 9 version of this document, which appears to be the version that was the basis for the provisional application, was authored by non-inventor Mr. Carpenter. *See* Ex. 2038 ("After talking with Guy and rereading the /docs/synchronization.doc document he wrote, I think it is sufficient for the

patent provisional as is."); Ex. 2077 at 35 (listing "guyc" as last saving the document).

Patent Owner argues that the Fight Club demonstrations occurred prior to December 11, 2001, and Mr. Balassanian recalls that he participated in these demonstrations from September 2001 forward. PO Resp. 24 (citing Ex. 2001 ¶ 56). We agree with Petitioner that Mr. Balassanian's testimony is largely uncorroborated. But even assuming that the demonstrations occurred in the time frame recalled by Mr. Balassanian and that the demonstrations operated to synchronize content over multiple devices, the evidence as a whole does not support the conclusion that Mr. Balassanian or Mr. Bradley conceived of the synchronization technology behind the demonstrations. The occurrence of the demonstrations as recalled by Mr. Balassanian does not corroborate his testimony regarding conception itself.

Ultimately, Patent Owner relies on BeComm source code, more than any other piece of evidence, to corroborate both conception and reduction to practice. PO Resp. 26–31. Patent Owner highlights three source code modules, "audiosync," "timesync," and "clocksync," as forming "the central core of BeComm's embodiment of the Challenged Claims." PO Resp. 20. These modules, Patent Owner contends, were fully operational to synchronously render content over multiple devices by the end of October 2001. PO Resp. 21. These source code modules are also the modules that Patent Owner contends were used for the Fight Club demonstrations (PO Resp. 25), and that are referenced in documents such as the "Using Strings" document (*see* Ex. 2021 at 9). Dr. Hashmi analyzed these modules, amongst others, in opining that BeComm source code dated November 2001 practices

the claim limitations. Ex. 2080 ¶ 18. However, as Petitioner points out, each of these modules lists Mr. Carpenter as the sole author. Pet. Reply 9 (citing Exs. 2017, 2019, 2020 (showing that "Guy Carpenter (guyc)" as the owner)). Neither Mr. Balassanian nor Mr. Bradley is listed as an author, and Patent Owner does not present any evidence that either of the two inventors contributed to writing the source code.

Petitioner first raised the inurement issue in its Reply Brief. Pet. Reply 9. Patent Owner did not respond to the inurement issue at all in its briefing. *See generally* PO Sur-Reply. Patent Owner briefly addressed inurement at the oral hearing and argued that it would be "a matter of common sense" that Mr. Carpenter would have written the source code on behalf of Mr. Balassanian given that Mr. Balassanian was the CEO of BeComm and that Mr. Carpenter was BeComm's Master Engineer. Tr. 67:1–15. Even if this is true, as we explained above, inurement requires a showing that the inventors conceived of the invention in order for them to benefit from Mr. Carpenter's work. The record, however, does not support that the Patent Owner made such a showing.

In summary, none of the BeComm internal documents, demonstrations of BeComm technology, or BeComm source code corroborate Mr. Balassanian's testimony that he and Mr. Bradley conceived of the challenged claims or that they communicated the inventions to Mr. Carpenter. Considering the record before us as a whole, we determine that Patent Owner fails to meet its burden of producing evidence sufficient to show conception by Mr. Balassanian and Mr. Bradley and, therefore, that Mr. Carpenter's actions inure to the benefit of the inventors.

Thus, we find that Patent Owner fails to provide sufficient support for antedating Janevski. Accordingly, we agree with Petitioner that Janevski serves as prior art to the '252 Patent. Under these circumstances, it is not necessary to reach the issue of whether BeComm source code practices the claim limitations.

*D. Obviousness*

Petitioner argues claims 1–3, 8, 11, and 17 would have been obvious over the cited prior art references. Pet. 35–68. To support its contentions, Petitioner provides an explanation of how Janevski teaches each limitation of the challenged claims, except for the limitation requiring to "smooth a rendering time differential that exists between the master rendering device and the first slave device" (the "smoothing element") of independent claims 1 and 11. According to Petitioner, however, the smoothing aspect of the independent claims would have been an insignificant advance over Janevski alone, or would have been obvious over the teachings of Azevedo, Mills, Berthaud, Eidson, or Baumgartner. *Id.* Petitioner also relies on the declaration of Dr. Roman Chertov (Ex. 1009, "Chertov Decl.") in support of its arguments. We discuss each of Petitioner's challenges below.

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc*., 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art;

23

(3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To be relevant, evidence of nonobviousness must be commensurate in scope with the claimed invention. *In re Huai–Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011). Thus, to be accorded substantial weight, there must be a nexus between the merits of the claimed invention and the evidence of secondary considerations. *In re GPAC Inc*., 57 F.3d 1573, 1580 (Fed. Cir. 1995). "For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *Kao*, 639 F.3d at 1068. The stronger the showing of nexus to the claimed invention, the greater the weight accorded the objective indicia of nonobviousness. *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc*., 776 F.2d 281, 306 (Fed. Cir. 1985). We apply "a [rebuttable] presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'is the invention disclosed and claimed in the patent.'" *WBIP, LLC v. Kohler Co*., 829 F.3d 1317, 1329 (Fed. Cir. 2016) (citing *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 105 F.3d 1563, 1571 (Fed. Cir. 1997).

*Ground 1: Obviousness over Janevski Alone*

*1. Overview of Janevski*

Janevski is directed to "techniques for synchronizing playback of two or more digital streams based on renderable content of those streams." Ex. 1007, 1:8–11. Janevski describes a situation in which two or more individuals watch content recorded on their personal video recorders (typically television broadcasts) at different locations simultaneously while

24

communicating over the phone about the content being watched.  *Id.* at

1:38–44.  Janevski notes that one possible problem that may occur in this

situation is that the content being played at the respective locations may fall

out of synch with each other and therefore affect the enjoyment of watching

a program simultaneously together.  *Id.* at 1:44–52.  Janevski, therefore,

"provides a system that allows two or more people with personal video

recorders (PVRs) to precisely synchronize their time-shifted viewing."  *Id.* at

5:3–5.

In Janevski's system, certain PVRs are designated as "initiators,"

while others are referred to as "participants."  *Id.* at 6:16–18.  The initiator is

initially the PVR that starts the session, but the role of the initiator is handed

off to any PVR that performs a control function such as stop, pause, fast

forward, or reverse.  *Id.* at 6:18–25.  "To ensure that the PVRs . . .

participating in a session remain synchronous, a status message is sent out

periodically by the 'initiator.'"  *Id.* at 7:36–39.  The status message includes

"an indication of the program being watched, the current mode of watching

(e.g., normal play, fast forward, pause), an indication of the time into the

program, and information characteristic of content of a digital bit stream

from which playback to the message sender is being generated."  *Id.* at 7:41–

46.

Janevski describes a two-phase synchronization method, the first

phase of which is to perform time synchronization and the second phase of

which is to fine tune the time synchronization by performing frame

synchronization.  *Id.* at 7:47–50, 9:10–14, 10:28–35.  Janevski describes one

embodiment of the time synchronization phase in which a time

misregistration is calculated.  The time misregistration is a difference or

misalignment of the video timers of the PVRs and is calculated using information in messages sent between initiator and participant PVRs. *See id*. 9:15–10:3. A participant compensates for the time misregistration by advancing or rolling back the time count of its video timer to synchronize with the initiator. *Id*. at 12:59–13:7. Although Janevski describes one way of performing time synchronization, Janevski notes that "[t]ime synchronization can be implemented in many different known ways," and cites to Azevedo as a reference describing examples of certain clock synchronization techniques. *Id*. at 8:53–59.

After time compensation, the process proceeds to the frame synchronization phase, which entails finding the frame in the participant's stream that most closely matches the initiator's frame. *Id*. at 10:52–62. This is done by determining frame misregistration, which is described as "the content-wise misalignment of two playbacks." *Id.* at 10:58–60. The participant then compensates for such frame misregistration by fast forwarding or rewinding playback so that synchronization is achieved. *Id*. at 10:52–62, 13:24–26, 15:22–26.

### 2. Independent Claims 1 and 11

Based on our review of the record, we are persuaded Petitioner has provided sufficient evidence that Janevski discloses each of the limitations of claim 1, and analogously of claim 11, except we are unpersuaded that Janevski renders obvious the smoothing aspect of these claims. For this reason, we are ultimately unpersuaded by Petitioner's Ground 1 challenge over Janevski alone. Claim 11 recites limitations that are analogous to those recited in claim 1 and Petitioner relies on largely the same arguments as

those made for the corresponding limitations of claim 1 (*see* Pet. 50–55), thus, in our analysis below, we refer primarily to claim 1 of the '252 Patent.

Claim 1 recites "[a] method comprising: a master rendering device rendering a first content stream." Petitioner argues Janevski discloses a master rendering device that renders a first content stream by designating certain PVRs as the "initiator" and other PVRs as participants. Pet. 36 (citing Ex. 1007, Fig. 1, 6:4–25). The initiator and participant PVRs in Janevski receive broadcasts of video content that take the form of digital bit streams then play back their respective bit streams in a synchronized manner. Pet. 37 (citing Ex. 1007, Fig. 1, Abstract, 1:8–11, 5:3–32, 6:4–25, 15:64–16:5, 16:35–37, 16:44–52). According to Petitioner, "the 'initiator' PVR playing back a 'digital bit stream' amounts to the claimed functionality of a 'master rendering device rendering a first content stream.'" Pet. 37.

We agree with Petitioner that Janevski's initiator PVRs teach the claimed "master rendering device" and the participant PVRs teach the claimed "plurality of slave devices." The '252 Patent describes the relationship between the master rendering device and the slave rendering devices as one where the slave device "adjusts the rendering of its content to keep it in synchronization with the rendering of the content at the master rendering device." Ex. 1001, 2:36–38. This is precisely what the participant devices in Janevski do relative to the initiator device. *See e.g.*, Ex. 1007, Fig. 6 (showing that participant device advances its time count to match the stamp from the initiator device).

Claim 1 also recites "sending from the master rendering device to a first one of a plurality of slave devices, a plurality of master rendering times indicative of statuses of the rendering the first content stream at the master

27

rendering device at different times." Petitioner argues Janevski teaches this limitation because its initiator PVRs send periodic status messages to participant PVRs and the status messages include the initiator's "time into the [video] program," and Janevski also discloses that the status messages include "query time stamps." Pet. 37–38 (citing Ex. 1007, Abstract, 7:36–50, 10:19–35, 12:5–36).

We are persuaded by Petitioner's mapping of the aforementioned limitation to Janevski. Janevski discloses that the initiator device sends a status message to participant devices where the status message includes, amongst other things, a "time into the program." Ex. 1007, 7:41–44. We agree with the Petitioner that the status message's "time into the program" teaches the claimed "master rendering time" that is sent from an initiator device (i.e., a "master rendering device") to the participant devices (i.e., a "slave device").

Claim 1 further recites:

> wherein the first slave device is configured to smooth a rendering time differential that exists between the master rendering device and the first slave device in order to render a second content stream at the first slave device synchronously with the rendering of the first content stream at the master rendering device, wherein smoothing the rendering time differential includes calculations using the plurality of master rendering times.

Petitioner argues Janevski teaches every aspect of this claim element, other than the smoothing element. Pet. 38–39. We agree. In particular, Petitioner argues Janevski discloses that each participant PVR periodically determines whether there is a misalignment between the initiator PVR's video content and its own video content and, if so, synchronizes the video content. Pet. 39 (citing Ex. 1007, Abstract, 7:36–50, 10:36–60, 12:59–13:29, 15:32–33).

28

The synchronization includes the steps of determining a time misregistration (i.e., a difference in the time counts of the PVRs) and compensating for the time misregistration by adjusting the participant's time count. Pet. 39–40 (citing Ex. 1007, Abstract, 7:36–50, 8:39–10:3, 10:19–35, 11:43–12:4, 12:5–36, 12:59–13:21). The steps further include calculating a frame misregistration (i.e., a differential between the video frames that have been rendered by the initiator PVR and the video frames that have been rendered by the participant PVR), and compensating for this frame misregistration by slowing down, speeding up, rewinding, fast-forwarding, and/or halting its rendering of the video content. Pet. 40 (citing Ex. 1007, Abstract, 3:52–57, 10:60–62, 13:24–30, 14:35–63). Petitioner contends that the foregoing establishes that the calculated values for both time count differential and frame differential are used by the participant PVR to render video content synchronously with the initiator PVR and that the time count differential and the frame differential each separately amounts to "two or more calculated values for a differential between a time measure of a master rendering device and a corresponding time measure of the first slave device." Pet. 41–42 (citing Ex. 1009 ¶¶ 117–118).

We agree with Petitioner that Janevski's time misregistration teaches the claimed "time differential" between the master and slave devices. Indeed, the formula used to calculate Janevski's time misregistration (Ex. 1007, 9:34 ("TM=$\frac{1}{2}$ [(A+D)–(C+B)]")) is similar to the formula used to calculate the '252 Patent's "time differential" (Ex. 1001, 5:37 ("Diff=((RT1-ST1)+ST2-RT2)/2")).

We do not agree with Petitioner's alternative contention that Janevski's frame misregistration also teaches the claimed "time differential."

Janevski's frame misregistration "refer[s] to the content-wise misalignment of two playbacks." Ex. 1007, 10:59–60. In other words, frame misregistration represents the frame count differential between the target query frame of the initiator and the identified participant frame that is most similar content-wise to the initiator's query frame. We disagree that frame misregistration would teach the claimed time differential to one of ordinary skill in the art. Nevertheless, because we agree that Janevski's time misregistration teaches the claimed "time differential," we are persuaded by Petitioner's contentions regarding this limitation.

Petitioner acknowledges that "[t]he only aspect of [the above claim element] not expressly disclosed by Janevski is the 'smoothing' function." Pet. 42. However, Petitioner contends that applying a smoothing function to either the time count differential or the frame differential would be an insignificant advance over Janevski because smoothing (e.g., by averaging or filtering) was a conventional technique well within the knowledge of the ordinarily skilled artisan used for reducing volatility in a set of measured values. Pet. 43 (citing Ex. 1009 ¶¶ 120–121; Ex. 1015; Ex. 1016). Petitioner relies on Dr. Chertov's testimony that if the participant PVR in Janevski were configured to calculate an average of the last two or more calculated values of either the time count or frame differential, or to apply a filter to these values before using them, then the participant PVR would be "smoothing" the values. Ex. 1009 ¶ 120. Dr. Chertov cites to certain textbooks and publications discussing methods for data smoothing as evidence that a person of ordinary skill would have had knowledge of smoothing techniques used to smooth data. Ex. 1009 ¶ 122 (citing Exs. 1015, 1016).

Patent Owner argues that it is undisputed that Janevski does not disclose the "smoothing" elements and reminds us that for this reason, we did not find this ground persuasive in our Decision to Institute. PO Resp. 32. Patent Owner does not present any further arguments against this ground and instead focuses on Petitioner's other grounds.

We are unpersuaded that one of skill in the art would have been motivated to smooth the time count differential based on Janevski's disclosure alone. We find Petitioner's arguments improperly guided by hindsight in light of the smoothing aspect of the challenged claims. *See In re Fritch*, 972 F.2d 1260, 1266 (Fed. Cir. 1992) ("It is impermissible to use the claimed invention as an instruction manual or 'template' to piece together the teachings of the prior art so that the claimed invention is rendered obvious." (citation omitted)).

Petitioner contends that smoothing was a well-known technique for reducing volatility in a set of measured values. Pet. 43. Although this statement may be true, in general, for the instance where Janevski is considered alone, no persuasive evidence is provided that smoothing would have been applied to the values of time count differential in the specific context of synchronizing clocks or content streams. For example, although the textbook and publication relied upon by Dr. Chertov mention data smoothing, they do not do so in the context of synchronization. *See* Ex. 1015 (discussing data smoothing in the context of the "measurement of energy spectra"); *see also* Ex. 1016 (discussing smoothing generally in statistics but failing to discuss its application in synchronization). Besides hindsight reconstruction, Petitioner does not present sufficient evidence why one of ordinary skill in the art, even equipped with the knowledge of

31

smoothing, would have applied it to clock synchronization or content stream synchronization. Further, although Dr. Chertov testifies that by simply averaging or filtering the last few time count and frame differential values, Janevski's PVRs would be practicing the smoothing limitation, insufficient evidence is put forth of a reason why one of ordinary skill would have been motivated to average or filter Janevski's time count and frame differential values. Janevski alone does not mention the benefits of averaging or filtering the time count and frame differentials once those values are obtained.

Petitioner has shown, by a preponderance of the evidence that Janevski teaches every limitation of claims 1 and 11, except for the recited smoothing element. We are not persuaded that Janevski alone would render the smoothing limitation obvious. Thus, we conclude that the Petitioner has not presented sufficient evidence to support the Ground 1 challenge of claims 1 and 11, and claims 2, 3, 8, and 17, which depend from one of claims 1 and 11, as obvious over Janevski alone under a preponderance of evidence standard.

### *Grounds 2–5: Obviousness over Janevski and Each One of Azevedo, Mills, Berthaud, and Eidson*

#### *1. Overview of Azevedo*

Azevedo is directed to fault tolerant clock synchronization in a distributed system. Ex. 1010, 1. Azevedo explains that in a distributed computer system, time synchronization is important and must be maintained in spite of the presence of faults in the system. *Id.* Fault tolerant clock synchronization may be achieved "via *interactive convergence algorithms* in which nodes exchange their clock values and determine clock correction

**Appx135**

terms at regular intervals." *Id.* Azevedo presents the measured performance of three interactive convergence algorithms, one of which is identified as "the adaptive exponential averaging fault-tolerant midpoint algorithm" ("AEFTMA"). *Id.* AEFTMA includes a weight factor that "smooths" the clock correction term. *Id.* at 4.

## 2. *Overview of Mills*

Mills, a 1992 reference, is directed to a Network Time Protocol ("NTP"), "which is used to synchronize timekeeping among a set of distributed time servers and clients. It defines the architectures, algorithms, entities and protocols used by NTP and is intended primarily for implementors." Ex. 1011, 1. Section 4 of Mills "describes algorithms useful for deglitching and smoothing clock-offset samples collected on a continuous basis." *Id.*

## 3. *Overview of Berthaud*

Berthaud "presents a general time synchronization algorithm that analyzes the time offset between any two computers' clocks in a network and its evolution, by using mathematical topology properties." Ex. 1012, 265. Berthaud discloses synchronization between master and slave devices by measuring time offset between their clocks. An estimate of a clock offset is produced from a set of observations "and several tools may be used in the estimation evaluation process, such as: mean value, weighted average, linear regression, midpoint functions, etc." *Id.* at 266. The "estimation is used to determine the amount by which a slave should adjust its local clock." *Id.*

## 4. *Overview of Eidson*

Eidson "relates to enhancements to time synchronization in distributed systems." Ex. 1013, 1:9–10. "The enhancements include techniques that

33

compensate for jitter associated with communication circuitry in the distributed system including jitter associated with physical interfaces and gateways in the distributed system." Ex. 1013, Abstract. Eidson describes that "[o]ne method for reducing the negative effects of jitter . . . is to average the differences computed between the time value in the time-stamp latch and the time-stamp . . . ." *Id*. 4:16–21. Eidson explains that the averaged result is then used to adjust the local clock. *Id*. 4:30–32.

### 5. *Independent Claims 1 and 11*
#### a. *Petitioner's Contentions*

As before, Petitioner argues Janevski teaches each of the limitations of claims 1 and 11, except for the smoothing element of these claims. Pet. 42. As explained above, we ultimately agreed with Petitioner that Janevski teaches the limitations of claims 1 and 11 except the smoothing function. For the smoothing element of claim 1, Petitioner argues any one of Azevedo, Mills, Berthaud, and Eidson ("the clock synchronization references") teaches the smoothing element and applies it to various clock variables.

According to Petitioner, Janevski discloses that time synchronization between initiator and participant PVRs "can be implemented in many different known ways" and Janevski identifies Azevedo as disclosing some examples of these known ways. Pet. 44 (citing Ex. 1007, 8:53–59). Azevedo relates to fault tolerant clock synchronization in a distributed system. Ex. 1010, 1. One of the examples disclosed in Azevedo involves the computation of a weighted average of certain clock correction terms in order to smooth the clock correction terms, so that volatility is attenuated. Pet. 44 (citing Ex. 1010, 1–4).

According to Petitioner, "Janevski's citation to the Azevedo paper provides further support for the conclusion that modifying a 'participant' PVR such that was configured to calculate a weighted average of the periodically-calculated values for either the 'time count' differential or the 'frame' differential would have been nothing more than a trivial change for a PHOSITA." Pet. 44–45 (citing Ex. 1009 ¶ 122). Petitioner also argues that Janevski repeatedly emphasizes the goal of providing precise synchronization. Pet. 46 (citing Ex. 1007, Abstract, 3:43–57, 5:3–5). Hence, according to Petitioner, "it would have been well known to a PHOSITA in 2001 that applying data smoothing to a periodically-calculated data variable would reduce volatility of such periodic calculations and thereby improve the overall accuracy of the calculation." Pet. 45 (citing Ex. 1009 ¶ 124). Petitioner concludes, and we agree, that, in light of Janevski's goal of providing precise synchronization, a person of ordinary skill would have been motivated to modify Janevski to use smoothing to reduce volatility and improve the accuracy of calculating Janevski's time count or frame differentials. Pet. 46 (citing Ex. 1009 ¶ 125).

For similar reasons, Petitioner argues that one of ordinary skill would have combined Janevski with either Mills, Berthaud, or Eidson to smooth Janevski's time count differential to reduce volatility and provide precise synchronization. Pet. 59–64. Mills, Berthaud, and Eidson relate to synchronizing clocks of devices in a distributed network, just as Azevedo does. Pet. 59–63. Petitioner argues that "the nature of the problem to be solved by Janevski relates to accuracy of synchronizing playback between rendering devices that are nodes in a distributed network, and Mills, Berthaud, and Eidson all disclose mechanisms for improving the accuracy of

'time synchronization' between nodes in a distributed network." *Id.* at 64 (citing Ex. 1009 ¶ 166). Each, according to Petitioner, applies smoothing in their respective synchronization techniques, thus one of ordinary skill in the art would have combined Mills, Berthaud, or Eidson with Janevski to smooth the periodically calculated values for Janevski's time count differential between initiator and participant PVRs. *Id.* (citing Ex. 1009 ¶ 167).

### b. Patent Owner's Arguments

Patent Owner does not present any arguments regarding whether Janevski and the clock synchronization references teach any of the specific limitations of claims 1 and 11 as asserted by Petitioner. Instead Patent Owner argues Janevski teaches away from the clock synchronization references and that objective indicia of nonobviousness show that the claims would not have been obvious.

Patent Owner argues that Janevski "teaches away from using device-clock-based smoothing techniques such as those in the secondary references." PO Resp. 33. This is because, according to Patent Owner, "Janevski expressly cites Azevedo as a technique in which distributed processors in network can 'broadcast their respective clock values periodically to maintain synchronization'" but instead uses a different two-step technique. *Id.* Patent Owner contends that "if it would have been obvious to modify the Janevski system to smooth a rendering time using techniques like Azevedo, Mr. Janevski would have disclosed those techniques or incorporated those techniques by reference into his patent since he was aware of Azevedo." *Id.* at 34.

With respect to objective indicia of obviousness, Patent Owner argues "[p]rior to the inventions of the Challenged Claims, there was an unmet need for a solution to synchronize across multiple devices the playback of audio and video received from a source." PO Resp. 35 (citing Ex. 2001 ¶¶ 26–30; Ex. 2009 at 15; Ex. 2012 at 37–38). Patent Owner points to the early Juno documents stating that "[b]oth Jupiter and BeComm recognize that true synchronization is an unsolved computer science problem" as evidence of the invention's long-felt need. PO Resp. 36 (citing Ex. 2009 at 14–15; Ex. 2001 ¶¶ 29–30). Patent Owner claims that this evidence indicates that Intel had not solved the synchronization problem and thus, a solution was not obvious at the time. PO Resp. 36.

Patent Owner next argues that Intel's willingness to pay $850,000 and share 5% of Intel's Consumer Products Division revenue with BeComm is more evidence of nonobviousness. PO Resp. 36–37 (citing Ex. 2001 ¶ 29). Patent Owner also points to licensing of the patented technology to various technology companies as evidence of nonobviousness. PO Resp. 37. Finally, Patent Owner argues that companies that used the claimed synchronization technology have achieved significant commercial success. PO Resp. 37.

### c. Analysis

We find Petitioner has shown by a preponderance of the evidence that claims 1–3, 8, 11, and 17 are unpatentable over Janevski combined with each one of the clock synchronization references. Petitioner has provided sufficient evidence that Azevedo, Mills, Berthaud, and Eidson teach synchronization techniques that involve smoothing of various clock variables. Specifically, we agree that Azevedo relates to fault tolerant clock

37

synchronization in a distributed system. Ex. 1010, 1. One of the examples disclosed in Azevedo involves the computation of a weighted average of certain clock correction terms in order to smooth the clock correction term, so that volatility is attenuated. Pet. 44 (citing Ex. 1010, 1–4). Similarly, Mills relates to a NTP, "which is used to synchronize timekeeping among a set of distributed time servers and clients." Ex. 1011, 1. Section 4 of Mills "describes algorithms useful for deglitching and smoothing clock-offset samples collected on a continuous basis." *Id.* Moreover, Berthaud discusses synchronization between master and slave devices by measuring time offset between their clocks. Ex. 1012, 266. In Berthaud, an estimate of a clock offset is produced from a set of observations "and several tools may be used in the estimation evaluation process, such as: mean value, weighted average, linear regression, midpoint functions, etc." *Id.* As Petitioner contends and Dr. Chertov testifies (Ex. 1009 ¶ 159), we agree that references to "mean value, weighted average, linear regression, midpoint functions, etc." refer to various smoothing techniques. And finally, we agree with Petitioner's contention that Eidson "relates to enhancements to time synchronization in distributed systems." Ex. 1013, 1:9–10. "The enhancements include techniques that compensate for jitter associated with communication circuitry in the distributed system including jitter associated with physical interfaces and gateways in the distributed system." *Id.*, Abstract. Eidson describes that "[o]ne method for reducing the negative effects of jitter . . . is to average the differences computed between the time value in the time-stamp latch and the time-stamp." Ex. 1013, 4:16–21. By averaging the differences between time values, the evidence supports that Eidson teaches smoothing the time value differences.

Although Patent Owner is correct that the clock synchronization references do not specifically teach smoothing a rendering time differential, Petitioner is not relying on these references for such a teaching. Instead, Petitioner relies on each of the clock synchronization references as teaching the general technique of smoothing clock differentials and applies such a technique to Janevski's rendering time differentials. *See* Pet. 44–47, 58–59, 63–64.

Petitioner articulates a reason with rational underpinning for combining Janevski with the clock synchronization references. In this regard, Petitioner notes that, according to Janevski, time synchronization between the PVRs can be implemented in many different known ways and provides, as examples of such techniques, the various clock synchronization techniques disclosed in Azevedo. Pet. 44. We agree. Unlike the Ground 1 challenge based on Janevski alone, here there is an explicit connection between smoothing techniques and applying them to clock synchronization. Janevski states "[t]ime synchronization can be implemented in many different known ways" (Ex. 1007, 8:53–54) and explicitly refers to Azevedo as disclosing one such way (Ex. 1007, 8:54–59). Thus, Janevski itself indicates that clock synchronization techniques may be applicable to synchronizing video timers. *See* Ex. 1007, 8:39–64. Janevski's reference to Azevedo would have led one of ordinary skill in the art to Azevedo's discussion of smoothing as applied to Azevedo's clock correction terms, which one of skill could then readily have applied to Janevski's time misregistration. Once exposed to smoothing techniques as applied in Azevedo, one of ordinary skill would reasonably have looked to other

references, such as Mills, Berthaud, and Eidson that also teach smoothing in the context of clock differentials.

### (i) Teaching Away

We do not find Patent Owner's argument that Janevski teaches away from the clock synchronization references to be persuasive. Rather than teaching away, Janevski expressly draws the reader's attention to Azevedo as an alternative way of performing time synchronization. *See* Ex. 1007, 8:39–64. The fact that Janevski does not adopt Azevedo's technique is not tantamount to teaching away from it. *See In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) ("The prior art's mere disclosure of more than one alternative does not constitute teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed"); *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012) ("[T]he mere disclosure of alternative designs does not teach away" and "just because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes."). Moreover, Patent Owner does not contend that Janevski criticizes, discredits, or discourages smoothing in general or as disclosed in Azevedo, Mills, Berthaud, or Eidson, nor do we find any such criticism or discouragement.

### (ii) Objective Indicia of Nonobviousness

The *Graham* factors instruct that we must consider—apart from what the prior art itself would have suggested—whether objective evidence of nonobviousness (i.e., secondary considerations), when present, may lead to a conclusion that the challenged claims would not have been obvious. *See, e.g.*, *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed. Cir. 1983) (instructing that evidence of secondary considerations, when present,

must always be considered in determining obviousness). It is only a part of the "totality of the evidence"; its mere existence does not control the conclusion of obviousness. *See Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997) (citations omitted). Objective evidence of nonobviousness "may often be the most probative and cogent evidence in the record" and "may often establish that an invention appearing to have been obvious in light of the prior art was not." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). Objective evidence of nonobviousness may include evidence of commercial success, licensing, copying, praise by others, long-felt but unresolved need, and failure by others. *Graham*, 383 U.S. at 17–18. Objective evidence of nonobviousness "is only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312 (2006)). "[T]here is no nexus unless the evidence presented is 'reasonably commensurate with the scope of the claims.'" *Id.* (citing *Rambus Inc. v. Rea*, 731 F.3d 1248, 1257 (Fed. Cir. 2013) (quoting *In re Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011)).

*Long-Felt Unmet Need*

Patent Owner argues "there was an unmet need for a solution to synchronize across multiple devices the playback of audio and video received from a source." PO Resp. 35 (citing Ex. 2001 ¶¶ 26–30; Ex. 2009 at 15; Ex. 2012 at 37–38).

In order to show a long-felt but unmet need for the claimed invention, the objective evidence must show that the need was a persistent one that was

41

recognized by those of ordinary skill in the art. *In re Gershon*, 372 F.2d 535, 538 (CCPA 1967). Patent Owner's evidence shows that there was a need by BeComm for synchronization at least around the time of the Juno project in late 2000 and early 2001. However, Patent Owner does not present sufficient evidence showing that this need was persistent, long-felt, or recognized generally by persons of ordinary skill in the relevant art. The Juno documents are dated only one year before the priority date of the '252 Patent and no evidence is presented showing that the need for synchronization extended any further back in time. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000) (finding a one-year time between identification of the problem and patented solution was insufficient to show "a long-felt need"). Moreover, an internal BeComm document reflecting the knowledge of employees at one company is not enough to show general recognition of an unmet need in the relevant technical field.

*Intel's Partnership and Licensing*

Patent Owner argues that Intel's willingness to pay $850,000 and share 5% of Intel's Consumer Products Division revenue with BeComm is more evidence of nonobviousness. PO Resp. 36–37 (citing Ex. 2001 ¶ 29). However, Patent Owner fails to establish a nexus between Intel's payment to BeComm and the claimed invention. Juno was intended to provide a subset of the functionality of a larger home audio network that enables audio services in the home environment. Ex. 2009, 7–8. Juno provided transcoding and decoding of content, including encryption, decryption, compression, and decompression. Ex. 2009, 8. Juno also provided routing capability for routing content to the appropriate adapter, and also ensured

42

that high quality audio was delivered to the adapters. Ex. 2009, 8. The aforementioned features are all unrelated to the '252 Patent. Patent Owner does not provide any information regarding how much of Intel's payment can be attributed to the specific claimed features of the '252 Patent.

Similar to its prior arguments, Patent Owner's argument regarding licensing also fails to provide sufficient evidence demonstrating a nexus between the licenses and the merits of the claimed invention. No evidence is provided other than the inventor's uncorroborated testimony that patents that stem from his work were licensed. The licenses and licensed patents are not presented as evidence so that a determination could be made as to how the claimed invention contributed to the licenses and their total value.

*Commercial Success*

Finally, although Patent Owner argues that companies that used the claimed synchronization technology have achieved significant commercial success (PO Resp. 37), the only company Patent Owner identifies is Petitioner, which it alleges uses synchronization technology that meets the claim limitations. PO Resp. 37–38. As before, insufficient evidence is provided to show a nexus between Petitioner's commercial success and the claimed features of the '252 Patent. Other than one mention of synchronization in Petitioner's annual report, Patent Owner does not present evidence showing the extent to which synchronization or the smoothing features of the challenged claims contributed to Petitioner's revenue and profit margin.

In summary, we do not find Patent Owner's arguments regarding objective indicia of non-obviousness to be persuasive.

*d. Conclusion*

Having reviewed Petitioner's and Patent Owner's arguments and evidence, we find that Petitioner has established that Janevski and the clock synchronization references teach the limitations of claims 1 and 11 and has provided a persuasive rationale to combine the references. We have considered the objective indicia of non-obviousness and accorded them appropriate weight along with all of the *Graham* factors, and we agree with Petitioner that claims 1 and 11 would have been obvious over Janevski combined with Azevedo, Mills, Berthaud, or Eidson.

*6. Dependent Claim 2*

Claim 2 depends from claim 1 and recites "wherein one of the plurality of master rendering times includes a master device time at which the master rendering device renders content."

Petitioner argues, and we agree, that Janevski teaches the limitations of claim 2 because it discloses "that the 'initiator' PVR (the 'master rendering device') periodically sends each 'participator' PVR a 'status message' that contains an indication of the 'initiator' PVR's 'time into the [video] program' as well as a 'query time stamp' for 'a frame that the initiator has just played or has recently played.'" Pet. 48 (citing Ex. 1007, Abstract, 7:36–50, 10:19–35, 12:5–36; Ex. 1009 ¶ 129).

Patent Owner argues Janevski "fails to disclose the 'master device time' limitation of claim 2." PO Resp. 38. Patent Owner argues that under the proper construction, the claim term "device time" refers to a time as indicated by a *designated clock* on the device, and that "Janevski does not indicate if the query time stamp contains a time indicated by a designated clock of any particular device, let alone the initiator device." PO Resp. 39.

44

Petitioner responds that there is no difference in scope between the parties' proposed constructions because even under Patent Owner's construction, "there is no limitation on what kind of clock can be 'a designated clock.'" Pet. Reply 26. Petitioner argues that Janevski's "query time stamp" is a "time value indicated by [a] clock of a given rendering device" and cites the testimony of its expert, Dr. Chertov, and Janevski for support. Pet. Reply 26 (citing Ex. 1007, 11:66–12:8, 12:18–29).

We agree with Petitioner that Janevski's query time stamp, included in the status message sent from the initiator PVR to the participant PVR, teaches the claimed "a master device time at which the master rendering device renders content." The time stamps discussed in Janevski, including those found in Figure 4 and Figure 5, and therefore also including the query time stamp, originate from Janevski's video timer 212. *See* Ex. 1007, 9:18–20 ("The message 402 is sent at a time A which is 0 hours, 0 minutes and 2 seconds according the video timer 212 of the initiator PVR 114a."). We find the video timer 212 of the initiator device teaches a "designated clock" of the claimed master device of claim 2, consistent with our construction of the term "master device time" because the video timer is designated to track the time of the video output of Janevski's PVRs. *See* Ex. 1007, 2:16–20. The query time stamp is the time stamp of the query frame and the query frame is the frame that is rendered on the initiator device. *See* Ex. 1007, 10:36–41 ("[T]he signature to be compared to the query signature . . . is the signature of the I frame of the participant PVR 114b whose time stamp is closest to the time stamp 590 of the query frame."). The time stamp of the query frame is thus the time of the video timer at which the initiator renders content. Thus,

45

we agree with Petitioner that Janevski's query time stamp teaches "a master device time at which the master rendering device renders content."

### 7. *Dependent Claim 3*

Claim 3 depends from claim 1 and recites "wherein sending the plurality of master rendering times comprises sending a series of transmissions to the first slave device, each one of the series of transmissions being at a different time."

Petitioner asserts, and we agree, that Janevski teaches the additional limitations of claim 3 because it discloses that status messages, which contain the time into the video program and the query time stamp, are sent periodically from initiator to participant PVR. Pet. 48 (citing Ex. 1007, 7:36–38, 15:32–33). According to Petitioner, the periodic transmission of status messages from initiator to participant PVR amounts to "sending the plurality of master rendering times comprises sending a series of transmissions to the first slave device, each one of the series of transmissions being at a different time." *Id.* at 49 (citing Ex. 1009 ¶ 130).

Patent Owner does not present arguments against Petitioner's contention that Janevski and the clock synchronization references teach the specific limitations of claim 3. *See generally* PO Resp. We agree with, and adopt as our own findings and conclusions, Petitioner's evidence and analysis, summarized above, which we determine show by a preponderance of the evidence that Janevski teaches the additional limitations of claim 3.

### 8. *Dependent Claim 8*

Claim 8 depends from claim 1 and recites "wherein the first content stream is sent from a first source device to the master rendering device and

the second content stream is sent to the first slave device from a difference source device."

Petitioner asserts, and we agree, that Janevski discloses that the "initiator" and "participant" PVRs (the "master rendering device" and "slave rendering device," respectively) each receive respective broadcasts of "digital bit streams" that may be sent by "different cable or satellite providers." Pet. 49 (citing Ex. 1007, 3:13–16, 6:5–39, 16:44–52). Petitioner contends "[b]ecause these 'different cable or satellite providers' amount to different sources, this disclosure amounts to the claim functionality of 'the first content stream [being] sent from a first source device to the master rendering device and the second content stream [being] sent to the first slave device from a difference source device.'" Pet. 49 (citing Ex. 1009 ¶ 131).

Patent Owner does not present arguments against Petitioner's contention that Janevski and the clock synchronization references teach the specific limitations of claim 8. *See generally* PO Resp. We agree with, and adopt as our own findings and conclusions, Petitioner's evidence and analysis, outlined above, which we determine show by a preponderance of the evidence that Janevski teaches the additional limitations of claim 8.

*9. Dependent Claim 17*

Claim 17 depends from claim 11 and recites "wherein the master rendering device and the slave device are part of a same system."

Petitioner asserts, and we agree, that Janevski discloses a "synchronized PVR viewing system' that includes both an 'initiator' PVR (which amounts to the claimed 'master rendering device') and a 'participant' PVR (which amounts to the claimed 'slave rendering device')." Pet. 56 (citing Ex. 1007, Fig. 1, 6:4–25). Thus, because the initiator and participant

47

PVRs are part of the same "synchronized PVR viewing system," Petitioner argues Janevski teaches the additional limitations of claim 17.

Patent Owner does not present arguments against Petitioner's contention that Janevski and the clock synchronization references teach the specific limitations of claim 17. We agree with, and adopt as our own findings and conclusions, Petitioner's evidence and analysis, summarized above, which we determine show by a preponderance of the evidence that Janevski teaches the additional limitations of claim 17.

### *Ground 6: Obviousness over Janevski and Baumgartner*
#### *1. Overview of Baumgartner*

Baumgartner discloses "[a] method and [system] for synchronizing audio and video data streams in a computer system during multimedia presentation." Ex. 1014, Abstract. "The method . . . periodically queries each driver for the current audio and video position (or frame number) and calculates the synchronization error. The synchronization error is used to determine a tempo value adjustment to one of the data stream designed to place the video and audio back in sync. . . . The method applies a smoothing function to the determined tempo value to prevent overcompensation." Ex. 1014, Abstract.

#### *2. Claims 1–3, 8, 11, and 17*

As before, Petitioner argues Janevski teaches all the limitations of the challenged claims, except for the smoothing element of the claims. Pet. 64. For "smoothing," Petitioner relies on Baumgartner and argues that its "application of a 'smoothing' function to a frame offset while synchronizing the rendering of two streams of multimedia frames" combined with

**Appx151**

Janevski's teachings would render the challenged claims obvious. Pet. 65 (citing Ex. ¶¶ 169–180).

Petitioner argues that Baumgartner discloses a method for synchronizing separate audio and video data streams. Pet. 65 (citing Ex. 1014, 6:18–20). In order to synchronize audio with video, Baumgartner calculates a synchronization error value, "which is essentially the number of frames by which the video frame position is in front of or behind the current audio frame position." Pet. 66 (quoting Ex. 1014, 6:50–55, 13:60–67). The synchronization error value is transformed into a video tempo value that adjusts the rendering of the video stream. Pet. 66 (citing Ex. 1014, 6:56–7:4). Petitioner argues that before performing the adjustment, Baumgartner "adjusts this video tempo value by applying a smoothing function, i.e., a weighted average of prior tempo values, to the determined tempo value." Pet. 66 (quoting Ex. 1014, 6:61–65).

Petitioner argues a person of ordinary skill in the art would have been motivated to combine Janevski's teachings with Baumgartner's teachings so that a smoothing function would be applied to the periodically calculated frame differentials between initiator and participant PVRs in Janevski. Pet. 67 (citing Ex. 1009 ¶ 176). Petitioner emphasizes that the '252 Patent, Janevski, and Baumgartner "all have the same objective, which is to synchronize playback of multiple streams of multimedia content" and all also "express a desire to improve the accuracy of synchronizing playback of multiple streams of multimedia content to improve user experience." *Id*. at 67–68.

Petitioner's arguments and supporting evidence contending that Baumgartner's smoothing of tempo value would be combinable with and

**Appx152**

applied to Janevski's frame differential are insufficient. It is Baumgartner's synchronization error value that most closely analogizes to Janevski's frame misregistration. *See* Ex. 1014, 6:50–55 (explaining that the synchronization error value "is essentially the number of frames by which the video frame position is in front of or behind the current audio frame position"). However, Baumgartner does not disclose smoothing of the synchronization error value. Instead, Baumgartner uses the synchronization error value to assign a tempo value, which is used to adjust the audio or video stream's tempo to achieve synchronization between the two. Ex. 1014, 6:39–65. Thus, it is not apparent, based on Petitioner's allegations and evidence relied upon, that smoothing of the tempo value would have suggested to one of ordinary skill in the art the smoothing of Janevski's frame differential because the two parameters are different. Further, we find Petitioner has not sufficiently explained how smoothing Janevski's frame differential would "improve the accuracy of synchronization playback of multiple streams" (Pet. 67), as Petitioner contends.

We therefore conclude, on the record before us, that the Petitioner has not presented adequate evidence and reasoning in support of its challenge of claims 1 and 11, and claims 2, 3, 8, and 17, which depend from one of claims 1 and 11, as obvious over Janevski in combination with Baumgartner.

*E. Motion to Exclude*

Petitioner filed a Motion to Exclude (Paper 30) two sets of exhibits: (1) Exhibits 2002–2009, 2011–2078, and 2083–2088, which Petitioner seeks to exclude on the ground that they are not properly authenticated, and (2) Exhibits 2081 and 2082 as being improperly incorporated by reference.

### *1. Exhibits 2002–2009, 2011–2078, and 2083–2088*

Petitioner argues Exhibits 2002–2009, 2011–2078, and 2083–2088 were submitted by Patent Owner to corroborate Mr. Balassanian's testimony on conception and reduction to practice, but that Patent Owner fails to authenticate these exhibits with evidence that is not dependent solely on the testimony of Mr. Balassanian himself.  Paper 30, 1–3.

Patent Owner argues that the exhibits do not rely on Mr. Balassanian's testimony alone.  For example, Patent Owner points to metadata from the CVS source code repository system and the computer file system on which the exhibits were originally stored as providing independent evidence of authentication, including an indication of the dates when the exhibits were authored.  Paper 33, 1–9.  The only exhibit for which metadata is not presented is Exhibit 2038, an email chain that Patent Owner argues is dated on its face and discusses another exhibit (Exhibit 2037) for which Patent Owner has submitted metadata.  Paper 33, 9.

Petitioner, in its Reply, argues that the metadata is essentially part of the documents themselves, and that because these documents and the included metadata all come from Mr. Balassanian, they cannot constitute independent evidence of authenticity.  Paper 34, 2–3.  According to Petitioner, independent evidence of authenticity would need to come from someone other than the inventor.  *Id*. at 2.

Federal Rule of Evidence 901(a) states that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  The Rule provides several examples of evidence that may satisfy the requirement, including the

testimony of a witness with knowledge that the item is what it is claimed to be. Fed. R. Evid. 901(b)(1).

We are not persuaded by Petitioner that Patent Owner's exhibits lack sufficient authentication. Mr. Balassanian testifies that he was the authorized custodian of BeComm and that the exhibits are true copies of the original records and were kept in the course of regularly conducted business activity. Ex. 2001 ¶¶ 81–83. Mr. Balassanian's testimony also describes the CVS repository as tracking the dates, users, and versions of the exhibits, and recording such information in the source code files themselves and also in log files. Ex. 2001 ¶ 85–89; *see also* Ex. 2080 ¶ 19. Patent Owner submitted the metadata containing the log files and also metadata from the file systems on which the exhibits were originally stored. *See, e.g.*, Exs. 2013, 2077. We find Mr. Balassanian's testimony coupled with the metadata from the CVS repository and file system sufficient to authenticate the exhibits. We disagree that such testimony and evidence should be excluded on the basis of insufficient authentication because they stem from the inventor himself.

To the extent the analysis of whether the exhibits are sufficiently authenticated and the analysis of whether they effectively corroborate Mr. Balassanian's testimony overlap with each other, we find that the documents and their metadata do not suffer from the circular evidentiary problems argued by Petitioner. *See ATI Tech. ULC v. Iancu*, 920 F.3d 1362, 1370–71 (Fed. Cir. 2019) (relying in part on metadata from a revision-control system to corroborate inventor testimony).

*2. Exhibits 2081 and 2082*

The second set of documents sought to be excluded by Petitioner are Exhibits 2081 and 2082, which are claim charts attached to Patent Owner's expert declaration containing a limitation-by-limitation mapping of BeComm source code to the challenged claims. *See* Exs. 2081, 2082. Patent Owner relies on these charts as evidence that BeComm source code practices the claim limitations and therefore that the inventors conceived of and reduced the invention to practice prior to Janevski's priority date. PO Resp. 29–31. As indicated above, however, we find that BeComm source code, even if it practices the claim limitations, does not show that the inventors conceived of the invention. This is because the source code files themselves indicate the source code was authored by non-inventor Mr. Carpenter, rather than the two named inventors.

Because we have not relied upon Exhibits 2081 or 2082 in this Decision, we dismiss Petitioner's Motion to Exclude as moot as it relates to these two exhibits.

## III. CONCLUSION

For the foregoing reasons, we conclude Petitioner has demonstrated by a preponderance of the evidence that claims 1–3, 8, 11, and 17 of the '252 Patent are unpatentable under 35 U.S.C. § 103(a) over Janevski in combination with Azevedo, Mills, Berthaud, or Eidson but has not demonstrated by a preponderance of the evidence that the aforementioned claims are unpatentable over Janevski alone, or over Janevski combined with Baumgartner.

## ORDER

For the reasons given, it is:

53

ORDERED that claims 1–3, 8, 11, and 17 are held to be unpatentable;

FURTHER ORDERED Petitioner's Motion to Exclude is *denied-in-part* with respect to Exhibits 2002–2009, 2011–2078, and 2083–2088 and *dismissed-in-part* as moot with respect to Exhibits 2081 and 2082; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.


PETITIONER:

Rory P. Shea
Cole B. Richter
George I. Lee
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
shea@ls3ip.com
richter@ls3ip.com
lee@ls3ip.com
boyea@ls3ip.com


PATENT OWNER:

James Hopenfeld
SINGER BEA, LLP
jhopenfeld@singerbea.com

Christian Hurt
THE DAVIS FIRM PC
churt@bdavisfirm.com



## (12) United States Patent
### Balassanian et al.

(10) **Patent No.:** US 7,391,791 B2
(45) **Date of Patent:** Jun. 24, 2008

---

(54) **METHOD AND SYSTEM FOR SYNCHRONIZATION OF CONTENT RENDERING**

(75) Inventors: **Edward Balassanian**, Bellevue, WA (US); **Scott W. Bradley**, Kirkland, WA (US)

(73) Assignee: **Implicit Networks, Inc.**, Seattle, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 836 days.

(21) Appl. No.: **10/322,335**

(22) Filed: **Dec. 17, 2002**

(65) **Prior Publication Data**

US 2003/0221161 A1 Nov. 27, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/341,574, filed on Dec. 17, 2001.

(51) **Int. Cl.**
*H04J 3/06* (2006.01)
(52) **U.S. Cl.** ........................................................ **370/503**
(58) **Field of Classification Search** ................ 370/431, 370/432, 464, 498, 503, 507–521; 709/219, 709/231–237, 248
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,333,299 A * 7/1994 Koval et al. .................. 713/400

| | | | | |
|---|---|---|---|---|
| 5,487,167 | A * | 1/1996 | Dinallo et al. ........... | 715/500.1 |
| 5,553,222 | A * | 9/1996 | Milne et al. .............. | 715/500.1 |
| 5,602,992 | A * | 2/1997 | Danneels .................... | 709/248 |
| 5,623,483 | A * | 4/1997 | Agrawal et al. ............. | 370/253 |
| 5,815,689 | A * | 9/1998 | Shaw et al. ................. | 713/400 |
| 5,909,431 | A * | 6/1999 | Kuthyar et al. ............. | 370/260 |
| 6,009,457 | A * | 12/1999 | Moller ....................... | 709/203 |
| 6,622,171 | B2 * | 9/2003 | Gupta et al. ................ | 709/231 |
| 6,763,374 | B1 * | 7/2004 | Levi et al. .................. | 709/217 |
| 6,934,759 | B2 * | 8/2005 | Hejna, Jr. ................... | 709/231 |
| 6,985,966 | B1 * | 1/2006 | Gupta et al. ................ | 709/248 |
| 7,096,271 | B1 * | 8/2006 | Omoigui et al. ............. | 709/231 |

* cited by examiner

*Primary Examiner*—Dmitry Levitan
(74) *Attorney, Agent, or Firm*—Black Lowe & Graham PLLC

(57) **ABSTRACT**

A method and system for synchronizing the rendering of content at various rendering devices. Each rendering device has a device time and a rendering time. The synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices. Each slave rendering device adjusts the rendering of its content to keep it in synchronization with the rendering of the content at the master rendering device. The master rendering device sends a message with its rendering time and corresponding device time to the slave rendering devices. Each slave rendering device, upon receiving the message from the master rendering device, determines whether it is synchronized with the master rendering time. If not, the slave rendering device adjusts the rendering of its content to compensate for the difference between the master rendering time and the slave rendering time.

**27 Claims, 10 Drawing Sheets**



Appx158

**SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 7,391,791**



Fig 1

**PAGE 2 OF 16**     Appx159     **SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 7,391,791**



Fig 2

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 7,391,791

Time Domain Table     <u>300</u>

| | 301<br>Node id | 302<br>ST1 | 303<br>RT1 | 304<br>ST2 | 305<br>RT2 | 306<br>Diff |
|---|---|---|---|---|---|---|
| 307~ | 101 | 2000 | 1010 | 1015 | 2025 | 1000 |
| 308~ | 102 | 2000 | 2510 | 2600 | 2120 | -495 |

Fig 3

Appx161     SONOS EXHIBIT 1001<br>IPR of U.S. Pat. No. 7,391,791



SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 7,391,791



FIG. 5

**PAGE 6 OF 16**     Appx163     **SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 7,391,791**



Fig 4

SONOS EXHIBIT 1001

IPR of U.S. Pat. No. 7,391,791



Fig 7

SONOS EXHIBIT 1001

IPR of U.S. Pat. No. 7,391,791



Fig 8

SONOS EXHIBIT 1001



Fig 9

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 7,391,791



Fig 10

**SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 7,391,791**

# METHOD AND SYSTEM FOR SYNCHRONIZATION OF CONTENT RENDERING

## CROSS REFERENCE TO RELATED APPLICATION

This application claims the benefit of U.S. Provisional Application No. 60/341,574 filed Dec. 17, 2001, which is incorporated herein by reference in its entirety.

## TECHNICAL FIELD

The described technology relates to rendering of content at multiple rendering devices in a synchronized manner.

## BACKGROUND

Multimedia presentations that are presented on different rendering devices (e.g., video display and stereo system) typically require that the different content of the presentation be rendered in a synchronized manner. For example, a multimedia presentation may include video, audio, and text content that should be rendered in a synchronized manner. The audio and text content may correspond to the dialogue of the video. Thus, the audio and text contents need to be rendered in a synchronized manner with the video content. Typically, the content of a multimedia presentation is stored at a single location, such as on a disk drive of a source device. To render the presentation, the source device retrieves each different type of content and sends it to the appropriate rendering device to effect the multimedia presentation. The source device then sends the content to the rendering devices in sufficient time so that the rendering devices can receive and render the content in a timely manner.

Various rendering devices, however, may have different time domains that make the rendering of the multimedia presentation in a synchronized manner difficult. For example, video and audio rendering devices may have system clocks that operate at slightly different frequencies. As a result, the video and audio content will gradually appear to the person viewing the presentation to be out of synchronization. The rendering of content in a synchronized manner is made even more difficult because some rendering devices may have multiple time domains. For example, an audio rendering device may have a system clock and a clock on a digital signal processing ("DSP") interface card. In such a case, the combination of clocks may result in the presentation becoming even more quickly out of synchronization.

It would be desirable to have the technique that would facilitate the rendering of the multimedia presentation in a synchronized manner.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating synchronization of rendering devices in one embodiment.

FIG. 2 is a diagram illustrating the calculation of the time domain differential between two devices.

FIG. 3 illustrates a time domain table for a rendering device in one embodiment.

FIG. 4 illustrates a block diagram of another embodiment of the synchronization system.

FIG. 5 is a block diagram illustrating components of a content rendering device in one embodiment.

FIG. 6 is a flow diagram illustrating the processing of the send time domain message component in one embodiment.

FIG. 7 is a flow diagram of the receive time domain message component in one embodiment.

FIG. 8 is a flow diagram illustrating the render content component in one embodiment.

FIG. 9 is a flow diagram illustrating the process of the send rendering time message component in one embodiment.

FIG. 10 is a block diagram illustrating the processing of the receive rendering time message component in one embodiment.

## DETAILED DESCRIPTION

A method and system for synchronizing the rendering of content at various rendering devices is provided. In one embodiment, each rendering device has a device time and a rendering time. The device time is the time as indicated by a designated clock (e.g., system clock) of the rendering device. The rendering time is the time represented by the amount of content that has been rendered by that rendering device. For example, if a rendering device is displaying 30 frames of video per second, then the rendering time will be 15 seconds after 450 frames are displayed. The rendering time of content at a rendering device has a "corresponding" device time, which is the device time at which the rendering time occurred. For example, the rendering time of 15 seconds may have a corresponding device time of 30 minutes and 15 seconds when the rendering device initialized 30 minutes before the start of rendering the video. To help ensure synchronization of rendering devices, the synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices. Each slave rendering device adjusts the rendering of its content to keep it in synchronization with the rendering of the content at the master rendering device. The master rendering device sends a message with its rendering time and corresponding device time to the slave rendering devices. Each slave rendering device, upon receiving the message from the master rendering device, determines whether it is synchronized with the master rendering time. If not, the slave rendering device adjusts the rendering of its content to compensate for the difference between the master rendering time and the slave rendering time. A slave rendering device can determine the amount it is out of synchronization by comparing its slave rendering time at a certain slave device time to the master rendering time at that same device time. Alternatively, the amount can be determined by comparing its slave device time at a certain rendering time to the master device time at that same rendering time. In another embodiment, the synchronization system can define a default rendering time for the synchronization. In such a case, the master rendering device need only include its effective device time that corresponds to the default rendering time in the message that is sent to the slave rendering devices. For example, the default rendering time might be the rendering time of zero. In such a case, the master rendering device can subtract its current rendering time from its current device time to give its effective device time at rendering time zero. A slave rendering device, knowing the default rendering time, can determine whether it is synchronized and the variation in rendering time between the master rendering device and the slave rendering device.

In one embodiment, the synchronization system allows for two sources of content to be synchronized even though the rendering times of the sources are not themselves synchronized. For example, two separate sources may be video transmitted via satellite and audio transmitted via land telephone lines. If audio is being transmitted and then a few seconds

**SONOS EXHIBIT 1001**

**IPR of U.S. Pat. No. 7,391,791**

later the corresponding video starts to be transmitted, then the rendering times of zero for the audio and video will not correspond to a synchronized state. For example, the video at the video rendering time of zero should be rendered at the same time as the audio with the audio rendering time of five is rendered. This difference in rendering times is referred to as source offset. In addition, the difference in the propagation delay resulting from the different transmission paths of the video and audio may be variable and thus contribute to a variation in synchronization that is variable and is not known in advance.

To account for this lack of synchronization, the synchronization system allows a user (e.g., the person viewing the content) to manually account for the variation. For example, if the video and audio are rendered via a personal computer, the synchronization system may display a dial or a slider on a user interface that the user can adjust to indicate the difference in the rendering times. If the video is rendered five seconds after the corresponding audio, then the user can indicate via the user interface that the offset is five seconds. In such a case, the synchronization system may use the offset to adjust the rendering time of the audio so that the audio associated with the adjusted audio rendering time should be rendered at the same time as the video content with the same video rendering time. The synchronization system could buffer the audio to account for the offset.

The synchronization system in one embodiment factors in the differences in the time domains of the various rendering devices when evaluating synchronization. The rendering devices exchange device time information so that the rendering devices can account for the differences in the time domains of the other rendering devices. Each rendering device may send to the other rendering devices a time domain message that includes its current device time (i.e., send time) along with the time it received the last time domain message (i.e., receive time) from each of the other rendering devices and the send time of that last time domain message. When a rendering device receives such a time domain message, it calculates the time differential between its time domain and the time domain of the sending rendering device. In one embodiment, the synchronization system calculates the time domain differential by combining the difference in send and receive times for the last messages sent to and received from another device in a way that helps factor out the transmission time of the messages. A slave rendering device can then use this time domain differential to convert the master device time to the time domain of the slave when synchronizing the rendering of content. In one embodiment, each rendering device broadcasts at various times its time domain message. The time domain message includes a received time for a message received for each of the other rendering devices. Each rendering device receives the broadcast time domain message. The receiving rendering device can then calculate its time domain differential with the broadcasting rendering device. In this way, time domain differentials can be determined on a peer-to-peer basis without the need for a master device to keep a master time and by broadcasting the time domain messages, rather then sending separate time domain messages for each pair of devices.

FIG. 1 is a block diagram illustrating synchronization of rendering devices in one embodiment. The source device 101 distributes the content of a presentation to the video rendering device 102, the audio rendering device 103, and the text rendering device 104 via communications link 105. The source device may have the multimedia presentation stored locally, for example, on a disk drive, may dynamically generate the multimedia presentation, may receive content of the

multimedia presentation from other sources, and so on. A multimedia presentation is any presentation that includes different content that is to be rendered in a synchronized manner. For example, the content could be video and audio content for a virtual ride in a theme park along with motion content to control the ride. As another example, the presentation may include light content that controls the display of a laser to be synchronized with audio content. Also, the "synchronization" of content may be different for different rendering devices. For example, audio content may be sent to multiple audio rendering devices with the expectation that some of the audio rendering devices may delay rendering for a certain period (e.g., 10 milliseconds) to achieve a desired audio effect. In such a case, the rendering is considered synchronized when the delay equals that period. The synchronization system designates one of the rendering devices as the master rendering device. In this example, the audio rendering device 103 is designated as the master rendering device, and the video rendering device 102 and text rendering device 104 are designated as slave rendering devices. After the source starts sending the content to the rendering devices, the audio rendering device broadcasts a master rendering time message with its master device time and master rendering time to the slave rendering devices on a periodic basis. In this example, since the communications link is point-to-point from the source device, the audio rendering device sends the message to the source device, which in turn forwards the message to the slave rendering devices. Upon receiving the master rendering time message, the slave rendering devices convert the master device time to their own time domains and then calculate the difference between their slave rendering time and the master rendering time at a certain point in time. In one embodiment, the synchronization system uses a device time at a calculated start of sending as the point in time. The slave rendering devices then adjusts the rendering as appropriate to compensate for the difference. The rendering device adjusts the rendering of their content in ways that are appropriate for their content. For example, if the video rendering device was one second behind the master audio rendering device, then it might skip the display of every other frame for the next two seconds to "speed up" to the master audio rendering device. Alternately, if the video rendering device was one second ahead of the master audio rendering device, then the video rendering device might display each of the next 30 frames twice to "slow down" to the master audio rendering device.

FIG. 2 is a diagram illustrating the calculation of the time domain differential between two devices. Device 1 initially sends to device 2 a time domain message 201 that includes its current device time, referred to as "sendtime1." When device 2 receives the time domain message, it stores the sendtime1 along with the time it received the time domain message, referred to as "receivetime1." Device 2 then sends to device 1 a time domain message 202 that includes its device time, referred to as "sendtime2," along with sendtime1 and receivetime1. When device 1 receives the time domain message, it stores sendtime1, receivetime1, and sendtime2 along with its device time, referred to as "receivetime2." Device 1 now has enough information to calculate the time domain differential according to the following formula:

$$Diff=((RT1-ST1)+(ST2-RT2))/2$$

where Diff is the time domain differential, RT is receive time, and ST is send time. Device 1 then sends a time domain message 203 to device 2 that includes its device time, referred to as "sendtime3" along with sendtime2 and receivetime2. When device 2 receives the time domain message, it stores

SONOS EXHIBIT 1001

IPR of U.S. Pat. No. 7,391,791

sendtime2, receivetime2, and sendtime3 along with its device time, referred to as "receivetime3." Device 2 now has enough information to calculate the time differential according to a similar formula.

This formula calculates the difference between the send time and the receive time for time domain messages between the two devices. If there was no variation in the time domains between the devices, then the send and receive times would reflect the communications link latency between sending and receiving the time domain messages. In one embodiment, the synchronization system assumes that the latency in transmitting a message from one device to another device is approximately the same as the latency in transmitting the message from the other device to the device. Thus, the synchronization system calculates the time domain difference by taking the average of the differences in the send and receive times of the messages. The receive time of the messages is represented by the following equations:

$$RT1=ST1+Diff+L$$

$$RT2=ST2-Diff+L$$

where Diff represents the time domain differential and L represents the latency of the communications link. These equations are equivalent to the following equations:

$$Diff=RT1-ST1-L$$

$$Diff=ST2-RT2+L$$

The average of these two equations is

$$Diff=((RT1-ST1-L)+(ST2-RT2+L))/2$$

The latency factors out of the equation to give the following equation:

$$Diff=((RT1-ST1)+(ST2-RT2))/2$$

FIG. 3 illustrates a time domain table for a rendering device in one embodiment. The time domain table of a device includes a row for each other device to which the device is connected. For example, the audio rendering device 103 of FIG. 1 would have a row for the source device 101, the video rendering device 102, and the text rendering device 104. In this example, the time domain table includes a node identifier column 301, a sendtime1 column 302, a receivetime1 column 303, a sendtime2 column 304, a receivetime2 column 305, and a time domain differential column 306. A positive time domain differential indicates the number of time units that this device is ahead of the other device, and a negative time domain differential indicates the number of time units that this device is behind the other device. Thus, in this example, the device time of the audio rendering device 103 is ahead of the device time of the source device 101 by 1000 time units. In contrast, the device time of the audio rendering device 103 is behind the device time of the video rendering device 102 by 495 time units. One skilled in the art will appreciate the time units can be any units appropriate to the desired synchronization accuracy, such as milliseconds, microseconds, and so on. One skilled in the art will appreciate the time domain messages need not include the times set by the receiving device. For example, the time domain message 302 need not include sendtime1 since device 1 could have stored that time locally.

FIG. 4 illustrates a block diagram of another embodiment of the synchronization system. In this example, the source device 400 performs the function of the master, and the video rendering device 401, the audio rendering device 402, and the text rendering device 403 are slaves. In particular, the source device, even though it does no rendering itself, may keep track of an idealized rendering time that may not correspond to the actual rendering time of any of the rendering devices. In such a situation, the master source device periodically sends a rendering time message that includes its device time along with the corresponding idealized rendering time to each of the rendering devices. The rendering devices can then adjust their rendering in the same manner as if the rendering time message is sent from a master rendering device. Alternatively, each rendering device can provide their device time and corresponding rendering time to the source device. The source device can then calculate the rendering time differential for each rendering device and provide that differential to the rendering devices to speed up or slow down their rendering as appropriate.

FIG. 5 is a block diagram illustrating components of a content rendering device in one embodiment. The content rendering device 500 includes a receive content component 501, a render content component 502, a send time domain message component 503, a receive time domain message component 504, a time domain table 505, a send rendering time message component 506, and a receive rendering time message component 507. The receive content component receives content from the source device and may store the content in a buffer for subsequent rendering. The rendering content component retrieves the buffered content and effects the rendering of the content. The send time domain message component sends time domain messages to the other devices. The send time domain message component may send the message upon occurrence of an event, such as when a timer expires, when a message is received, and so on. One skilled in the art will appreciate that the frequency of sending time domain messages can be adjusted to account for the anticipated drift between clocks of the rendering devices. The receive time domain message component receives the time domain messages sent by other devices and updates the time domain table as appropriate. The send rendering time message component is used when this content rendering device is a master rendering device to send a rendering time message to the other rendering devices. The receive rendering time message component receives the rendering time messages sent by the master device and calculates a rendering time differential that is used to adjust the rendering of the content. The devices may include a central processing unit, memory, input devices (e.g., keyboard and pointing devices), output devices (e.g., display devices), and storage devices (e.g., disk drives). The memory and storage devices are computer-readable media that may contain instructions that implement the synchronization system. In addition, data structures and message structures may be stored or transmitted via a data transmission medium, such as a signal on a communications link. Various communications links may be used, such as the Internet, a local area network, a wide area network, or a point-to-point dial-up connection.

FIG. 6 is a flow diagram illustrating the processing of the send time domain message component in one embodiment. In block 601, the component adds the identifier of this device to the time domain message. In block 602, the component adds the send time to the message. The send time is the current device time. In blocks 603-607, the component loops selecting each other device and adding times for that device to the time domain message then loops to block 603 to select the next device. In block 608, the component sends the time domain message to the other devices and then completes.

FIG. 7 is a flow diagram of the receive time domain message component in one embodiment. In decision block 701, if the identifier of this device is in the list of device identifiers in the message, then the component continues at block 702, else the component completes. In block 702, the component retrieves the current send time from the message and saves it in the time domain table. In block 703, the component retrieves the last send time from the message and saves it in

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 7,391,791

the time domain table. In block **704**, the component retrieves the last receive time from the message and saves it in the time domain table. In block **705**, the component retrieves the device time as the current receive time and saves it in the time domain table. The time values may be saved by storing them in the time domain table in the row associated with the device that sent the message. In block **706**, the component calculates the time domain differential. In block **707**, the component smoothes the time domain differential. The time domain differential can be smoothed using various techniques such as averaging the last several time domain differentials using a decaying function to limit the impact of the oldest time domain differentials. In one embodiment, the synchronization system saves the values of the last eight pairs of time domain differentials (i.e., ST2–RT2 and RT1–ST1) and uses the average of the minimum value of the set of eight larger differentials and the maximum value of the set of eight smaller differentials as the time domain differential. The component then completes.

FIG. **8** is a flow diagram illustrating the render content component in one embodiment. In blocks **801-806**, the component loops processing each block of content that is received from the source device. In block **801**, the component selects the next block of content provided by the source device. The content may be buffered at this rendering device. In decision block **802**, if all the blocks of content have already been selected, then the component completes, else the component continues at block **803**. In decision block **803**, if the rendering time differential is 0, then the component continues at block **806**, else the component continues at block **804**. The rendering time differential is calculated by the receive rendering time message component and adjusted by this component as the rendering of the content is adjusted. In block **804**, the component adjusts the selected block to account for the rendering time differential. For example, if the content corresponds to video information, then the component may remove frames to effectively speed up the rendering or may duplicate frames to effectively slow down the rendering. In block **805**, the component adjusts the rendering time differential to account for the adjustments to the selected block. For example, if the block corresponds to one second of video information and the adjustment was to duplicate every frame in the block, then the rendering time differential is adjusted by subtracting one second. The rendering time continues to reflect the amount of the content that has been effectively rendered. For example, if every frame is duplicated in a one second interval resulting in two seconds of adjusted content, the rendering time would only be increased by one second. In block **806**, the component outputs the selected block, either adjusted or unadjusted to effect the rendering of that block of content. The component then loops to **801** to select the next block of content.

FIG. **9** is a flow diagram illustrating the process of the send rendering time message component in one embodiment. The component can be executed upon the occurrence of various events, such as when a timer expires. In block **901**, the component adds the rendering time of this master device to the message. In block **902**, the component retrieves the device time for this master device. In block **903**, the component adds the device time to the message. In block **904**, the component then broadcasts the message to the other rendering devices and then completes.

FIG. **10** is a block diagram illustrating the processing of the receive rendering time message component in one embodiment. In block **1001**, the component extracts the master device time from the message. In block **1002**, the component extracts the master rendering time from the message. In block **1003**, the component converts the master device time to the time domain of this device. In block **1004**, the component calculates the master start time by subtracting the master rendering time from the converted master device time. The master start time is in the time domain of this device and represents the time at which the master device effectively started rendering its content. In block **1005**, the component calculates the slave start time of this device by subtracting the slave rendering time from the current slave device time. The slave start time indicates the time at which this slave device started rendering its content. In block **1006**, the component calculates the rendering time differential by subtracting the slave start time from the master start time. The component then completes.

From the foregoing, it will be appreciated that specific embodiments of the invention have been described herein for purposes of illustration, but that various modifications may be made without deviating from the spirit and scope of the invention. The rendering devices can be components of the same physical device. For example, a DVD player may have a component that processes the video content and a separate component that processes the audio. The hardware and software of these components may result in a difference in rendering speed of the content, and thus the rendering can become out of synchronization over time. Accordingly, the invention is not limited except as by the appended claims.

We claim:

1. A method for synchronizing a rendering of a content provided by a source at one or more devices which are nodes of a network, the content having a rendering time, the method comprising:

designating one of the one or more devices a master device, the master device having a master device time and a master rendering time;

designating remaining devices among one of the one or more devices as at least one slave device, the at least one slave device having a slave device time and a slave rendering time;

receiving the content for rendering by the master and at least one slave device;

sending from the master device to the at least one slave device an indication of when the master device renders content corresponding to the master rendering time;

determining a master device time domain, a slave device time domain, and a source time domain;

determining whether a time domain differential exists between the master rendering time, the slave rendering time; and

adjusting, based on the received indication, the rendering of the content at the at least one slave device within the slave device time domain and in proportion to the time domain differential when present to account for variation between when the master device and the at least one slave device to render content that should be rendered at the same time.

2. The method of claim **1** wherein the indication sent from the master device to the at least one slave device includes the master device time at which the master device renders content corresponding to the master rendering time.

3. The method of claim **2** wherein the indication sent from the master device to the at least one slave device includes the master rendering time.

4. The method of claim **2** wherein the master rendering time is a default rendering time.

5. The method of claim **2** wherein the master rendering time is time zero.

6. The method of claim **1** wherein the determining the time domains of the master device, the slave device, and the source includes determining the time domains relative to an other

**SONOS EXHIBIT 1001**

**PAGE 15 OF 16**          Appx172          **IPR of U.S. Pat. No. 7,391,791**

**9**

device by sending the send and receive times of at least one of the master device, the slave device, and the source to the other device.

7. The method of claim **6** wherein determining the time domain differential includes:

calculating a first difference between the master receive and master send times;

calculating a second difference between the slave receive and the slave send times;

adding the first and second differences to yield a difference sum; and

halving the difference sum.

8. The method of claim **7** wherein adjusting the rendering of the content includes:

conforming the slave rendering time to the master device rendering time so that the master device time and the at least one slave device operate in the same time domain; and

deducting or adding the time domain differential to the same time domain.

9. The method of claim **1** wherein the sending of the indication from the master device to the slave devices occurs at various times so that the at least one slave device can adjust the rendering of the content as appropriate.

10. The method of claim **1** wherein the adjusting accounts for variations in the time domain of the master device and the at least one slave device.

11. The method of claim **1** wherein the content is sent from a single source to the master device and the at least one slave device.

12. The method of claim **1** wherein the content is sent from different sources to the master device and the at least one slave device.

13. The method of claim **12** including receiving a rendering time adjustment that indicates a difference in the master rendering time and the slave rendering time of content that is to be synchronized.

14. The method of claim **13** wherein a user specifies the rendering time adjustment.

15. The method of claim **14** wherein the user specifies the rendering time adjustment by indicating the amount of time the master device and the slave device are out of synchronization.

16. A method for synchronizing rendering of content at devices which are nodes of network, each device having a device time and a rendering time, the device time of a device being in a time domain of the device, the method comprising:

designating one of the devices as a master device having a master rendering time and the one or more slave devices having a slave rendering time;

sending to each device content to be rendered at that device synchronized with the content sent to the other devices;

sending from the master device to the one or more slave devices a master device time corresponding to the master rendering time of the master device; and upon receiving the sent master device time at the one or more slave devices,

exchanging time domain information between the master and one or more slave devices;

determining at least one time domain differential between the master rendering time and the slave rendering time between the master device and the one or more slave devices;

**10**

adjusting the rendering of the content at the one or more slave devices to account for a difference in the slave rendering time and the master rendering time calculated based on the master device time adjusted for a difference in time domains of the one or more slave devices and the master device.

17. The method of claim **16** wherein the at least one time domain differential between the slave rendering time and the master rendering time is calculated by:

converting the master device time to a time frame of the slave device;

calculating a master start time for the master device from the converted master device time and the master rendering time;

calculating a slave start time for the slave device from the slave device time and the slave rendering time; and

calculating the difference between the slave start time and the master start time.

18. The method of claim **16** wherein sending from the master device to the one or more slave devices includes the master device time and the master rendering time to occur at various times so that the one or more slave devices can adjust the rendering of the content as appropriate.

19. The method of claim **16** wherein the content is sent from different sources to the master device and the slave devices.

20. The method of claim **19** including receiving a rendering time adjustment that indicates the difference in a master rendering time and the slave rendering time of content that is to be synchronized.

21. The method of claim **20** wherein a user specifies the rendering time adjustment.

22. The method of claim **21** wherein the user specifies the rendering time adjustment by indicating the amount of time the master device and the slave device are out of synchronization.

23. A method for synchronizing rendering of content at devices which are nodes of a network, each device having a device time and a rendering time, the device time of a device being in a time domain of the device, the method comprising:

designating one of the devices as a master device having a master rendering time and the one or more slave devices having a slave rendering time; and for each slave device,

exchanging time domain information between the master and one or more slave devices;

calculating a time domain difference between the master rendering time of the master device and the slave rendering time of the slave device based on a master device time adjusted for a difference in time domains of the slave device and the master device; and

rendering content at the slave device to account for the calculated time domain difference.

24. The method of claim **23** including sending a master device time and the master rendering time to each slave device for use in calculating the time domain difference.

25. The method of claim **24** wherein the master device sends the master device time and the master rendering time to the slave devices.

26. The method of claim **24** wherein each slave device converts the master device time to its time domain.

27. The method of claim **24** wherein the master device converts the master device time to the time domain of a slave device before sending it.

* * * * *

SONOS EXHIBIT 1001

IPR of U.S. Pat. No. 7,391,791

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 7,391,791 B2                         Page 1 of 1
APPLICATION NO.  : 10/322335
DATED            : June 24, 2008
INVENTOR(S)     : Edward Balassanian et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:


On the Title Page

Column 1, item (75) Inventors, please insert -- Guy A. Carpenter, Brisbane (AU) --


Signed and Sealed this
Thirtieth Day of August, 2022

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

**Appx174**    Implicit Exhibit 2097 - Page 1 of 1
Sonos v. Implicit - IPR2018-00766



US008942252B2

## (12) United States Patent
### Balassanian et al.

(10) Patent No.: **US 8,942,252 B2**
(45) Date of Patent: **Jan. 27, 2015**

(54) **METHOD AND SYSTEM SYNCHRONIZATION OF CONTENT RENDERING**

(71) Applicant: **Implicit Networks, Inc.**, Bellevue, WA (US)

(72) Inventors: **Edward Balassanian**, Bellevue, WA (US); **Scott W. Bradley**, Kirkland, WA (US)

(73) Assignee: **Implicit, LLC**, Seattle, WA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/850,260**

(22) Filed: **Mar. 25, 2013**

(65) **Prior Publication Data**

US 2013/0290461 A1    Oct. 31, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/710,146, filed on Feb. 22, 2010, now Pat. No. 8,406,257, which is a continuation of application No. 11/933,194, filed on Oct. 31, 2007, now abandoned, which is a continuation

(Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *H04L 12/28* | (2006.01) |
| *H04L 12/24* | (2006.01) |
| *G06F 17/30* | (2006.01) |
| *H04N 5/765* | (2006.01) |
| *H04N 5/775* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *H04L 41/04* (2013.01); *G06F 17/30056* (2013.01); *H04N 5/765* (2013.01); *H04N 5/775* (2013.01)

USPC .......................................................... **370/431**

(58) **Field of Classification Search**
CPC .................................................. H04L 2007/04
USPC ......... 370/431, 432, 464, 498, 503, 507–521; 709/219, 231–237, 248
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,569,042 | A | 2/1986 | Larson |
| 5,333,299 | A | 7/1994 | Koval et al. |

(Continued)

OTHER PUBLICATIONS

Mills, RFC 778—DCNET Internet Clock Service, RFC, Apr. 1981, pp. 1-5.

(Continued)

*Primary Examiner* — Dmitry H Levitan

(57) **ABSTRACT**

A method and system for synchronizing the rendering of content at various rendering devices. Each rendering device has a device time and a rendering time. The synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices. Each slave rendering device adjusts the rendering of its content to keep it in synchronization with the rendering of the content at the master rendering device. The master rendering device sends a message with its rendering time and corresponding device time to the slave rendering devices. Each slave rendering device, upon receiving the message from the master rendering device, determines whether it is synchronized with the master rendering time. If not, the slave rendering device adjusts the rendering of its content to compensate for the difference between the master rendering time and the slave rendering time.

**17 Claims, 10 Drawing Sheets**

Table Domain Table                    300

| | 301 | 302 | 303 | 304 | 305 | 306 |
|---|---|---|---|---|---|---|
| | Node ID | ST 1 | RT 1 | ST 2 | RT 2 | Diff |
| 307 | 101 | 2000 | 1010 | 1015 | 2025 | 1000 |
| 308 | 102 | 2000 | 2510 | 2600 | 2120 | -495 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### Related U.S. Application Data

of application No. 10/322,335, filed on Dec. 17, 2002, now Pat. No. 7,391,791.

(60) Provisional application No. 60/341,574, filed on Dec. 17, 2001.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,452,435 | A | 9/1995 | Malouf et al. |
| 5,487,167 | A | 1/1996 | Dinallo et al. |
| 5,530,859 | A | 6/1996 | Tobias, II et al. |
| 5,553,222 | A | 9/1996 | Milne et al. |
| 5,602,992 | A | 2/1997 | Danneels |
| 5,623,483 | A | 4/1997 | Agrawal et al. |
| 5,815,689 | A | 9/1998 | Shaw et al. |
| 5,909,431 | A | 6/1999 | Kuthyar et al. |
| 6,009,457 | A | 12/1999 | Moller |
| 6,622,171 | B2 | 9/2003 | Gupta et al. |
| 6,643,612 | B1 | 11/2003 | Lahat et al. |
| 6,763,374 | B1 | 7/2004 | Levi et al. |
| 6,766,407 | B1 * | 7/2004 | Lisitsa et al. .................. 710/316 |
| 6,859,460 | B1 | 2/2005 | Chen |
| 6,934,759 | B2 | 8/2005 | Hejna, Jr. |
| 6,985,966 | B1 | 1/2006 | Gupta et al. |
| 7,096,271 | B1 | 8/2006 | Omoigui et al. |
| 7,391,791 | B2 | 6/2008 | Balassanian et al. |
| 7,756,032 | B2 | 7/2010 | Feick et al. |
| 2002/0031196 | A1 | 3/2002 | Muller et al. |

OTHER PUBLICATIONS

Postel, RFC 792—Internet Control Message Protocol, RFC, Sep. 1981, pp. 1-16.

* cited by examiner

SONOS EXHIBIT 1001

IPR of U.S. Pat. No. 8,942,252



Fig. 1

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252



*FIG. 2*

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252

Table Domain Table  300

| | 301<br>Node ID | 302<br>ST 1 | 303<br>RT 1 | 304<br>ST 2 | 305<br>RT 2 | 306<br>Diff |
|---|---|---|---|---|---|---|
| 307 | 101 | 2000 | 1010 | 1015 | 2025 | 1000 |
| 308 | 102 | 2000 | 2510 | 2600 | 2120 | -495 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Fig. 3

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252



Fig. 4

Appx180      SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252



Fig. 5

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252



Fig. 6

**SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 8,942,252**



*FIG. 7*

**SONOS EXHIBIT 1001**

**IPR of U.S. Pat. No. 8,942,252**



Fig. 8

**SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 8,942,252**

**U.S. Patent**    Jan. 27, 2015    Sheet 9 of 10    US 8,942,252 B2



*FIG. 9*

**PAGE 11 OF 17**    Appx185

**SONOS EXHIBIT 1001**
**IPR of U.S. Pat. No. 8,942,252**



Receive
rendering time
msg

1001

Extract master
device time

1002

Extract master
render time

1003

Convert master
device time to TD

1004

Master start time =
Master device time -
Master rendering time

1005

Slave start time =
Slave device time -
Slave rendering time

1006

Timediff =
Master start time -
Slave start time

Return

Fig. 10

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252

# METHOD AND SYSTEM SYNCHRONIZATION OF CONTENT RENDERING

## PRIORITY CLAIM

This application is a continuation of U.S. application Ser. No. 12/710,146, filed Feb. 22, 2010, which is a continuation of U.S. application Ser. No. 11/933,194, filed Oct. 31, 2007, now abandoned, which is a continuation of U.S. application Ser. No. 10/322,335, filed Dec. 17, 2002, now U.S. Pat. No. 7,391,791, which claims the benefit of U.S. Provisional Application No. 60/341,574, filed Dec. 17, 2001.

## TECHNICAL FIELD

The described technology relates to rendering of content at multiple rendering devices in a synchronized manner.

## BACKGROUND

Multimedia presentations that are presented on different rendering devices (e.g., video display and stereo system) typically require that the different content of the presentation be rendered in a synchronized manner. For example, a multimedia presentation may include video, audio, and text content that should be rendered in a synchronized manner. The audio and text content may correspond to the dialogue of the video. Thus, the audio and text contents need to be rendered in a synchronized manner with the video content. Typically, the content of a multimedia presentation is stored at a single location, such as on a disk drive of a source device. To render the presentation, the source device retrieves each different type of content and sends it to the appropriate rendering device to effect the multimedia presentation. The source device then sends the content to the rendering devices in sufficient time so that the rendering devices can receive and render the content in a timely manner.

Various rendering devices, however, may have different time domains that make the rendering of the multimedia presentation in a synchronized manner difficult. For example, video and audio rendering devices may have system clocks that operate at slightly different frequencies. As a result, the video and audio content will gradually appear to the person viewing the presentation to be out of synchronization. The rendering of content in a synchronized manner is made even more difficult because some rendering devices may have multiple time domains. For example, an audio rendering device may have a system clock and a clock on a digital signal processing ("DSP") interface card. In such a case, the combination of clocks may result in the presentation becoming even more quickly out of synchronization.

It would be desirable to have the technique that would facilitate the rendering of the multimedia presentation in a synchronized manner.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram illustrating synchronization of rendering devices in one embodiment.

FIG. 2 is a diagram illustrating the calculation of the time domain differential between two devices.

FIG. 3 illustrates a time domain table for a rendering device in one embodiment.

FIG. 4 illustrates a block diagram of another embodiment of the synchronization system.

FIG. 5 is a block diagram illustrating components of a content rendering device in one embodiment.

FIG. 6 is a flow diagram illustrating the processing of the send time domain message component in one embodiment.

FIG. 7 is a flow diagram of the receive time domain message component in one embodiment.

FIG. 8 is a flow diagram illustrating the render content component in one embodiment.

FIG. 9 is a flow diagram illustrating the process of the send rendering time message component in one embodiment.

FIG. 10 is a block diagram illustrating the processing of the receive rendering time message component in one embodiment.

## DETAILED DESCRIPTION

A method and system for synchronizing the rendering of content at various rendering devices is provided. In one embodiment, each rendering device has a device time and a rendering time. The device time is the time as indicated by a designated clock (e.g., system clock) of the rendering device. The rendering time is the time represented by the amount of content that has been rendered by that rendering device. For example, if a rendering device is displaying 30 frames of video per second, then the rendering time will be 15 seconds after 450 frames are displayed. The rendering time of content at a rendering device has a "corresponding" device time, which is the device time at which the rendering time occurred. For example, the rendering time of 15 seconds may have a corresponding device time of 30 minutes and 15 seconds when the rendering device initialized 30 minutes before the start of rendering the video. To help ensure synchronization of rendering devices, the synchronization system designates one of the rendering devices as a master rendering device and designates all other rendering devices as slave rendering devices. Each slave rendering device adjusts the rendering of its content to keep it in synchronization with the rendering of the content at the master rendering device. The master rendering device sends a message with its rendering time and corresponding device time to the slave rendering devices. Each slave rendering device, upon receiving the message from the master rendering device, determines whether it is synchronized with the master rendering time. If not, the slave rendering device adjusts the rendering of its content to compensate for the difference between the master rendering time and the slave rendering time. A slave rendering device can determine the amount it is out of synchronization by comparing its slave rendering time at a certain slave device time to the master rendering time at that same device time. Alternatively, the amount can be determined by comparing its slave device time at a certain rendering time to the master device time at that same rendering time. In another embodiment, the synchronization system can define a default rendering time for the synchronization. In such a case, the master rendering device need only include its effective device time that corresponds to the default rendering time in the message that is sent to the slave rendering devices. For example, the default rendering time might be the rendering time of zero. In such a case, the master rendering device can subtract its current rendering time from its current device time to give its effective device time at rendering time zero. A slave rendering device, knowing the default rendering time, can determine whether it is synchronized and the variation in rendering time between the master rendering device and the slave rendering device.

In one embodiment, the synchronization system allows for two sources of content to be synchronized even though the

PAGE 13 OF 17

SONOS EXHIBIT 1001

IPR of U.S. Pat. No. 8,942,252

rendering times of the sources are not themselves synchronized. For example, two separate sources may be video transmitted via satellite and audio transmitted via land telephone lines. If audio is being transmitted and then a few seconds later the corresponding video starts to be transmitted, then the rendering times of zero for the audio and video will not correspond to a synchronized state. For example, the video at the video rendering time of zero should be rendered at the same time as the audio with the audio rendering time of five is rendered. This difference in rendering times is referred to as source offset. In addition, the difference in the propagation delay resulting from the different transmission paths of the video and audio may be variable and thus contribute to a variation in synchronization that is variable and is not known in advance.

To account for this lack of synchronization, the synchronization system allows a user (e.g., the person viewing the content) to manually account for the variation. For example, if the video and audio are rendered via a personal computer, the synchronization system may display a dial or a slider on a user interface that the user can adjust to indicate the difference in the rendering times. If the video is rendered five seconds after the corresponding audio, then the user can indicate via the user interface that the offset is five seconds. In such a case, the synchronization system may use the offset to adjust the rendering time of the audio so that the audio associated with the adjusted audio rendering time should be rendered at the same time as the video content with the same video rendering time. The synchronization system could buffer the audio to account for the offset.

The synchronization system in one embodiment factors in the differences in the time domains of the various rendering devices when evaluating synchronization. The rendering devices exchange device time information so that the rendering devices can account for the differences in the time domains of the other rendering devices. Each rendering device may send to the other rendering devices a time domain message that includes its current device time (i.e., send time) along with the time it received the last time domain message {i.e., receive time) from each of the other rendering devices and the send time of that last time domain message. When a rendering device receives such a time domain message, it calculates the time differential between its time domain and the time domain of the sending rendering device. In one embodiment, the synchronization system calculates the time domain differential by combining the difference in send and receive times for the last messages sent to and received from another device in a way that helps factor out the transmission time of the messages. A slave rendering device can then use this time domain differential to convert the master device time to the time domain of the slave when synchronizing the rendering of content. In one embodiment, each rendering device broadcasts at various times its time domain message. The time domain message includes a received time for a message received for each of the other rendering devices. Each rendering device receives the broadcast time domain message. The receiving rendering device can then calculate its time domain differential with the broadcasting rendering device. In this way, time domain differentials can be determined on a peer-to-peer basis without the need for a master device to keep a master time and by broadcasting the time domain messages, rather than sending separate time domain messages for each pair of devices.

FIG. 1 is a block diagram illustrating synchronization of rendering devices in one embodiment. The source device 101 distributes the content of a presentation to the video rendering device 102, the audio rendering device 103 and the text rendering device 104 via communications link 105. The source device may have the multimedia presentation stored locally, for example, on a disk drive, may dynamically generate the multimedia presentation, may receive content of the multimedia presentation from other sources, and so on. A multimedia presentation is any presentation that includes different content that is to be rendered in a synchronized manner. For example, the content could be video and audio content for a virtual ride in a theme park along with motion content to control the ride. As another example, the presentation may include light content that controls the display of a laser to be synchronized with audio content. Also, the "synchronization" of content may be different for different rendering devices. For example, audio content may be sent to multiple audio rendering devices with the expectation that some of the audio rendering devices may delay rendering for a certain period (e.g., 10 milliseconds) to achieve a desired audio effect. In such a case, the rendering is considered synchronized when the delay equals that period. The synchronization system designates one of the rendering devices as the master rendering device. In this example, the audio rendering device 103 is designated as the master rendering device, and the video rendering device 102 and text rendering device 104 are designated as slave rendering devices. After the source starts sending the content to the rendering devices, the audio rendering device broadcasts a master rendering time message with its master device time and master rendering time to the slave rendering devices on a periodic basis. In this example, since the communications link is point-to-point from the source device, the audio rendering device sends the message to the source device, which in turn forwards the message to the slave rendering devices. Upon receiving the master rendering time message, the slave rendering devices convert the master device time to their own time domains and then calculate the difference between their slave rendering time and the master rendering time at a certain point in time. In one embodiment, the synchronization system uses a device time at a calculated start of sending as the point in time. The slave rendering devices then adjusts the rendering as appropriate to compensate for the difference. The rendering device adjusts the rendering of their content in ways that are appropriate for their content. For example, if the video rendering device was one second behind the master audio rendering device, then it might skip the display of every other frame for the next two seconds to "speed up" to the master audio rendering device. Alternately, if the video rendering device was one second ahead of the master audio rendering device, then the video rendering device might display each of the next 30 frames twice to "slow down" to the master audio rendering device.

FIG. 2 is a diagram illustrating the calculation of the time domain differential between two devices. Device 1 initially sends to device 2 a time domain message 301 that includes its current device time, referred to as "sendtime1." When device 2 receives the time domain message, it stores the sendtime1 along with the time it received the time domain message, referred to as "receivetime1." Device 2 then sends to device 1 a time domain message 302 that includes its device time, referred to as "sendtime2," along with sendtime1 and receivetime1. When device 1 receives the time domain message, it stores sendtime1, receivetime1, and sendtime2 along with its device time, referred to as "receivetime2." Device 1 now has enough information to calculate the time domain differential according to the following formula:

$$\text{Diff}=((RT1-ST1)+(ST2-RT2))/2$$

where Diff is the time domain differential, RT is receive time, and ST is send time. Device 1 then sends a time domain

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252

message **303** to device 2 that includes its device time, referred to as "sendtime3" along with sendtime2 and receivetime2. When device 2 receives the time domain message, it stores sendtime2, receivetime2, and sendtime3 along with its device time, referred to as "receivetime3." Device 2 now has enough information to calculate the time differential according to a similar formula.

This formula calculates the difference between the send time and the receive time for time domain messages between the two devices. If there was no variation in the time domains between the devices, then the send and receive times would reflect the communications link latency between sending and receiving the time domain messages. In one embodiment, the synchronization system assumes that the latency in transmitting a message from one device to another device is approximately the same as the latency in transmitting the message from the other device to the device. Thus, the synchronization system calculates the time domain difference by taking the average of the differences in the send and receive times of the messages. The receive time of the messages is represented by the following equations:

$$RT1 = ST1 + Diff + L$$

$$RT2 = ST2 - Diff + L$$

where Diff represents the time domain differential and L represents the latency of the communications link. These equations are equivalent to the following equations:

$$Diff = RT1 - ST1 - L$$

$$Diff = ST2 - RT2 + L$$

The average of these two equations is

$$Diff = (\{RT1 - ST1 - L\} + (ST2 - RT2 + L))/2$$

The latency factors out of the equation to give the following equation:

$$Diff = ((RT1 - ST1) + (ST2 - RT2))/2$$

FIG. **3** illustrates a time domain table for a rendering device in one embodiment. The time domain table of a device includes a row for each other device to which the device is connected. For example, the audio rendering device **103** of FIG. **1** would have a row for the source device **101**, the video rendering device **102**, and the text rendering device **104**. In this example, the time domain table includes a node identifier column **301**, a sendtime1 column **302**, a receivetime1 column **303**, a sendtime2 column **304**, a receivetime2 column **305**, and a time domain differential column **306**. A positive time domain differential indicates the number of time units that this device is ahead of the other device, and a negative time domain differential indicates the number of time units that this device is behind the other device. Thus, in this example, the device time of the audio rendering device **103** is ahead of the device time of the source device **101** by 1000 time units. In contrast, the device time of the audio rendering device **103** is behind the device time of the video rendering device **102** by 495 time units. One skilled in the art will appreciate the time units can be any units appropriate to the desired synchronization accuracy, such as milliseconds, microseconds, and so on. One skilled in the art will appreciate the time domain messages need not include the times set by the receiving device. For example, the time domain message **302** need not include sendtime1 since device 1 could have stored that time locally.

FIG. **4** illustrates a block diagram of another embodiment of the synchronization system. In this example, the source device **400** performs the function of the master, and the video rendering device **401**, the audio rendering device **402**, and the text rendering device **403** are slaves. In particular, the source device, even though it does no rendering itself, may keep track of an idealized rendering time that may not correspond to the actual rendering time of any of the rendering devices. In such a situation, the master source device periodically sends a rendering time message that includes its device time along with the corresponding idealized rendering time to each of the rendering devices. The rendering devices can then adjust their rendering in the same manner as if the rendering time message is sent from a master rendering device. Alternatively, each rendering device can provide their device time and corresponding rendering time to the source device. The source device can then calculate the rendering time differential for each rendering device and provide that differential to the rendering devices to speed up or slow down their rendering as appropriate.

FIG. **5** is a block diagram illustrating components of a content rendering device in one embodiment. The content rendering device **500** includes a receive content component **501**, a render content component **502**, a send time domain message component **503**, a receive time domain message component **504**, a time domain table **505**, a send rendering time message component **506**, and a receive rendering time message component **507**. The receive content component receives content from the source device and may store the content in a buffer for subsequent rendering. The rendering content component retrieves the buffered content and effects the rendering of the content. The send time domain message component sends time domain messages to the other devices. The send time domain message component may send the message upon occurrence of an event, such as when a timer expires, when a message is received, and so on. One skilled in the art will appreciate that the frequency of sending time domain messages can be adjusted to account for the anticipated drift between clocks of the rendering devices. The receive time domain message component receives the time domain messages sent by other devices and updates the time domain table as appropriate. The send rendering time message component is used when this content rendering device is a master rendering device to send a rendering time message to the other rendering devices. The receive rendering time message component receives the rendering time messages sent by the master device and calculates a rendering time differential that is used to adjust the rendering of the content. The devices may include a central processing unit, memory, input devices (e.g., keyboard and pointing devices), output devices (e.g., display devices), and storage devices (e.g., disk drives). The memory and storage devices are computer-readable media that may contain instructions that implement the synchronization system. In addition, data structures and message structures may be stored or transmitted via a data transmission medium, such as a signal on a communications link. Various communications links may be used, such as the Internet, a local area network, a wide area network, or a point-to-point dial-up connection.

FIG. **6** is a flow diagram illustrating the processing of the send time domain message component in one embodiment. In block **601**, the component adds the identifier of this device to the time domain message. In block **602**, the component adds the send time to the message. The send time is the current device time. In blocks **603-607**, the component loops selecting each other device and adding times for that device to the time domain message then loops to block **603** to select the next device. In block **608**, the component sends the time domain message to the other devices and then completes.

**SONOS EXHIBIT 1001**

**IPR of U.S. Pat. No. 8,942,252**

7

FIG. **7** is a flow diagram of the receive time domain message component in one embodiment. In decision block **701**, if the identifier of this device is in the list of device identifiers in the message, then the component continues at block **702**, else the component completes. In block **702**, the component retrieves the current send time from the message and saves it in the time domain table. In block **703**, the component retrieves the last send time from the message and saves it in the time domain table. In block **704**, the component retrieves the last receive time from the message and saves it in the time domain table. In block **705**, the component retrieves the device time as the current receive time and saves it in the time domain table. The time values may be saved by storing them in the time domain table in the row associated with the device that sent the message. In block **706**, the component calculates the time domain differential. In block **707**, the component smoothes the time domain differential. The time domain differential can be smoothed using various techniques such as averaging the last several time domain differentials using a decaying function to limit the impact of the oldest time domain differentials. In one embodiment, the synchronization system saves the values of the last eight pairs of time domain differentials (i.e., ST2–RT2 and RT1–ST1) and uses the average of the minimum value of the set of eight larger differentials and the maximum value of the set of eight smaller differentials as the time domain differential. The component then completes.

FIG. **8** is a flow diagram illustrating the render content component in one embodiment. In blocks **801-806**, the component loops processing each block of content that is received from the source device. In block **801**, the component selects the next block of content provided by the source device. The content may be buffered at this rendering device. In decision block **802**, if all the blocks of content have already been selected, then the component completes, else the component continues at block **803**. In decision block **803**, if the rendering time differential is 0, then the component continues at block **806**, else the component continues at block **804**. The rendering time differential is calculated by the receive rendering time message component and adjusted by this component as the rendering of the content is adjusted. In block **804**, the component adjusts the selected block to account for the rendering time differential. For example, if the content corresponds to video information, then the component may remove frames to effectively speed up the rendering or may duplicate frames to effectively slow down the rendering. In block **805**, the component adjusts the rendering time differential to account for the adjustments to the selected block. For example, if the block corresponds to one second of video information and the adjustment was to duplicate every frame in the block, then the rendering time differential is adjusted by subtracting one second. The rendering time continues to reflect the amount of the content that has been effectively rendered. For example, if every frame is duplicated in a one second interval resulting in two seconds of adjusted content, the rendering time would only be increased by one second. In block **806**, the component outputs the selected block, either adjusted or unadjusted to effect the rendering of that block of content. The component then loops to **801** to select the next block of content.

FIG. **9** is a flow diagram illustrating the process of the send rendering time message component in one embodiment. The component can be executed upon the occurrence of various events, such as when a timer expires. In block **901**, the component adds the rendering time of this master device to the message. In block **902**, the component retrieves the device time for this master device. In block **903**, the component adds

8

the device time to the message. In block **904**, the component then broadcasts the message to the other rendering devices and then completes.

FIG. **10** is a block diagram illustrating the processing of the receive rendering time message component in one embodiment. In block **1001**, the component extracts the master device time from the message. In block **1002**, the component extracts the master rendering time from the message. In block **1003**, the component converts the master device time to the time domain of this device. In block **1004**, the component calculates the master start time by subtracting the master rendering time from the converted master device time. The master start time is in the time domain of this device and represents the time at which the master device effectively started rendering its content. In block **1005**, the component calculates the slave start time of this device by subtracting the slave rendering time from the current slave device time. The slave start time indicates the time at which this slave device started rendering its content. In block **1006**, the component calculates the rendering time differential by subtracting the slave start time from the master start time. The component then completes.

From the foregoing, it will be appreciated that specific embodiments of the invention have been described herein for purposes of illustration, but that various modifications may be made without deviating from the spirit and scope of the invention. The rendering devices can be components of the same physical device. For example, a DVD player may have a component that processes the video content and a separate component that processes the audio. The hardware and software of these components may result in a difference in rendering speed of the content, and thus the rendering can become out of synchronization over time. Accordingly, the invention is not limited except as by the appended claims.

We claim:

1. A method, comprising:
   a master rendering device rendering a first content stream; and
   sending, from the master rendering device to a first one of a plurality of slave devices, a plurality of master rendering times indicative of statuses of the rendering the first content stream at the master rendering device at different times;
   wherein the first slave device is configured to smooth a rendering time differential that exists between the master rendering device and the first slave device in order to render a second content stream at the first slave device synchronously with the rendering of the first content stream at the master rendering device, wherein smoothing the rendering time differential includes calculations using the plurality of master rendering times.

2. The method of claim **1**, wherein one of the plurality of master rendering times includes a master device time at which the master rendering device renders content.

3. The method of claim **1**, wherein sending the plurality of master rendering times comprises sending a series of transmissions to the first slave device, each one of the series of transmissions being at a different time.

4. The method of claim **1**, wherein the master device time corresponds to a default rendering time.

5. The method of claim **1**, wherein the smoothing includes:
   calculating an average difference between the master rendering times and a plurality of first slave device rendering times.

**SONOS EXHIBIT 1001**

**IPR of U.S. Pat. No. 8,942,252**

9

10

6. The method of claim **1**, wherein the smoothing is based on a weighted average of differences between the master rendering times and a plurality of first slave device rendering times.

7. The method of claim **1**, wherein the first content stream and second content stream are sent from a single source device to the master rendering device and the first slave device, respectively.

8. The method of claim **1**, wherein the first content stream is sent from a first source device to the master rendering device and the second content stream is sent to the first slave device from a difference source device.

9. The method of claim **8**, wherein a first latency for a first communication link between the first source device and the master rendering device is different than a second latency for a second communication link between the different source device and the first slave device, and wherein the smoothing includes calculations using the first latency and second latency.

10. The method of claim **9**, wherein the first and second communication links are different types of communication links.

11. A method, comprising:

receiving, at a slave device, a particular content stream;

receiving, at the slave device from a master rendering device, a plurality of master rendering times indicative of status of rendering a different content stream at the master rendering device;

the slave device determining a smoothed rendering time differential that exists between the master rendering device and the slave device, wherein the determining is based on calculations using the plurality of master rendering times and a plurality of slave rendering times corresponding to rendering the particular content stream at the slave device; and

based on the smoothed rendering time differential, the slave device rendering the particular content stream synchronously with the master rendering device rendering the different content stream.

12. The method of claim **11**, wherein the plurality of master rendering times are received at the slave device via a source device.

13. The method of claim **11**, wherein determining the smoothed rendering time differential comprises averaging a plurality of differences between the plurality of master rendering times and the plurality of slave rendering times.

14. The method of claim **13**, wherein the averaging is a weighted averaging that gives greater weight to times that are more recent than older times.

15. The method of claim **11**, wherein the particular content stream is a video stream and the different content stream is an audio stream.

16. The method of claim **11**, wherein the slave device rendering the particular content stream synchronously comprises the slave device rendering the particular content stream within a particular time variance.

17. The method of claim, **11** wherein the master rendering device and the slave device are part of a same system.

* * * * *

SONOS EXHIBIT 1001
IPR of U.S. Pat. No. 8,942,252

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 8,942,252 B2                                      Page 1 of 1
APPLICATION NO.  : 13/850260
DATED              : January 27, 2015
INVENTOR(S)      : Edward Balassanian et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the Title Page

Column 1, item (72) Inventors, please insert -- Guy A. Carpenter, Brisbane (AU) --

Signed and Sealed this
Ninth Day of August, 2022

*Katherine Kelly Vidal*

Katherine Kelly Vidal
*Director of the United States Patent and Trademark Office*

Implicit Exhibit 2097 - Page 1 of 1
Sonos v. Implicit - IPR2018-00767

Appx192

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2020-1173, -1174

**Short Case Caption:** Implicit, LLC v. Sonos, Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes _10,501_ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _06/13/2024_

Signature: _/s/ J. Derek McCorquindale_

Name: _J. Derek McCorquindale_